IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
--------------------------------------------X
DARREN JOHNSON,                             :
                   Plaintiff               :
                                           :
        v.                                 :
                                           :  BRUCE W. KAUFFMAN, J.
                                           :
DOCTOR STEMPLER,                           :
DOCTOR DENNIS MOYER,                       :
COMMISSIONER MARTIN HORN,                  :  Case Number: 00-CV-711
PRISON HEALTH SERVICES, INC.,              :  CIVIL ACTION
CORRECTIONAL PHYSICIAN SERVICES, INC.,     :
                   Defendants              :
--------------------------------------------X
```

*This is the 3rd Amended Complaint*

## PLAINTIFF'S SECOND AMENDED
## MEDICAL MALPRACTICE COMPLAINT

Plaintiff Darren Johnson, pro se, for his second amended complaint pursuant to 28 U.S.C.§1983 against Doctor Stempler, Doctor Dennis Moyer, Commissioner Martin Horn, Prison Health Services, INC., Correctional Physician Services, INC., alleges as follows:

### JURISDICTION AND VENUE

This action is brought pursuant to the Eighth and Fourteenth Amendments of the United States Constitution and the torts of negligence, medical malpractice. This court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and the aforementioned constitutional provisions. This court also has jurisdiction over Plaintiff's PENDENT State Claims pursuant to 28 U.S.C. §1367.

2.      Venue properly lies in this District pursuant to 28 U.S.C. §1391(b)(2), because the events giving rise to this cause of action occurred at the Department of Corrections (hereinafter "DOC")facility, which is the State Correctional Institute at Graterford, (hereinafter "SCI-Graterford" or "Graterford"), in Graterford, PA, which is located within the Eastern District of Pennsylvania.

DEFENDANT'S EXHIBIT A

## PARTIES

3. Plaintiff Darren Johnson( hereinafter "Johnson") is and was, at all times relevant hereto, a prisoner in the custody of the Department of Corrections (DOC). At the time of the events relevant hereto, Johnson was incarcerated at SCI-Graterford.

4. Defendant Doctor Stempler(hereinafter "Stempler") was, at all times relevant hereto, a physician employed or retained by CPS or PCS to provide medical services at the DOC facility, which is SCI-Graterford. He is sued in his individual capacity.

5. Defendant Doctor Dennis Moyer(hereinafter "Moyer"), was at all times relevant hereto, a physician employed or retained by either CPS or PHS to provide medical services at the DOC facility which is SCI-Graterford. He is sued in his individual capacity.

6. Defendant Commissioner Martin Horn(hereinafter "Horn") was, at all times relevant hereto, Commissioner of the DOC, and SCI-Graterford. He is sued in his individual capacity.

7. Defendant Prison Health Services, INC.(hereinafter "PHS")was, at all times relevant hereto, had a contract to provide medical services to inmates at SCI-Graterford. They are sued in their official capacity.

8. Defendant Correctional Physician Services, INC.(hereinafter "CPS"), was, at all times relevant hereto, had a contract to provide medical services to inmates at SCI-Graterford. They are sued in their official capacity.

   All defendants have acted, and continue to act under color of state law at all times relevant to this complaint.

## FACTS

9.      On June 9, 1999, Johnson went to the main yard and while playing volleyball, injured his right knee.

10.     Johnson was taken to the Institution's dispensary at approximately 1800 hours and was issued an ice pack and motrin. He was told to sign up for sick call for an x-ray and diagnosis.

11.     On June 10, 1999, Johnson went to sick call and received a 5 day medical lay-in and issued a pair of crutches.

12.     On June 12, 1999, Johnson received a pass to report to the dispensary.  Plaintiff's right knee was then x-rayed.

13.     On June 14, 1999, Johnson signed up for sick call because the swelling was still present in his right knee.   It is the custom of the Medical Department that Sick Call passes be placed in a box on the middle of the block the night before.   Johnson had to get someone to place the request in the box and wait until the next morning.  He experienced sleepless nights.

14.     On June 15, 1999, Johnson went to sick call and spoke to Defendant Doctor Dennis Moyer, a defendant selected and retained by either CPS or PHS. who issued plaintiff a pass for the dispensary for 1400 hours to receive a knee tap.

15.     At approximately 1400 hours, Johnson arrived at the dispensary.  Defendant Doctor Dennis Moyer gave Johnson a knee tap without novocaine or any other local anestesia.

16.     The knee tap related supra was witnessed by a CO Snyder, who was assigned to that area that day.

17.     The performance of the knee tap without any local anestesia caused Johnson extreme and intense pain.   Johnson explained that he was in extreme pain and could not bend his knee because his kneecap was out of place. His knee was out of place, swollen, and painful.   Johnson also explained to the sick call

(2)

nurse that this may be the same thing that has happened to him earlier in his incarceration and showed her the scar on his left knee.

18.     On June 22, 1999, Johnson once again signed up for sick call because he was still experiencing pain and swelling in his right knee.  Johnson obtained another pass to the dispensary to see Doctor Dennis Moyer.

19.     Defendant Doctor Dennis Moyer gave Johnson another knee tap without any local anestesia.  Neither CPS or PHS questioned Doctor Dennis Moyer's actions.

20.     The performance of the second knee tap without any local anestesia caused Johnson extreme and intense pain.

21.     On July 2, 1999, Johnson received a pass to report to the Clinic Office to receive a knee brace.  While there, the Office Secretary, Rose, told Johnson that she was going to call Doctor Baddick because Johnson's "knee didn't look proper".  Doctor Baddick was the Supervising Doctor, either selected or retained by CPS or PHS.

22.     Doctor Baddick arrived in the Examining Room a short while later.  After examining Johnson's right knee, Doctor Baddick stated that something is definitely wrong with Johnson's patella.

23.     Doctor Baddick instructed Johnson to return to the dispensary at 1300.

24.     Johnson returned to the dispensary at 1300 hours.  Doctor Baddick informed Johnson that he was going to tap Johnson's knee.

25.     Doctor Baddick then assembled an assortment of equipment and administering a local anestesia of novocaine, Doctor Baddick also explained to Johnson that "your condition (injury in fact) was submitted to the Medical Departments Review Board (CPS and

(3)

PHS) to be voted on to be taken to an outside hospital, but it was denied, then a Doctor Eugene Pratt tapped Johnson's knee. Upon information and belief, the voting system is a practice used to determine if patients should be taken to outside facilities for medical treatment. Because of this denial to send Johnson to an outside hospital, Defendant's CPS and PHS failed to formulate, adopt, and enforce adequate rules and policies to ensure quality care for inmates at Graterford. Johnson also contends that because of this practice, CPS and PHS, with deliberate indifference to the consequences, maintained a practice of prioritizing inmates, which directly caused his harm in violation of the Eighth Amendment of the U.S. Constitution. On information and belief, this same practice has happened to Gregory Sourbeer, Mike Winters(affidavits submitted with the court), and Timothy Winder BQ-5101.

26.    Johnson experienced no pain as Doctor Pratt performed the knee tap.

27.    On July 9, 1999, Johnson was summoned to the dispensary and issued a knee brace by the Dispensary Secretary Ms. Rose, as well as authorization to wear/possess it for 30 days.

28.    On July 15, Johnson was seen at the Institutions Orthopedic Clinic by Defendant, Dr. Stempler, who told Plaintiff that nothing was wrong with his knee except a raised Patella.

29.    Johnson was told by Defendant Dr. Stempler, who is selected and retained by either CPS or PHS to "just do leg exercises and to take the knee brace off".

30.    On July 15, 1999, Johnson was taken to an outside MRI Center. Shortly thereafter, PHS and CPS received the MRI report that displayed the exact type of injury in fact that Johnson had. But nothing was said to Johnson. Even, assuming that PHS and CPS

(4)

possibly reviewed these reports within a minimum of 72 hours, it could be concluded that PHS and CPS had knowledge that Johnson had a serious injury, and therefore, at the first instance, actual knowledge from the medical records of Johnson, that created the injury in fact. Still, nothing was said to Johnson. Because CPS and PHS knew that Johnson had a serious injury (ruptured patella tendon), for several weeks, without any outside medical treatment.

31.    The Doctor (Doctor Richard Mandel) at Suburban General Hospital informed Johnson that (because) of the (delay) in him being brought to Suburban General Hospital, they would have to operate in his knee and place a wire in his knee. Doctor Mandel then stated "As a matter of fact, I am going to call them (CPS and/or PHS at the institution) right now! At that point, CPS, and PHS had, the second instance, if even assuming, actual knowledge of the procedures that caused harm to Johnson. He then came back and said "Are you ready for the surgery? And the two guards that excorted me their said, "We weren't scheduled to stay". The delay was caused by the failure of Commissioner Martin Horn, CPS and PHS to oversee all persons who practice medicine within its walls as to patient care; and failed to formulate, adopt, and enforce adequate rules and policies to ensure quality care for inmates(patients). Because no guards were scheduled to stay for the surgery of Johnson, Johnson was brought back to the institution, and nothing else was said to Johnson.

32.    Johnson was informed by a Doctor Richard Mandel, that he may experience pain on occasions after the operation and will not be able to extend or bend his leg fully. This was the same day as indicated in #31.

(5)

33.     Johnson was informed that these conditions would be permanent. Since the filing of the complaint, Johnson does have permanent damage to his injury in fact, right leg. This is the same day as indicated in #31.

34.     On July 30, 1999, Johnson went to the Institution's dispensary because of the pain in his right knee. Johnson was issued a prescription for Motrin by the dispensary nurse Ms. Carnes.

35.     Nurse Carnes charged Johnson $2.00 for the Motrin and another $2.00 for the visit to the dispensary for a total of $4.00.

36.     On September 17, 1999, 100 days later, Johnson went to the Mercy Suburban Hospital in Norristown, PA to have reconstructive surgery performed on his right knee which required 1 day of outside medical treatment. Because of the misdiagnosis and malpractice caused by Doctors Moyer and Stempler. Delays in scheduling, follow-up examinations, emergency medical treatment processing to an outside hospital were also delayed. PHS, CPS and Commissioner Martin Horn had subjective knowledge and their practice were deliberately indifferent to Johnson in violation of the Eighth Amendment of the U.S. Constitution.

37.     On November 23, 1999, Edna Rice, Physical Therapist had Johnson use weights to try and strengthen his knee.

38.     When Johnson returned to his physical therapy sessions on December 1, 1999, he explained to the physical therapist that he was experiencing pain on the left side of his knee.

39.     On January 4, 2000, the Physical Therapist, Edna Rice, took back the cane Johnson had been using notwithstanding the fact that he still needs it.

43.      Soon after, Johnson filed administrative grievances all the way to Final Review.


## CAUSE OF ACTION

### COUNT I.      CRUEL AND UNUSUAL PUNISHMENT AGAINST
### DEFENDANTS DOCTORS DENNIS MOYER, AND DOCTOR STEMPLER

44.      Johnson incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

45.      Defendants Doctor Dennis Moyer and Doctor Stempler were both deliberately indifferent to Johnson's serious medical need in violation of the Eighth Amendment of the U.S. Constitution.

46.      Defendants, Doctor Moyer and Doctor Norman Stempler both knew of the obvious danger to Johnson if his condition remained untreated, yet they failed to treat his condition in a timely manner.

47.      As a result of their actions and omissions, Defendants Doctor Dennis Moyer and Doctor Stempler committed medical malpractice       under       the       State       Tort       claim       of


### COUNT II. CRUEL AND UNUSUAL PUNISHMENT AGAINST DEFENDANTS
### MARTIN HORN, PRISON HEALTH SERVICES, INC,
### AND CORRECTIONAL PHYSICIAN SERVICES, INC.

48.      Johnson incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

49.      Defendants, Martin Horn, Prison Health Services, Inc., and Correctional Physician Services, Inc.    were deliberately indifferent to Johnson in violation of the Eighth Amendment to the U.S. Constitution.

( 8 )

**DEFENDANT MARTIN HORN**

50.   The failure of Defendant Martin Horn to take disciplinary or other actions to curb the known pattern and practice of medical malpractice and delays in treatment constituted deliberate indifference, and contributed to and proximately caused the above described violation of Eighth Amendment rights and Medical Malpractice.

51.   The failure of Defendant Martin Horn to act on prior complaints of Doctors Dennis Moyer, Doctor Stempler, PHS, and CPS, which he knew of or reasonable should have known that a practice and pattern of medical malpractice on inmates at SCI-Graterford has emerged, constitutes deliberate indifference and contributed to and proximately caused the above violation of the Eighth Amendment of the U.S. Constitution.

**PHS AND CPS**

52.   Johnson incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

53.   The failure of PHS and CPS, after two seperate occasions of notification, that Johnson had a serious medical need, established and maintained a practice which directly caused Johnson to have permanent damage to his right leg, were deliberately indifferent to Johnson in violation of the Eighth Amendment of the U.S. Constitution.

**COUNT III.   MEDICAL MALPRACTICE AGAINST DEFENDANTS**

**DOCTORS DENNIS MOYER AND DOCTOR STEMPLER**

54.   Johnson incorporates by reference the allegations in the preceding paragraphs as if fully set herein.

55.   Defendants Doctors Moyer and Stempler rendered treatment which fell below the standard of medical practice in the community in which they failed to diagnose or TIMELY treat the symptoms related to Johnson's injury.

56.   The failure to diagnose and treat the symptoms related to Johnson's injury caused Johnson to suffer serious and permanent harm.

57.   The failure of Doctors Dennis Moyer and Doctor Stempler to provide Johnson with adequate treatment of his injury in fact constitutes the tort of medical malpractice under the law of
.

58.   The actions and omissions set forth above were willful and malicious and they were performed in wanton disregard for Johnson's health and safety.

COUNT IV.      CORPORATE NEGLIGENCE AGAINST DEFENDANTS
PRISON HEALTH SERVICES, INC., AND
CORRECTIONAL PHYSICIAN SERVICES, INC.

59.   Johnson incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

60.   Defendants Prison Health Services, Inc. and Correctional Physician Services, Inc. are liable to Johnson on a theory of Corporate Negligence in that they failed to select and retain only competent physicians and nurses, which was a breach of duty causing direct liable to Johnson.

61.   Defendants Prison Health Services, Inc. and Correctional Services, Inc. failed to oversee all persons who practice medicine within its walls as to patient care, which was also a breach of duty and are directly liable to Johnson.

(10)

62.    Defendant Prison Health Services, Inc. and Correctional Physician Services, Inc. failed to formulate, adopt, and enforce adequate rules and policies to ensure quality care for patients was also a breach of duty and is therefore liable to Johnson.

63.    The failure of Prison Health Services, Inc. and Correctional Physician Services, Inc, after having actual knowledge on two seperate occasions, of Johnson's injury in fact, and procedures(delays) which created more harm to Johnson constitutes a cause of action under the torts of Corporate Negligence.

64.    The failure of Prison Health Services, Inc. and Correctional Physician Services, Inc to timely treat Johnson's injury in fact, with emergency medical treatment, caused Johnson to require a more extensive surgery, therefore, constitutes a cause of action under the torts of Corporate Negligence.

COUNT V.          INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

65.    Johnson incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

66.    Because of the defendants conduct, Johnson is suffering from psychological and physical injuries for the negligent acts of the defendants.

(11)

COMMONWEALTH OF PENNSYLVANIA )
County of Montgomery          )          SS:

**AFFIDAVIT IN SUPPORT**
**OF PLAINTIFF'S PHYSICAL AND PSYCHOLOGICAL**
**INJURIES**


I, Darren Johnson, plaintiff, hereby declare:

That on July 27, 2001, I went to sick call at SCI-Graterford, complaining of stomach problems. After further investigation, it was concluded that I have a stomach tumor caused by and incurred in military service. When I told the medical department at SCI-Graterford. They informed me that I would have to get minor surgery. I was sent a pass to report to the Dispensary. When I arrived at the dispensary, to at least get further tests to verify at least, if the tumor's extraction would cause me any future problems. When I arrived at one of the rooms to receive the surgery, it was a one, Doctor Dennis Moyer, to perform the task. He explained to me that I didn't need the surgery until I am released from prison. I was kind of relieved because of the fear of being subjected to another malpractice or medical mistake.

No tests were done to inquire if this same tumor that I still have is causing any problems to my stomach. Therefore, I still have the physical injury.


**DECLARATION**

I, Darren Johnson, declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Signed this ___24___ day of March, 2002

## CERTIFICATE OF SERVICE

I, DARREN JOHNSON, pro se plaintiff, hereby certify that I have sent a true and correct copy of the "SECOND AMENDED MEDICAL MALPRACTICE COMPLAINT", by U.S. First Class Regular Mail on this date to the following individuals:

Alan S. Gold, Esq.
Manor Professional Bulding
7837 Old York Road
Elkins Park, PA  19027
ATTORNEY FOR DEFENDANTS
STEMPLER, MOYER, PHS, CPS)

Randall Henzes, Esq.
Attorney General's Office
21 South 12th Street
Philadelphia, PA 19107-3603
ATTORNEY FOR DEFENDANT
(MARTIN HORN)

Respectfully Submitted,

Darren Johnson, pro se Plaintiff

Date: March 24, 2002

DARREN JOHNSON



Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                      - - -
 4   DARREN JOHNSON        : BRUCE W. KAUFFMAN, J.
 5      -vs-              : CASE NO. OO-CV-711
 6   DOCTOR STEMPLER, DOCTOR   : CIVIL ACTION
 7   DENNIS MOYER, COMMISSIONER :
 8   MARTIN HORN, PRISON HEALTH :
 9   SERVICE, INC., CORRECTIONAL :
10   PHYSICIAN SERVICES, INC.   :
11                      - - -
12       Oral deposition of DARREN JOHNSON, was
13   taken pursuant to notice, held at GRATERFORD PRISON,
14   Route 29 & Gravel Hill Road, Graterford,
15   Pennsylvania, commencing at 11:15 a.m., on February
16   5, 2004, before Micheline Brown, Certified Court
17   Reporter and Commissioner of Deeds in the
18   Commonwealth of Pennsylvania, there being present:
19
20                      - - -
21            ZANARAS REPORTING
             REGISTERED PROFESSIONAL REPORTERS
22         1616 Walnut Street, Suite 300
           Philadelphia, Pennsylvania  19103
23            2112 Bay Avenue
           Ocean City, New Jersey  08226
24         (215) 790-7857  1-877-GO-DEPOS
```

Page 2

```
 1   A P P E A R A N C E S:
 2
 3     GOLD, BUCKOVITZ & ROBINS, P.C.
       BY:  ALAN BUCKOVITZ, ESQUIRE
 4     7837 Old York Road
       Elkins Park, Pennsylvania 19027
 5     (215) 635-2000
       Counsel for Defendant, Prison Health Services,
 6     Inc., Correctional Physician Services, Inc.
 7
       NAULTY, SACARICAMAZZA & McDEVITT, LTD.
 8     BY:  DENISE P. MARTINDELL, ESQUIRE
       Suite 1600, One Penn Center at Suburban Station
 9     1617 John F. Kennedy Boulevard
       Philadelphia, Pennsylvania  19103
10     (215) 568-5116
       Counsel for Defendant, Dr. Stempler
11
12
13
14
15
16
17
                      - - -
18
19
20
21
22
23
24
```

DEFENDANT'S EXHIBIT B

Pag[e]

```
 1                  I N D E X
 2
 3   WITNESS:     INTERROGATION BY       PAGE
 4   Darren Johnson
 5        Mr. Buckovitz        5
 6        Ms. Martindell       62
 7
 8                   - - -
 9
10             E X H I B I T S
11
12   EXHIBIT NUMBER      DESCRIPTION      PAGE
13            (NONE MARKED)
14
15
16
17
18
19                 - - -
20
21
22
23
24
```

Page 4

```
 1         LITIGATION SUPPORT INDEX
 2
 3
 4     DIRECTION TO WITNESS NOT TO ANSWER
 5
 6   PAGE  LINE       PAGE  LINE       PAGE  LINE
 7
 8              (NONE)
 9
10
11
12
13     REQUEST FOR PRODUCTION OF DOCUMENTS
14
15   PAGE  LINE       PAGE  LINE       PAGE  LINE
16
17              (NONE)
18
19
20
21            STIPULATION
22
23        PAGE            LINE
24         5               1
```

1 (Pages 1 to 4)

DARREN JOHNSON

Page 5

1      (It is hereby stipulated and agreed by
2  and between counsel that sealing, filing and
3  certification are waived; and that all
4  objections, except as to the form of the
5  questions, be reserved until the time of
6  trial.)
7      DARREN JOHNSON, after having been first
8  duly sworn, was examined and testified as
9  follows:
10      MR. BUCKOVITZ:  Are you going to
11  require an opportunity to read the deposition
12  and sign it?
13      THE WITNESS:  Can you ask me again?  I
14  have no idea.
15      MS. MARTINDELL:  Well, whenever someone
16  gives a deposition they have an opportunity
17  to look at the deposition, check it for
18  errors not in the content of what you say.
19  Spelling errors and things of that nature and
20  then you get the chance to sign it.  So when
21  you say I reserve the right to read and sign
22  that is what you are saying on the record.
23  So you can reserve that right.
24      THE WITNESS:  Yes.

Page 6

1      MR. BUCKOVITZ:  Yes, what?
2      THE WITNESS:  Yes, I'll reserve the
3  right.
4      MS. MARTINDELL:  To read and sign.
5  BY MR. BUCKOVITZ:
6      Q.   I am Al Buckovitz.  I'm the attorney
7  for Dr. Moyer, the Correction Physician Services,
8  Inc. and for Physicians Health Services, Inc. We're
9  here today to take your testimony under oath in a
10  case that you have filed which is in the Federal
11  District Court in the Eastern District of
12  Pennsylvania, Darren Johnson versus Dr. Stempler,
13  et. al.  I'm going to ask you a series of questions
14  about that case, about your claims, about your
15  damages.  If anything that I say you do not
16  understand would you please stop me and ask me to
17  explain it to you?
18      A.   Yeah.
19      Q.   Do you understand that everything that
20  you state today has to be orally and not by nods of
21  the head and gestures because it's all going to be
22  recorded stenographically.  Do you understand that?
23      A.   Yes.
24      Q.   Have you ever been a witness before?

Page 7

1      A.   No.
2      Q.   In any case, criminal or civil?
3      A.   I've been my own witness in a criminal
4  matter.
5      Q.   How many times did you do that?
6      A.   Three.
7      Q.   Three times.  Have you ever testified
8  in a civil case?
9      A.   No.
10      Q.   Have you ever given a deposition?
11      A.   No.
12      Q.   Okay.  Now, your name is Darren
13  Johnson; is that right?
14      A.   Yes.
15      Q.   Are you known by any other names?
16      A.   I have two aliases.
17      Q.   What's that?
18      A.   Shorty or Mouse.
19      MS. MARTINDELL:  I'm sorry, what was
20  the first one?
21      THE WITNESS:  Shorty.
22  BY MR. BUCKOVITZ:
23      Q.   What is your birth date?
24      A.   3/27/62.

Page 8

1      Q.   And your Social Security number?
2      A.   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.
3      Q.   And you have an inmate number?
4      A.   Inmate number is CF.
5      Q.   What is it?
6      A.   CF Charlie Frank 8751.
7      Q.   How long have you been incarcerated at
8  Graterford?
9      A.   Ten years.
10      Q.   So that's since 1994?
11      A.   No.  It was 12 years.  Since -- yeah, I
12  would say ten years.
13      Q.   Since 1994?
14      A.   Yes.
15      Q.   Where were you before that?
16      A.   SCI Camp Hill.
17      Q.   From when to when?
18      A.   From '93 to '94.
19      Q.   And where were you before Camp Hill?
20      A.   I was in county prison.
21      Q.   Philadelphia County?
22      A.   Yes.
23      Q.   Which prison?
24      A.   Holmesburg.

DARREN JOHNSON

Page 9

1  Q.  From when?
2  A.  From December 1992 to January 1993.
3  Q.  Where were you before Holmesburg?
4  A.  I was in Philly.
5  Q.  Where did you live?
6  A.  West Philadelphia.
7  Q.  Do you remember the address?
8  A.  3936 Market Street.
9  Q.  And how long did you live there?
10 A.  For six months.
11 Q.  That's from July of 1992 to December of
12 1992?
13 A.  Yes.
14 Q.  Who if anyone did you live with?
15 A.  I had a girlfriend.
16 Q.  What's her name?
17 A.  Stephanie Moon.
18 Q.  What's the last name?
19 A.  Moon, M-O-O-N.
20 Q.  Anybody else?
21 A.  She had three children.
22 Q.  How old were the children?
23 A.  Two, six and seven.
24 Q.  Okay.  Is she still your girlfriend?

Page 10

1  A.  No.
2  Q.  Are you married?
3  A.  No.
4  Q.  Have you ever been married?
5  A.  No.
6  Q.  Do you have any children?
7  A.  Yes.
8  Q.  How many children?
9  A.  Two.
10 Q.  How old are they?
11 A.  One is 11 and one is 18.
12 Q.  And the time that you have been
13 incarcerated since you've been at Holmesburg up to
14 the present date is that on the same charge?
15 A.  Yes.
16 Q.  What is that charge?
17 A.  I like to stipulate -- I'd like to
18 object to that question.
19 Q.  On what basis?
20 A.  Because the statue of limitations has
21 ran out.
22 Q.  But you know that in order for us to
23 test a witness we are entitled to inquire the
24 certain kinds of convictions because they may have

Page 11

1  bearing on his credibility for truthfulness?
2  A.  But it has nothing to do with the case.
3  Q.  That is hard to determine without
4  knowing what the answer is?
5  A.  Okay.
6  Q.  So could you tell me what the --
7  A.  Murder in first degree.
8  Q.  What sentence are you serving?
9  A.  Life.
10 Q.  Now, have you previously been
11 convicted?
12 A.  No.
13 Q.  Of anything else?
14 A.  No.
15 Q.  This is the only charge you have ever
16 been convicted of?
17 A.  Yes.
18 Q.  Have you ever been convicted of theft
19 or perjury or fraud?
20 A.  Prior to this?
21 Q.  Yes.
22 A.  Yes.
23 Q.  What?
24 A.  Retail theft.

Page 12

1  Q.  When was that?
2  A.  This is like -- I have no real memory
3  of it.  It's about six, 12 years previous.
4  Q.  Twelve years before 1992?
5  A.  Yes.
6  Q.  So approximately 1980?
7  A.  Yes.
8  Q.  Other than that were you ever convicted
9  of a theft crime or a crime effecting honesty?
10 A.  No.
11 Q.  Is that the only other conviction you
12 have for anything?
13 A.  Yes.
14 Q.  Did you ever have any injury to your
15 knee prior to the time you were in prison?
16 A.  My right knee?
17 Q.  Yes.
18 A.  No.
19 Q.  How about your left knee?
20 A.  Yes.
21 Q.  What injury is that?
22 A.  Torn patella tendon.
23 Q.  When did that happen?
24 A.  In '93 -- I mean '94 up Camp Hill.

DARREN JOHNSON

Page 13

1     Q.    Was that in a sporting event?
2     A.    Yes.
3     Q.    What was the sport?
4     A.    Volley ball.
5     Q.    What treatment did you receive for
6 that?
7     A.    They took me out emergency treatment
8 the next day.
9     Q.    And what did they do for you?
10    A.    They gave me surgery, direct repair.
11    Q.    Do you know where that was performed?
12    A.    No.  I think Carlisle, PA, somewhere in
13 that area.
14    Q.    You don't know what hospital?
15    A.    No.
16    Q.    Do you know what doctor performed the
17 surgery?
18    A.    Not offhand.
19    Q.    What is the condition of your left knee
20 today?
21    A.    It's excellent.
22    Q.    Has it been excellent ever since the
23 time of the operation?
24    A.    Yes.

Page 14

1     Q.    Can you tell us about the accident that
2 is the subject of this case?
3     A.    Well, on June 9th somewhere around
4 there, I was out playing volley ball.
5     Q.    This is June 9th of what year?
6     A.    1999.
7     Q.    Right.
8     A.    And I injured my right knee.  I had
9 turned playing volley ball.
10    Q.    How did you injure it, just the turn?
11    A.    I think the turn, yes.
12    Q.    Then what happened?
13    A.    I was taken to the dispensary.
14    Q.    Who took you to the dispensary?
15    A.    The nurse came to the front door.  She
16 had a wheelchair there and a couple inmates and the
17 sergeant carried me up the steps to the wheelchair
18 and they transported me to the infirmary.
19    Q.    Do you know who the nurse it was?
20    A.    Not offhand.
21    Q.    Who were the inmates?
22    A.    Couple guys.
23    Q.    Do you know who they are?
24    A.    Not offhand.

Page 15

1     Q.    Who was the sergeant?
2     A.    I have no recollection.
3     Q.    They took you to the dispensary?
4     A.    Yes.
5     Q.    And what happened there?
6     A.    She gave me an ice pack, some crutches.
7     Q.    Who is she?
8     A.    The nurse that was on duty.
9     Q.    Do you know who that was?
10    A.    No, not offhand.
11    Q.    Did she give you any instructions?
12    A.    She said report the following day.
13    Q.    Did you do that?
14    A.    Yes.
15    Q.    Who did you see the following day?
16    A.    I talked to a Dr. Krusinak.
17    Q.    Krusinak?
18    A.    Yes.
19    Q.    And what did he do for you?
20    A.    He ordered X-rays.
21    Q.    Do you recall what you told Dr.
22 Krusinak?
23    A.    I didn't tell him anything.  I told
24 them I injured it playing volley ball.

Page 16

1     Q.    Okay.  And what if anything did he do
2 for you, just the X-ray?
3     A.    He told me I'll have a follow-up on
4 Monday the 14th.  I would like to correct that that
5 was Dr. Kirnara.
6     Q.    You did see Dr. Krusinak first and then
7 Dr. Kirnara or are you saying you saw Dr. Kirnara
8 instead of Krusinak?
9     A.    I seen Dr. Kirnara.
10    Q.    You did not see Dr. Krusinak?
11    A.    No.
12    Q.    Okay.  Dr. Kirnara ordered the X-ray?
13    A.    Yes.
14    Q.    And Dr. Kirnara told you to come back
15 on June 14th?
16    A.    Yes.
17    Q.    Did he give you a -- do you have a job
18 in the prison?
19    A.    Yes.
20    Q.    What is that job?
21    A.    I work in the shoe factory.
22    Q.    At the time of this injury was that
23 your job?
24    A.    Yes.

DARREN JOHNSON

Page 17

1    Q.   What do you do in the shoe factory?
2    A.   I operated the toe foreman machine.
3    Q.   How many hours a day do you do that?
4    A.   Six and a half.
5    Q.   Does that involve standing?
6    A.   Yes.
7    Q.   Are you constantly standing for the six
8    and a half hours?
9    A.   Yes.
10   Q.   Do you break for lunch or have other
11   breaks?
12   A.   We have an hour break from 11 -- 11:30
13   to 1:00.
14   Q.   When do you start work?
15   A.   7:30.
16   Q.   So 7:30 to 11:30 you are constantly on
17   your feet?
18   A.   No.  I have breaks on and off.
19   Q.   How many breaks do you have?
20   A.   About three or four.
21   Q.   Is there a set amount?
22   A.   No.  There is no specific time.
23   Q.   You have three or four breaks between
24   7:30 and 11:30?

Page 18

1    A.   Yes.
2    Q.   Then you come back on at 1:00?
3    A.   Yes.
4    Q.   One o'clock to when?
5    A.   To 3:15.
6    Q.   Do you have any breaks then?
7    A.   If you want.  It's at your discretion.
8    Q.   At the time did you take breaks?
9    A.   Yes.
10   Q.   How many breaks would you take between
11   1:00 and 2:15 back in 1999?
12   A.   During the occurrence of this injury?
13   Q.   Before the injury.
14   A.   Before the injury about two, three.
15   Q.   So between the time that you saw --
16   between the time of the volley ball injury and June
17   14th did you continue to work in the shoe factory?
18   A.   Yes.
19   Q.   Was there any change in your routine?
20   A.   Yes.
21   Q.   What was the change?
22   A.   I had to sit down.  I changed jobs.  I
23   had to sit down and pull tacks out the bottom of the
24   shoes.

Page 19

1    Q.   Is that constant sitting job?
2    A.   Yes.
3    Q.   Who is your supervisor in the shoe
4    factory?
5    A.   John Mellinger.
6    Q.   What is his last name?
7    A.   Mellinger, M-E-L-L-I-N-G-E-R.
8    Q.   Now, you still work at the shoe factory
9    to this day?
10   A.   Yes.
11   Q.   What is your job there now?
12   A.   Operator of a toe foreman machine.
13   Q.   So you are back to your original job?
14   A.   Yes.
15   Q.   When did you go back to your original
16   job?
17   A.   I never left.
18   Q.   Well, how long did you do the job that
19   involved sitting and pulling tacks out of the bottom
20   of shoes?
21   A.   About -- until after my physical
22   therapy was over.
23   Q.   Do you know when that was?
24   A.   It's about -- I'll say March 2000,

Page 20

1    March, April.
2    Q.   Okay.  And in this job where you're
3    pulling tacks out of shoes you're sitting for the
4    whole period of time that you're doing that?
5    A.   Yes.
6    Q.   Does the number of breaks increase or
7    change?
8    A.   Well, I took my breaks right here so it
9    didn't matter.
10   Q.   So there's no change in the number of
11   breaks?
12   A.   No.
13   Q.   Now, did somebody give you a note that
14   excused you from -- were you excused from work at
15   all during the period between the injury and June
16   14th?
17   A.   Nope.  I didn't receive any medical
18   clearance.
19   Q.   Did you get a five-day medical lay-in?
20   A.   No.
21   Q.   Do you have a copy of what's entitled
22   the second amended medical malpractice complaint?
23   A.   Yes.
24   Q.   I'm going to show it to you.  This is

DARREN JOHNSON

Page 21

1  the current amended complaint; is that right, it's
2  the one the court refers to as the third amended
3  complaint?
4      A.  Yes.
5      Q.  Do you have a company of this?
6      A.  Yes, I do.
7      Q.  On the section entitled facts -- if you
8  don't have it I can give you another copy.
9      A.  I have it.
10     Q.  Under section entitled facts under
11 paragraph 12 or paragraph 11, I'm sorry.  You say
12 that on June 10, 1999 you went to sick call and
13 received a five-day medical lay-up; is that
14 accurate?
15     A.  No.  I'd like to make a correction.
16 That was June 11th.
17     Q.  Other than that being June 11th is it
18 accurate?
19     A.  No.
20     Q.  What else is inaccurate about that?
21     A.  That I wasn't issued the crutches.
22     Q.  What about the five days medical
23 lay-in?
24     A.  I didn't receive that either.

Page 22

1      Q.  Why did you say that in this second
2  amended complaint?
3      A.  Because to my personal knowledge I was
4  incorrect.
5      Q.  Did you prepare this second amended
6  complaint yourself?
7      A.  Yes.
8      Q.  And did you refer it to any notes or
9  documents when you prepared it?
10     A.  No.
11     Q.  So are you saying now you prepared this
12 second amended complaint from memory?
13     A.  Yes.
14     Q.  Now you're saying that your memory is
15 wrong?
16     A.  Yes.
17     Q.  And you prepared this second amended
18 complaint on March 24, 2002?
19     A.  Yes.
20     Q.  This is almost two years later?
21     A.  Yes.
22     Q.  Why -- why do you believe that your
23 memory is more accurate on this day than it was two
24 years ago?

Page 23

1      A.  Because I received medical records
2  later.
3      Q.  And as a result what does that mean?
4      A.  It means that I couldn't state what I
5  state now then because I had no, no records of it.
6      Q.  Are you saying you are revising what
7  you state to be the facts based on your reading of
8  the medical records?
9      A.  Yes.
10     Q.  So your testimony today is that you did
11 not get a five-day medical lay-in and you did not
12 get crutches on the June 10th or June 11th of 2002;
13 is that right?
14     A.  Yes.
15     Q.  Did you ever get a five-day medical
16 lay-in?
17     A.  No.
18     Q.  Okay.  Isn't that something you would
19 remember?
20     A.  Yes.
21     Q.  Okay.  Why do you think you could make
22 a mistake like that?
23     A.  Because I had -- yes, I remember.  I
24 had a weekend off.

Page 24

1      Q.  All right.
2      A.  And that is when I thought I had a
3  medical lay-in.
4      Q.  Do you ever have a weekend off in your
5  job?
6      A.  Yes.
7      Q.  Now, you state in paragraph 12 that on
8  June 12, 1999 you received a pass to go to the
9  dispensary and that your knee was then X-rayed?
10     A.  Yes.  And I would like to correct that
11 also.  That was June 11th.
12     Q.  That was June 11th?
13     A.  Yes.
14     Q.  So you're saying everything that you
15 say in paragraph 11 happened on June 11th and
16 everything you say in paragraph 12 happened on June
17 11th?
18     A.  Not everything on paragraph 11th
19 because I didn't receive a five-day medical lay-in.
20     Q.  So on paragraph 11 all you're saying is
21 that you went to sick call on June 11th; is that
22 right?
23     A.  Yes.
24     Q.  And on paragraph 12 you say that,

DARREN JOHNSON

Page 25

1 everything you say in paragraph 12 actually happened
2 on June 11th?
3     A.   Yes.  I have another correction also.
4     Q.   Okay.
5     A.   That's it.
6     Q.   You want to make that correction?
7     A.   Yes.  Number 21.
8     Q.   Well, I meant on paragraph 12.  Is
9 there another correction on paragraph 12?
10     A.   No.
11     Q.   Do you know why you say the X-ray was
12 performed on June 11, 1999.  Do you have some
13 particular record you are referring to?
14     A.   Yes.  I have a copy of the X-ray
15 report.
16     Q.   Do you have that available?
17     A.   Yes.
18     Q.   Okay.
19     A.   It occurred on June 11th.
20     Q.   All right.  The next paragraph 13 you
21 say that you signed up for sick call?
22     A.   Yes.
23     Q.   All right.  Do you want to correct
24 anything in paragraph 13 or change anything?

Page 26

1     A.   No.
2     Q.   Then in paragraph 14 you say that you
3 saw Dr. Moyer on June 15, 1999; is that right?
4     A.   Yes.
5     Q.   What happened at that time?
6     A.   Well, I went to sick call.  I told them
7 my knee was still swollen.
8     Q.   This is the first time you saw Dr.
9 Moyer for this problem; is that right?
10     A.   Yes.
11     Q.   What did he do for you?
12     A.   He gave me a pass to report to the
13 dispensary.  He said he was going to tap my knee.
14     Q.   Did he diagnose the problem?
15     A.   I'm not aware of it.
16     Q.   Was that -- did he tap the knee the
17 same day?
18     A.   Yes.
19     Q.   Okay.  Can you describe that procedure?
20     A.   Well, I arrived at the dispensary
21 around 2:30.  So I met with a Correctional Officer
22 Snyder.  She escorted me around to the side where
23 the dispensary room is and she said wait here for
24 Dr. Moyer.

Page 27

1     Q.   Then what happened?
2     A.   Around ten or five after 3:00
3 Correctional Officer Snyder came back around and
4 said you haven't seen the doctor yet.  I said no.
5 So she went to go get him.
6     Q.   Then what happened?
7     A.   So when he came back he was kind of a
8 little irritated I would say, I recognized and he
9 said let's get this over with.
10     Q.   Then what happened?
11     A.   Then we proceeded into the dispensary
12 examining room and the far end inside of the
13 dispensary there was a chair.  He told me -- I took
14 a seat and he took the other seat and he rolled up
15 and he said bend your leg and he pulled out a needle
16 so long and I told him I couldn't bend it.  He said
17 well, if you can't bend it I'll bend it for you.
18     Q.   Is that what he did?
19     A.   No.
20     Q.   What happened?
21     A.   I tried to bend it as little as
22 possible.
23     Q.   Then what happened?
24     A.   Then he proceeded to stick me in my

Page 28

1 leg.  I said hold up.  I had to get my composure.  I
2 had to hold onto the chair because this was a big
3 needle.
4     Q.   Then what happened?
5     A.   So then I grabbed the edges of the
6 chair and he proceeded to stick me in my knee all
7 the way down to the joint.
8     Q.   Then what happened?
9     A.   I was in serious pain.
10     Q.   Did you scream?
11     A.   No.  I was shaking like gritting my
12 teeth and squeezing the edges of the chair.
13     Q.   Did you cry?
14     A.   Almost.
15     Q.   Was there anybody who saw you in this
16 condition?
17     A.   Yes.  Correctional Officer Snyder.
18 It's a female.
19     Q.   Then what happened?
20     A.   Then he said I'll see you in a week or
21 so.
22     Q.   Did he give you any instructions?
23     A.   No.
24     Q.   Is there anything else on this page

DARREN JOHNSON

Page 29

1  that you wish to revise, correct in paragraph 17?
2      A.   No.
3      Q.   All right.  Now, are you making a claim
4  against Dr. Moyer for performing the knee tap
5  without anesthesia?
6      A.   And deliberant waiting.
7      Q.   But this incident that you have just
8  described is that one of the bases of your lawsuit
9  against Dr. Moyer?
10     A.   That is one of them.
11     Q.   Did you file a grievance against Dr.
12 Moyer on that issue?
13     A.   Yes.
14     Q.   Do you have a copy of that grievance?
15     A.   Yes.
16     Q.   This is grievance number GRA02192000;
17 is that right?
18     A.   Yes.
19     Q.   That is dated February 23, 2000?
20     A.   Yes.
21     Q.   Could you point out to me where in this
22 grievance you complain about Dr. Moyer's performance
23 of the knee tap?
24     A.   This happened because of the delay in

Page 30

1  treating and misdiagnosing of Dr. Stempler and
2  Moyer.
3      Q.   Is that the only statement you make in
4  the grievance that relates to the knee tap?
5      A.   Yes.
6      Q.   All right.  On paragraph 19 you say
7  that Dr. Moyer did another knee tap on -- is this
8  June 22, 1999?
9      A.   Yes.  Without any anesthesia on both
10 occasions.
11     Q.   Did you discuss with him the question
12 of anesthesia?
13     A.   Yes.
14     Q.   What did you say?
15     A.   No.  I didn't, no.
16     Q.   Did you discuss it --
17     A.   I didn't know.
18     Q.   Did you discuss it with him the first
19 time?
20     A.   No, I didn't, no.  I never had that
21 before.
22     Q.   And the second time you didn't discuss
23 it with him?
24     A.   No.  I didn't know nothing about it.

Page 31

1      Q.   Well, you knew that when you had that
2  procedure a week earlier that you had a lot of pain?
3      A.   Yes.
4      Q.   Did you discuss that with Dr. Moyer?
5      A.   The anesthesia?
6      Q.   Did you tell him you had a lot of pain
7  the first time you did it?
8      A.   Yes.
9      Q.   Did you ask for anything to help you
10 tolerate the pain?
11     A.   He said you don't need it, I never
12 discussed it.
13     Q.   You never discussed that?
14     A.   No, I didn't know.
15     Q.   Was there anybody present when the knee
16 tap was performed on June 22nd?
17     A.   I don't know the names offhand.
18     Q.   Who were they?
19     A.   The nurse.
20     Q.   And your only reference to the second
21 knee tap in the grievance was the same one you just
22 pointed out when I asked you about the first knee
23 tap; is that right?
24     A.   Yes.

Page 32

1      Q.   All right.  Now, earlier you said you
2  were going to make a correction to paragraph 21?
3      A.   Yes.
4      Q.   The second amended complaint.  So we're
5  now on the page and what's paragraph 21?  Can you
6  tell me what correction or deletion you want to
7  make?
8      A.   I would like to make a correction that
9  it's July 9, 1999 instead of July 2nd.
10     Q.   Now, you did see Dr. Kirnara again on
11 July 7, 1999; is that right?
12     A.   I have no recollection.
13     Q.   You don't know if you saw Dr. Kirnara
14 on July 2, 1999?
15     A.   I don't know who it was.
16     Q.   Do you know if you saw anybody on July
17 2nd?
18     A.   I seen Dr. Battick.
19     Q.   You're talking about seeing Dr. Battick
20 on July 9th; is that right?
21     A.   Yes.
22     Q.   I'm asking you if on July 2nd you saw
23 Dr. Kirnara.
24     A.   Yes.

DARREN JOHNSON

Page 33

1    Q.   What did he do for you?
2    A.   He gave me Motrin.
3    Q.   And did he set up your examination with
4 Dr. Battick?
5    A.   Yes.
6    Q.   Is Dr. Battick an orthopaedist?
7    A.   Yes. He's CPS director.
8    Q.   But he's also an orthopaedist, right?
9    A.   I don't know.
10    Q.   And you saw Dr. Battick on July 9th?
11    A.   Yes.
12    Q.   What happened then?
13    A.   Well, on July 9th I went to get -- I
14 had a pass to meet with Secretary Rhodes.
15    Q.   All right.
16    A.   To pick up a knee immobilizer. See,
17 there's a difference between a knee immobilizer and
18 a knee brace.
19    Q.   Well, on July 2nd you got a pass to get
20 a knee brace; is that right?
21    A.   Well, the knee brace is the knee
22 immobilizer.
23    Q.   Why do you say that?
24    A.   Well, it's two different things because

Page 34

1 what I have here is a knee brace. This is the knee
2 brace. The knee immobilizer was longer from up to
3 the thigh to your ankle. So on that day I went to
4 see Secretary Rhodes to pick up a knee brace, I mean
5 a knee immobilizer.
6    Q.   Was that after you had the knee brace
7 or did you get the knee immobilizer first?
8    A.   I didn't have anything but an Ace
9 bandage first.
10    Q.   Then what was the next thing that you
11 had?
12    A.   I had the knee immobilizer.
13    Q.   When did you get the knee brace?
14    A.   I got the knee brace on August 4th.
15    Q.   Now, on here it says that you got to
16 see Dr. Battick because Rose suggested it; am I
17 right?
18    A.   Yes.
19    Q.   Do you know if it's in fact she
20 suggested it or was it because whether it was
21 because it was scheduled by Dr. Kirnara?
22    A.   I don't know. No. She seen me sitting
23 outside waiting for the brace and she wrote on the
24 pass that it didn't look right and she's going to

Page 35

1 call Dr. Battick. She told me to sit here and she
2 wrote on the pass waiting for Dr. Battick and she
3 went to go get him.
4    Q.   Are you saying it's written on one of
5 these passes waiting to see Dr. Battick?
6    A.   Yes. It's written on the pass dated
7 July 9, 1999 waiting for Dr. Battick.
8    Q.   Okay. Did she indicate anything on
9 this pass that she was suggesting you see Dr.
10 Battick or that the knee didn't look right?
11    A.   No. There is nothing on the pass.
12    Q.   Had you signed up to see Dr. Battick?
13    A.   No.
14    Q.   Before this?
15    A.   No. I reported to pick up the knee
16 immobilizer.
17    Q.   All right. Is this the first time you
18 saw Dr. Battick?
19    A.   Yes.
20    Q.   Ever?
21    A.   I seen him a couple times before.
22    Q.   What happened when you saw Dr. Battick
23 on July 9th?
24    A.   On July 9th?

Page 36

1    Q.   Right. Second amended complaint you
2 refer to it as July 2nd; is that right?
3    A.   I requested that correction.
4    Q.   What happened when that came in?
5    A.   He proceeded me to the examining room
6 and I picked my leg up and put it on the table. He
7 said yes, no problem. He said -- he said
8 potentially patellar altered.
9    Q.   Yes. Patella altered?
10    A.   Yes.
11    Q.   Did you understand what that meant?
12    A.   No.
13    Q.   Did he explain it to you?
14    A.   No, he didn't.
15    Q.   Did he tell you what he was going to
16 do?
17    A.   Well, him and Dr. Pratt assembled some
18 tools -- I mean some medical equipment.
19    Q.   Right.
20    A.   And he said he made a request three
21 times for me to be taken outside to a hospital and
22 while he was telling me that Dr. Pratt was
23 assembling some Novocaine and some needles and he
24 was taking my knee brace -- my Ace bandage off at

DARREN JOHNSON

Page 37

1  the same time.
2      Q.    What did he tell you about requesting
3  you being taken to an outside hospital?
4      A.    He said that he put the request in to
5  be reviewed three times but they all were denied.
6      Q.    Did he say who they were -- was?
7      A.    No, they didn't say.
8      Q.    He said he put the request in three
9  times for what?
10     A.    To be taken outside for surgery.
11     Q.    Did he say where?
12     A.    No, he didn't say.
13     Q.    Did he tell you how it was that he
14  became aware of your case?
15     A.    No, he didn't tell me.
16     Q.    Did he say whether or not Dr. Moyer had
17  asked him to try to get you treatment outside?
18     A.    No.  He never said that either.
19     Q.    So you don't know whether that occurred
20  or not?
21     A.    I don't know.
22     Q.    All right.  In your second amended
23  complaint you say that he submitted your -- your
24  situation to the medical department's review board;

Page 38

1  is that right?
2      A.    Yes.
3      Q.    Other than what you have already
4  referred to is there anything between paragraphs 18
5  and 25 that you wish to revise or amend?
6      A.    I'd like to add something.
7      Q.    Does it relate to one of these
8  paragraphs?
9      A.    It relates to the definition of the
10  knee brace and a knee immobilizer.
11     Q.    Which paragraph are you referring us
12  to?
13     A.    I'm referring to 21.
14     Q.    What is it that you would add?
15     A.    Sign for the knee immobilizer on July
16  9th.
17     Q.    Other than that you stand by everything
18  else that you said in paragraphs 18 through 25?
19     A.    Yes.
20     Q.    All right.  In paragraph 25 on the
21  next -- you state your understanding about the
22  voting system about determining wether you should be
23  taken to outside facilities.  What is it about this
24  voting system?

Page 39

1      A.    Well, upon my information that I
2  received from unknown inmates they say that their
3  injuries would have to be voted on so that they can
4  receive surgery.
5      Q.    Well, what is the information that you
6  received?
7      A.    That is why their treatment is being
8  delayed.  It's word of mouth.
9      Q.    Does the information indicate who
10  votes?
11     A.    No.
12     Q.    What kind of vote is necessary to get
13  outside treatment?
14     A.    No.
15     Q.    Have you seen any written description
16  of a voting system?
17     A.    No.  All I have seen is delays in
18  treatment to outside people.
19     Q.    And other than that are you familiar
20  with rumors from inmates that there is some voting
21  system involved?
22     A.    Yes.  That is the only way I think that
23  I was delayed in treatment.
24     Q.    Other than the rumors from the inmates

Page 40

1  do you have any other information that there is a
2  voting system to determine whether patients should
3  be taken to outside facilities for medical
4  treatment?
5      A.    No, except for Gregory Sourber.
6      Q.    What is that, Gregory?
7      A.    I have two Affidavits from Gregory
8  Sourber and Mike Winters.  I don't have one from Tim
9  Motty.  These Affidavits have already been submitted
10  to the court.
11     Q.    Do you have a copy of it?
12     A.    The same practice.
13     Q.    Gregory, how do you spell that last
14  name?
15     A.    Sourber.
16     Q.    Do you know how to spell it?
17     A.    S-O-U-R-B-E-R.
18     Q.    And who is the other one?
19     A.    Mike Winters.
20     Q.    Are they both inmates?
21     A.    Yes.
22     Q.    And what does this Affidavit say?
23     A.    That they have been delayed treatment
24  to an outside hospital.

DARREN JOHNSON

Page 41

1    Q.   In their own case?
2    A.   Yes.
3    Q.   Does it say anything about a voting
4  system or how the decision is made to refer or not
5  to refer inmates?
6    A.   No.
7    Q.   Now in paragraph 25 you say that CPS
8  and PHS failed to formulate, adopt or have adequate
9  rules to ensure quality care for inmates in
10  Graterford?
11   A.   Yes.
12   Q.   What is the basis for your saying that?
13   A.   Because if they had adequate policies
14  for emergency medical treatment this would not have
15  happened to me.
16   Q.   So your evidence that they don't have
17  adequate policies, is what that you were not
18  immediately sent to an outside hospital on July 9th,
19  as of July 9, 1999?
20   A.   Me and several other inmates.
21   Q.   You also say in that paragraph that CPS
22  and PHS had a practice of prioritizing inmates which
23  caused you harm?
24   A.   Yes.

Page 42

1    Q.   What evidence do you have that CPS or
2  PHS had such a system?
3    A.   None.
4    Q.   None?
5    A.   At this time.
6    Q.   All right.  You say that Dr. Pratt
7  performed a knee tap; is that right?
8    A.   Yes.  Eugene Pratt.
9    Q.   And on paragraph 27 you say on July
10  9th --
11   A.   I would like to make that correction.
12   Q.   On paragraph 27?
13   A.   Yes.
14   Q.   What correction do you want to make to
15  paragraph 27?
16   A.   That it wasn't a knee brace.  It was a
17  knee immobilizer.
18   Q.   All right.  You say that on July 16,
19  1999 you were taken to an outside MRI center?
20   A.   Yes.
21   Q.   Was that because of Dr. Battick's
22  direction?
23   A.   I don't know.  Yes.
24   Q.   Do you know when the results of the

Page 43

1  MRI, were they discussed with you?
2    A.   They were never.
3    Q.   Do you know what action if any was
4  taken as a result of the MRI?
5    A.   Not that I know of.
6    Q.   Do you know if Dr. Battick referred you
7  to Dr. Mandel at that time?
8    A.   Not that I know of -- not to an
9  institution.
10   Q.   Did Dr. Battick ever tell you he was
11  referring you to Dr. Mandel?
12   A.   No.  No one ever told me about the MRI
13  or the X-ray on June 11th.
14   Q.   Is Dr. Mandel an orthopaedist?
15   A.   He's an orthopaedic surgeon.
16   Q.   All right.  Did you see Dr. Mandel?
17   A.   Yes.
18   Q.   When did you see him?
19   A.   I seen Dr. Mandel on July 27, 1999.
20   Q.   And is that at Suburban General
21  Hospital?
22   A.   Yes.
23   Q.   What did he do for you?
24   A.   He told me to stand up and see if I

Page 44

1  could bend my knee.
2    Q.   And then what happened?
3    A.   Well, I couldn't bend it all the way
4  because it was torn I guess.  I didn't know at the
5  time.
6    Q.   You couldn't bend it all the way?
7    A.   No.
8    Q.   Then what happened?
9    A.   Then he said it's possible that you're
10  going to have permanent damage to your right leg
11  because of the delay bringing you out here.
12   Q.   Did he tell you a time frame in which
13  he believed you should have been brought out there?
14   A.   No.
15   Q.   Who was present when you made this
16  statement?
17   A.   Correction Officer Pry.
18   Q.   Who?
19   A.   Pry, P-R-Y.
20   Q.   Pry?
21   A.   Yes.
22   Q.   Is that the only person?
23   A.   It was a couple other guards but I
24  don't know the names.

DARREN JOHNSON

Page 45

1    Q.    All right.  What else did he tell you?
2    A.    He told me because of this delay he was
3  going to have to do a reconstructive surgery and
4  place a wire in my knee.
5    Q.    What else happened?
6    A.    He said as a matter of fact, I'm going
7  to call him right now.
8    Q.    And did he?
9    A.    I don't know but he left out the room.
10   Q.    Then what happened?
11   A.    Then he came back and said all right,
12  are you ready for the surgery.
13   Q.    Then what happened?
14   A.    Then the guard said he wasn't scheduled
15  to stay out there so he left again.
16   Q.    Then what happened?
17   A.    Then he said well, just sign these
18  papers when you get back.
19   Q.    What were the papers?
20   A.    Consent to have surgery.
21   Q.    Were you brought back to the surgery?
22   A.    Yes.
23   Q.    When was that?
24   A.    September.

Page 46

1    Q.    September 17th?
2    A.    September 17th.
3    Q.    Was that by Dr. Mandel?
4    A.    Yes.
5    Q.    All right.  Paragraph 32 you said Dr.
6  Mandel informed you that you'd have pain after the
7  operation and wouldn't be able to extend or bend
8  your leg fully?
9    A.    Yes.
10   Q.    Did he say that these conditions would
11  have been different if the treatment had been
12  different?
13   A.    No.
14   Q.    Okay.  Is there anything --
15   A.    He said I will have a problem because
16  of the delay.
17   Q.    What was the problem that you would
18  have because of the delay?
19   A.    My tendons were shortened when I
20  received the surgery.  I received reconstructive
21  surgery.
22   Q.    Did he say that that would have been
23  any different if the treatment had been any
24  different?

Page 47

1    A.    He didn't say it to me.
2    Q.    Do you know if he said it to anyone?
3  Do you have any evidence that he said it?
4    A.    Well, that's hearsay.  I have evidence
5  that he said it to somebody.
6    Q.    What is your evidence?
7    A.    It was attached to my -- it's a memo
8  from Jack Myerson.
9    Q.    This is a memorandum dated November 15
10  1999 from Jack to the file regarding Darren
11  Johnson.  Who is Jack?
12   A.    He was an attorney trying to represent
13  me.
14   Q.    Do you wish to make any additions or
15  revisions to paragraphs 30, 31 and 32?
16   A.    Yes.
17   Q.    What?
18   A.    Twenty?
19   Q.    Thirty, 31 and 32?
20   A.    Yes.  I would like to make an addition
21  to number 31.
22   Q.    And what's that?
23   A.    That the date of this was July 27,
24  1999.

Page 48

1    Q.    Okay.  All right.  In paragraph 36 you
2  say that PHS and CPS had subjective knowledge that
3  this misdiagnoses of malpractice of Drs. Moyer and
4  Stempler and therefore, they have deliberately
5  efficiencies.  Do you see that?
6    A.    Yes.
7    Q.    You refer to delays in scheduling,
8  follow-up examinations, emergency medical treatment
9  processing to an outside hospital resulting in
10  delays and you say that PHS and CPS had subjective
11  knowledge of this and that this practice was
12  deliberate indifference?
13   A.    Yes.  I see.
14   Q.    What evidence do you have that supports
15  that contention that they had subjective knowledge?
16   A.    The staff of -- the MRI reports date
17  stamped, all the consultation reports date stamped
18  by CPS.
19   Q.    Are you saying that the fact that PHS
20  and CPS knew how long it was taking that that's your
21  evidence of deliberant indifference?
22   A.    Well, they knew that I was hurt and
23  they failed to do anything.  I had a serious medical
24  need.

Page 53

1    A.   I'm withdrawing the claim I have to
2  emotional distress?
3    Q.   Okay.  Are you still pressing a claim
4  with regard to weight loss or are you withdrawing
5  that claim?
6    A.   Withdrawing a part.
7    Q.   You're withdrawing a part?
8    A.   Yes.
9    Q.   Well, what part are you withdrawing?
10   A.   I will withdraw it in case I can prove
11 facts before trial.
12   Q.   Are we going to be facing an issue in
13 trial about weight loss or not?
14   A.   After surgery, no.
15   Q.   You're not making a claim for weight
16 loss?
17   A.   No.
18   Q.   Are you making a claim for weight loss
19 at any time against any of our clients?
20   A.   No.  Not according to emotional
21 distress.
22   Q.   Well, I'm asking you aside from what
23 the court has done what is your position?  Are you
24 going to press that claim or are you withdrawing it?

Page 54

1    A.   No.  I'll withdraw it.
2    Q.   All right.  Are you still pressing a
3  claim against any of the defendants concerning fear
4  of other inmates or possible random acts of
5  violence?
6    A.   Well, I can't predict that because I
7  don't know if it will happen or not.
8    Q.   Does that have anything to do with any
9  of the actions taken by any of the Defendants?
10   A.   No.
11   Q.   Is that just a general concern you
12 would have from being in prison?
13   A.   Yes, and my medical disability.
14   Q.   Well, are you pressing a claim against
15 any of the Defendants on that sentence?
16   A.   Yes.
17   Q.   You make a claim in paragraph 42
18 regarding staying on a top level tier?
19   A.   Yes.
20   Q.   And why are you on a top level tier?
21   A.   Because medical -- department never
22 sent anybody any medical reports I mean clearance.
23   Q.   So is that part of the claim you're
24 making against the Defendants?

Page 55

1    A.   Yes.  Part of their negligence,
2  corporate negligence.
3    Q.   Corporate negligence was dismissed?
4    A.   It was?
5    Q.   Yes.
6    A.   Can I see that.  It says the Plaintiff
7  shall receive with count credulity is repentant (ph)
8  and shall forth corporate negligence against CPS and
9  PHS.
10   Q.   You're right.  My mistake.  You make a
11 statement, a contention in paragraph 42 about CPS'
12 negligence in communicating with department of
13 corrections staff?
14   A.   Yes.
15   Q.   What is that contention?
16   A.   Because if they would have communicated
17 with the Department of Corrections staff I wouldn't
18 have still been on the top tier.
19   Q.   All right.  In paragraph 46 you say Dr.
20 Moyer knew of obvious danger to you if your
21 condition remained untreated but he failed to treat
22 you?
23   A.   Yes.
24   Q.   Other than the items you have already

Page 56

1  referred to do you have any other evidence to
2  support that contention?
3    A.   Yes.  I have the radiological reports
4  of June 11, 1999.
5    Q.   Other than that do you have any other
6  evidence to support that contention?
7    A.   Not at this moment.
8    Q.   All right.  In paragraph 49 you contend
9  that CPS and PHS were deliberately indifferent to
10 you in violation of the 8th Amendment.  Other than
11 the items you have already referred to in this
12 deposition do you have any evidence to support that
13 contention?
14   A.   Not right now.
15   Q.   Do you have any expert opinion to
16 support your contention of medical malpractice?
17   A.   Not right now.
18   Q.   In paragraph 60 what evidence do you
19 have that PHS and CPS failed to select and retain
20 only competent physicians and nurses?
21   A.   Well, there's a couple mistakes in the
22 medical records that the doctor wrote.
23   Q.   Which doctor are you referring to?
24   A.   Dr. Moyer.

14 (Pages 53 to 56)

Page 57

1    Q.   So are you saying that the fact that
2  Moyer made some mistakes in the medical records
3  indicates that PHS and CPS hired an incompetent
4  physician?
5    A.   Yes.  I can produce Affidavits that
6  inform many grievances has been filed against these
7  doctors, Dr. Moyer.
8    Q.   What are the mistakes that you say Dr.
9  Moyer made in the medical records?
10    A.   He never reviewed my X-ray reports.
11    Q.   Anything else?
12    A.   And he wrote down that I was supposed
13  to be X-rayed for the left knee, not right knee.
14    Q.   Anything else?
15    A.   Not at this moment.
16    Q.   And is that the basis of your
17  contention that Dr. Moyer was incompetent?
18    A.   In part.
19    Q.   And is that in turn your basis of your
20  contention that CPS and PHS hired incompetent
21  physicians and nurses?
22    A.   In part.
23    Q.   Well, what else is part of your
24  contention that CPS and PHS hired incompetent

Page 58

1  physicians and nurses?
2    A.   I can prove that he showed apathy.
3    Q.   Apathy?
4    A.   Yes.
5    Q.   Who did?
6    A.   Dr. Moyer.
7    Q.   How did he show apathy?
8    A.   Because he just didn't care what the
9  outcome was going to be.
10    Q.   What's your basis for saying that?
11    A.   Because on June 22nd he never told me
12  anything.  I didn't see him after.  If I wouldn't
13  have seen Secretary Rhodes there was no physical
14  therapy from Dr. Moyer.
15    Q.   Other than that is there any other
16  evidence?
17    A.   Not at this point.
18    Q.   To support the contention that CPS and
19  PHS were not hiring competent physicians and nurses?
20    A.   Not at this moment.
21    Q.   In paragraph 61 what evidence do you
22  have that PHS and CPS didn't oversee the people who
23  were practicing medicine within Graterford's walls?
24    A.   Because nobody ever checked on Dr.

Page 59

1  Moyer after three times I went to see him.
2    Q.   How do you know no one checked on Dr.
3  Moyer?
4    A.   He still did the same thing.
5    Q.   So is your evidence just the nature of
6  the treatment you received from Dr. Moyer or is that
7  the nature of the evidence that you have to make the
8  contentions you do in paragraph 61?
9    A.   That's the partial basis.
10    Q.   Do you have any other bases on top of
11  that?
12    A.   Not at this moment.
13    Q.   Paragraph 62 you say that PHS and CPS
14  failed to formulate a doctor to force adequate rules
15  and policies to ensure quality care.  What evidence
16  do you have to support that contention?
17    A.   The policy was for me to receive
18  emergency outside treatment called a serious medical
19  need and they failed to adhere to that, adopt or
20  enforce it.
21    Q.   So you're saying that -- whose policy
22  are you saying was that you received emergency
23  outside medical care?
24    A.   Department of Corrections.

Page 60

1    Q.   Are you saying the passage of time
2  between the time that you contend you should have
3  received that treatment and the time you did is the
4  evidence you have to support that contention?
5    A.   Part of it.
6    Q.   Other than that do you have any other
7  evidence to support that contention?
8    A.   Not at this time.
9    Q.   Then in paragraph 63 you say that the
10  failure of PHS and CPS it's not clear to me what you
11  are saying in paragraph 63.  Can you tell me what
12  the allegation is in paragraph 63?
13    A.   The failure of Prison Health Services
14  Incorporate and Correctional Physicians Incorporate
15  after having actual knowledge on two separate
16  occasions of Johnson's injury and fact torn patellar
17  altered.  That is my injury in fact and procedures,
18  delays in my receiving surgery which created more
19  harm to me.  I received reconstructive surgery.
20    Q.   But what is the failure you're
21  referring to?
22    A.   He failed on several occasions to send
23  me out for surgery.  He sent me out there and brung
24  me back.

DARREN JOHNSON

Page 61

1    Q.   Other than what you have already
2  testified to today do you have any evidence to
3  support that contention?
4    A.   I have medical records and that is all
5  I have right now.
6    Q.   All right.  In paragraph 64 other than
7  what you have already testified to today do you have
8  any evidence to support your contention in paragraph
9  64?
10   A.   Yes.  I had the prison medical records
11 and I have the outside medical records.
12   Q.   Do you have any evidence that Dr. Moyer
13 or CPS or PHS knew of what they were doing to you
14 was causing you harm?
15   A.   No, I don't have any other evidence
16 right now.
17   Q.   You don't have any evidence of that
18 fact what I just said?
19   A.   Not right now.  I do have it through --
20 say that question again?
21   Q.   Do you have any evidence that Dr. Moyer
22 or CPS or PHS knew that their acts or omissions were
23 causing you harm?
24   A.   I have it through the medical records.

Page 62

1    Q.   Other than medical records do you have
2  any other evidence of that?
3    A.   Not right now.
4    Q.   In your grievance do you ask for money
5  damages?
6    A.   Yes, sir, in my appeal.  And I think on
7  the bottom of the first page according to --
8    Q.   Can you show me where you made the
9  request for money damages?
10   A.   Right near here.  What compensation
11 efforts are going to be made to resolve this
12 grievance.  And according to section six chapter F1
13 and A4 amended policy I am requesting relief as
14 deemed by any court of law.  That is pertaining to
15 compensation.
16   Q.   What happened to this grievance?
17   A.   It was denied by final review.
18   Q.   How many appeal levels did you take it
19 through?
20   A.   I took it all the way up to the final
21 review.  I took it through everyone.
22       MR. BUCKOVITZ:  That is all I have.
23 BY MS. MARTINDELL:
24   Q.   Good afternoon, Mr. Johnson.  My name

Page 63

1  is Denise Martindell.  I represent Dr. Stempler.  I
2  just have a few questions for you.  The records show
3  that the first time you saw Dr. Stempler in relation
4  to your right knee injury was July 15, 1999.  My
5  question is have you seen Dr. Stempler at any time
6  for any reason prior to that?
7    A.   No.  I haven't seen him.  And they just
8  kept telling me I would.
9    Q.   And who was that that told you you
10 would see him?
11   A.   A couple nurses.
12   Q.   The nurses.  Did you know who Dr.
13 Stempler was?
14   A.   No.  I never seen him before.
15   Q.   Did you know what kind of a doctor he
16 was?
17   A.   No.
18   Q.   Do --
19   A.   Until I received the pass.
20   Q.   Then what to do?
21   A.   To see an ortho.
22   Q.   So to your knowledge he is an
23 orthopaedic doctor?
24   A.   Yes.

Page 64

1    Q.   Now, you would agree that your injury
2  occurred on June 9th and you saw Dr. Stempler on
3  July 15th approximately five weeks had passed?
4    A.   Yes.
5    Q.   And you had not seen him prior to that?
6    A.   Yes.
7    Q.   Now, how did you come to see Dr.
8  Stempler you may have told me this before I
9  apologize for asking again?
10   A.   I was extended a pass to my cell.
11   Q.   And you were given a pass by who?
12   A.   By the guard, officer.
13   Q.   Do you know who referred you to Dr.
14 Stempler?
15   A.   I think Dr. Moyer did, a couple doctors
16 did and Battick according to the medical records.
17   Q.   Do you recall whether Dr. Moyer or Dr.
18 Battick discussed sending you to Dr. Stempler?
19   A.   I didn't know it would be Stempler.
20 All they said was ortho referral.
21   Q.   Now, in between the time of your injury
22 let me back up.  In between the time of your injury
23 and in between the time that you saw Dr. Stempler
24 you had a knee immobilizer and you described that as

DARREN JOHNSON

Page 65

1 a device that goes approximately from your hip to
2 your ankle?
3    A.   Yes.
4    Q.   And you were using that?
5    A.   Yes.
6    Q.   Were you using that on a daily basis?
7    A.   Yes.
8    Q.   Were you using crutches?
9    A.   Yes.
10    Q.   Were you taking anything for pain?
11    A.   He was giving me Motrin.
12    Q.   Did that help you?
13    A.   In a way.
14    Q.   And in a way what do you mean?
15    A.   My leg, I couldn't bend it.  My knee
16 was out of place.  It was painful but after a
17 certain time just like popping pills.
18    Q.   Were you given instructions to keep the
19 immobilizer on all the time?
20    A.   Yes.
21    Q.   You don't bend it?
22    A.   No.  I still couldn't bent it without
23 the immobilizer because fluid had naturally built up
24 around my knee.

Page 66

1    Q.   When would you take it off the
2 immobilizer and there is -- I'm talking about prior
3 to seeing Dr. Stempler?
4    A.   I would take it off when I slept.
5    Q.   And prior to seeing Dr. Stempler would
6 you consider your knee injury life threatening?
7    A.   No, but I couldn't hardly do a lot of
8 things.
9    Q.   And what things?
10    A.   Like clean up, walk down the steps, use
11 the bathroom.
12    Q.   And were you working during that time?
13    A.   Yes.
14    Q.   And you were working at the shoe shop?
15    A.   Yes.
16    Q.   And the job that you were doing was
17 removing the tacks?
18    A.   Removing the tacks, yes.
19    Q.   And you can sit?
20    A.   Yes.
21    Q.   Did you miss any time off from work
22 prior to seeing Dr. Stempler?
23    A.   I missed a lot, a couple hours, yes.
24    Q.   And when you went to see Dr. Stempler

Page 67

1 that would be on July 15, 1995; is that correct?
2    A.   Yes.
3    Q.   Tell me about your visit with Dr.
4 Stempler.
5    A.   Well, at that point my knee had healed
6 and normally.  So the swelling wasn't as big as it
7 used to be.  So when I went to see him he was
8 sitting approximately about three, two to three feet
9 from me.  So he was sitting to my left and I was
10 taking off the knee immobilizer and he was writing
11 something over here and he had a nurse standing by
12 him.  She was doing something with the records.  So
13 by the time I took my knee, the immobilizer off and
14 the Ace bandage he looked and said there is nothing
15 wrong with your leg.  Go back to your leg, take the
16 knee immobilizer off and do leg exercises and my
17 kneecap is over here.
18    Q.   How long was your visit with Dr.
19 Stempler?
20    A.   About five minutes.
21    Q.   So you're saying that he did not touch
22 your leg?
23    A.   No.  He was sitting like sideways.
24    Q.   Do you recall anything else he

Page 68

1 discussed with you at the time?
2    A.   That is all he said.
3    Q.   Did he discuss having seen X-rays?
4    A.   No.  He was just looking down writing.
5    Q.   So he didn't refuse to treat your leg?
6    A.   I don't even know if he treated me.
7    Q.   But he did look at it?  He did look at
8 your knee?
9    A.   Like a glance, yes, like a glance.
10    Q.   And he did give you instructions?
11    A.   Go back to your cell, do leg exercises.
12    Q.   Did he tell you what he thought was
13 wrong with your knee?
14    A.   No.  He said it was a raised patellar.
15    Q.   Patellar altered?
16    A.   He didn't say patellar altered.
17    Q.   He just said raised patellar?
18    A.   Yes.
19    Q.   Now, what was your understanding of a
20 raised patella at the time?
21    A.   I think it was just my understanding
22 was that because my kneecap was up here (indicating)
23 that is what I thought it was.
24    Q.   And you had an MRI the following day?

**Page 69**

1     A.   Yes.
2     Q.   Now, between Dr. Stempler's visit and
3 your repair which happened it was in September of
4 1999; is that correct?
5     A.   Yes.
6     Q.   Did you see Dr. Stempler at all during
7 that time?
8     A.   No. I seen him once before surgery.
9 That's July 15th. That is the one time.
10    Q.   The one time you saw him before the
11 surgery. So to your knowledge Dr. Stempler wasn't
12 involved in any way in your approval process for
13 this surgery.
14    A.   Not to my knowledge.
15    Q.   And to your knowledge did he have
16 any -- did he have any involvement in your surgery
17 at all?
18    A.   No. I went to an outside hospital.
19    Q.   That was Dr. Novell?
20    A.   Yes.
21    Q.   And how about after the surgery, did
22 you see Dr. Stempler after?
23    A.   Yes.
24    Q.   Do you know when that was?

**Page 70**

1     A.   September 23rd.
2     Q.   And what occurred during that visit?
3     A.   He said my leg looked okay with the
4 cast on. He said I can go back to work.
5     Q.   Did he give you some kind of paperwork
6 to send you back to work?
7     A.   He said I can work four hours a day
8 sitting down.
9     Q.   Did you agree?
10    A.   Yes.
11    Q.   And do you have a medical expert or a
12 medical expert report to support your claim of
13 negligence against Dr. Stempler?
14    A.   No. I had proof that he said
15 discontinue my immobilizer and take the brace off
16 and prove that the MRI the next day said that my
17 patella was completely torn.
18    Q.   Anything else?
19    A.   Not right now.
20       MS. MARTINDELL: I think that is all
21 the questions I have. Let me go over my
22 notes for a few minutes.
23       (Whereupon, a brief off-the-record
24 discussion was held.)

**Page 71**

1 BY MS. MARTINDELL:
2     Q.   Now, after your surgery you had
3 physical therapy; is that correct?
4     A.   Yes.
5     Q.   How long was your physical therapy?
6     A.   It was quite a while. I think it was a
7 couple months.
8     Q.   And was that always with Etta Rice?
9     A.   Yes.
10    Q.   And who was it that made the decision
11 to release you from physical therapy, do you know?
12    A.   The last time I had physical therapy I
13 came that following week and I talked to Etna Rice
14 and she said you can't come in because we can't give
15 you any more physical therapy because you already
16 expended your amount, you know, she said something
17 to the effect it was a certain amount that I had to
18 do for physical therapy.
19    Q.   It was your understanding this certain
20 amount was?
21    A.   Like say a thousand dollars or
22 something like that for example. She said I
23 exceeded my amount.
24    Q.   Do you know who set the amount?

**Page 72**

1     A.   No, I don't.
2     Q.   So you went for a period of several
3 months for physical therapy. So we are in to let's
4 say maybe March of 2000, February or March?
5     A.   Yes.
6     Q.   Does that sound right?
7     A.   About that time.
8     Q.   When you had stopped. Okay. So you
9 had been released to return to work four hours a
10 day?
11    A.   Yes.
12    Q.   You had been released for physical
13 therapy. After you were released from physical
14 therapy did you increase your work hours?
15    A.   Yes. Two more hours. I was only
16 allowed to work four hours. Well, two and a half.
17    Q.   So after you -- after you were released
18 from physical therapy you worked six hours total?
19    A.   Yes. Six and a half.
20    Q.   And where did you work?
21    A.   Shoe shop.
22    Q.   And what job were you doing there?
23    A.   I was doing -- it's called a back
24 something.

DARREN JOHNSON

Page 81

1  bending all the way?
2       A.   No, not since Etna Rice.
3       MS. MARTINDELL:  I think that's all I
4  have for you.  Thank you.
5       (Whereupon, the deposition concluded at
6  1:01 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 83

1       - - -
2       INSTRUCTIONS TO WITNESS
3       - - -
4
5       Read your deposition over carefully.
6  It is your right to read your deposition and make
   changes in form or substance.  You should assign a
7  reason in the appropriate column on the ERRATA SHEET
   for any change made.
8
9       After making any change in form or
   substance, and which have been noted on the
   following ERRATA SHEET, along with the reason for
10 change, sign your name on the ERRATA SHEET and date
   it.
11
12      Then sign your deposition at the end of
   your testimony in the space provided.  You are
13 signing it subject to the changes you have made in
   the ERRATA SHEET, which will be attached to the
14 deposition before filing.  You must sign in the
   space provided.  The witness need not be a Notary
15 Public.  Any competent adult may witness your
   signature.
16
17      Return the original ERRATA SHEET to
   Darren Johnson, Graterford Prison, Route 29 & Gravel
18 Hill Road, Graterford, Pennsylvania 19426.  Court
   rules require filing within 30 days after you
19 receive the deposition.
20
21
22
23
24

Page 82

1       C E R T I F I C A T I O N
2
3       I, Micheline Brown, a Court Reporter
4  and Commissioner of Deeds for the Commonwealth of
5  Pennsylvania, do hereby certify the foregoing to be
6  a true and accurate transcript of my original
7  stenographic notes taken at the time and place
8  hereinbefore set forth.
9
10
11
12          Micheline Brown
13          Court Reporter
14          Commissioner of Deeds
15 DATED:_____
16
17
18
19      (The foregoing certification of this
20 transcript does not apply to any reproduction of the
21 same by any means, unless under the direct control
22 and/or supervision of the certifying shorthand
23 reporter.)
24

Page 84

1       SIGNATURE PAGE
2            OF
3       DARREN JOHNSON
4
5       I hereby acknowledge that I have read
6  the foregoing deposition dated February 5, 2004, and
7  that the same is a true and correct transcription of
8  the answers given by me to the questions propounded,
9  except for the changes, if any, noted on the
10 attached ERRATA SHEET.
11
12 SIGNATURE
13
14 _____
15 DARREN JOHNSON
16
17 WITNESSED BY:        DATE:
18
19 _____    Mar 11, 04
20
21 ADDRESS:
22 HCF 8251
23 P. O. Box 244, Graterford, PA 19426
24

21 (Pages 81 to 84)

DARREN JOHNSON

Page 85

1  CASE: Darren Johnson vs. Dr. Stempler, et al.
   DEPOSITION OF: Darren Johnson
2  TAKEN: February 5, 2004
3
4  PAGE LINE ERROR  CORRECTION  REASON
5  change all "Battick" to "Baddick"
6  change all "Kirnara" to "Kanera"
7  change all "Krusinak" to "Korszniak"
8  change all "Rhodes" to "Rose"
9  pg. 55:6-9 change to "Plaintiff
10 shall be permitted to proceed
11 with Count IV against CPS and PHS".
12 change all "altered" to "alta"
13 change all "Sourber" to "Sourbeer"
14 pg. 29:6 change to "deliberately delaying".
15 change all "Etna" and "Etta" to "Edna"
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____

Page 86

1        LAWYER'S NOTES
2  LINE PAGE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**A**

**able** 46:7 73:7,8,9,22 80:14
**about** 6:14,14,14 12:3 12:19 14:1 17:20 18:14 19:21,24 21:20 21:22 29:22 30:24 31:22 32:19 37:2 38:21,22,23 41:3 43:12 50:15 53:13 55:11 66:2 67:3,8,20 69:21 72:7 74:12 76:3,12 78:19 79:20 80:24
**accident** 14:1
**according** 52:9 53:20 62:7,12 64:16
**accurate** 21:14,18 22:23 82:6
**Ace** 34:8 36:24 67:14
**acknowledge** 84:5
**action** 1:6 43:3 50:16
**actions** 54:9
**acts** 52:9 54:4 61:22
**actual** 60:15
**actually** 25:1 74:15
**add** 38:6,14
**addition** 47:20
**additional** 49:15
**additions** 47:14
**address** 9:7 84:21
**adequate** 41:8,13,17 59:14
**adhere** 59:19
**adopt** 41:8 59:19
**adult** 83:15
**affected** 78:18
**Affidavit** 40:22
**Affidavits** 40:7,9 57:5
**afraid** 75:12
**after** 5:7 19:21 27:2 34:6 46:6 52:14 53:14 58:12 59:1 60:15 65:16 69:21,22 71:2 72:13,17,17 73:6 74:7,14,20 75:3,7,14 77:10 78:4,24,24 83:8 83:18
**afternoon** 62:24
**again** 5:13 32:10 45:15 61:20 64:9
**against** 29:4,9,11 53:19 54:3,14,24 55:8 57:6 70:13
**go** 22:24
**agree** 51:10 64:1 70:9 73:21
**agreed** 5:1
**al** 6:6,13 85:1

**ALAN** 2:3
**aliases** 7:16
**allegation** 60:12
**allowed** 72:16
**almost** 22:20 28:14
**along** 83:9
**already** 38:3 40:9 55:24 56:11 61:1,7 71:15 78:16
**altered** 36:8,9 49:21 60:17 68:15,16
**always** 71:8
**amend** 38:5
**amended** 20:22 21:1,2 22:2,5,12,17 32:4 36:1 37:22 52:13 62:13
**Amendment** 56:10
**amount** 17:21 71:16,17 71:20,23,24
**and/or** 82:22
**anesthesia** 29:5 30:9,12 31:5
**ankle** 34:3 65:2
**announced** 49:19
**annual** 77:16,17
**another** 21:8 25:3,9 30:7
**answer** 4:4 11:4
**answers** 84:8
**anti-social** 51:13
**anybody** 9:20 28:15 31:15 32:16 54:22 80:23
**anyone** 9:14 47:2
**anything** 6:15 11:13 12:12 15:23 16:1 34:8 35:8 38:4 41:3 46:14 48:23 54:8 57:11,14 58:12 65:10 67:24 70:18 75:15 79:2 80:24
**anyway** 80:17
**apathy** 58:2,3,7
**apologize** 64:9
**appeal** 62:6,18
**apply** 82:20
**appropriate** 83:6
**approval** 69:12
**approve** 49:13
**approximately** 12:6 64:3 65:1 67:8 73:22
**April** 20:1
**area** 13:13 76:11,15
**around** 14:3 26:21,22 27:2,3 65:24 80:11
**arrived** 26:20
**aside** 53:22

**asked** 31:22 37:17 79:8 80:23
**asking** 32:22 53:22 64:9
**assembled** 36:17
**assembling** 36:23
**asserting** 52:13
**assign** 83:6
**attached** 47:7 83:13 84:10
**attorney** 6:6 47:12
**August** 34:14 49:13 74:6,6,17,23
**available** 25:16 79:14
**Avenue** 1:23
**aware** 26:15 37:14
**a.m** 1:15
**A4** 62:13

**B**

**B** 3:10
**back** 16:14 18:2,11 19:13,15 27:3,7 45:11 45:18,21 51:8 60:24 64:22 67:15 68:11 70:4,6 72:23 74:15,22 75:4
**ball** 13:4 14:4,9 15:24 18:16 77:6,9
**bandage** 34:9 36:24 67:14
**based** 23:7
**bases** 29:8 59:10
**basis** 10:19 41:12 52:19 57:16,19 58:10 59:9 65:6
**bathroom** 66:11 76:19 78:8
**Battick** 32:18,19 33:4,6 33:10 34:16 35:1,2,5 35:7,10,12,18,22 43:6 43:10 64:16,18
**Battick's** 42:21
**Bay** 1:23
**bearing** 11:1
**became** 37:14
**before** 1:16 6:24 8:15 8:19 9:3 12:4 18:13 18:14 30:21 35:14,21 50:23 53:11 63:14 64:8 69:8,10 77:7 78:6 83:14
**beginning** 77:23
**being** 1:18 21:17 37:3 39:7 54:12
**believe** 22:22
**believed** 44:13
**bend** 27:15,16,17,21 44:1,3,6 46:7 65:15

65:21 73:15,22,24 80:21
**bending** 73:19 81:1
**bent** 65:22
**between** 5:2 17:23 18:10,15,16 20:15 33:17 38:4 60:2 64:21,22,23 69:2 73:21
**big** 28:2 67:6
**birth** 7:23
**board** 37:24
**both** 30:9 40:20
**bottom** 18:23 19:19 62:7
**Boulevard** 2:9
**brace** 33:18,20,21 34:1 34:2,4,6,13,14,23 36:24 38:10 42:16 70:15 74:3,16,24 75:1 75:2,4,8
**break** 17:10,12
**breaks** 17:11,18,19,23 18:6,8,10 20:6,8,11 80:16,17
**brief** 70:23
**bringing** 44:11
**brought** 44:13 45:21
**Brown** 1:16 82:3,12
**BRUCE** 1:4
**brung** 60:23
**buckovitz** 2:3,3 3:5 5:10 6:1,5,6 7:22 62:22
**built** 65:23
**buy** 75:24

**C**

**C** 2:1 82:1,1
**call** 21:12 24:21 25:21 26:6 35:1 45:7 51:3 54:22 59:18 72:23 74:22 79:2 80:22
**came** 14:15 27:3,7 36:4 45:11 71:13
**Camp** 8:16,19 12:24
**care** 41:9 58:8 59:15,23 80:19
**carefully** 83:5
**Carlisle** 13:12
**carried** 14:17
**case** 1:5 6:10,14 7:2,8 11:2 14:2 37:14 41:1 51:4 52:20 53:10 85:1
**cast** 70:4
**caused** 41:23
**causing** 61:14,23
**cell** 64:10 68:11 78:15

80:6
**center** 2:8 42:19
**certain** 10:24 65:17 71:17,19
**certification** 5:3 82:19
**Certified** 1:16
**certify** 82:5
**certifying** 82:22
**CF** 8:4,6
**chair** 27:13 28:2,6,12 76:21,24
**chance** 5:20
**change** 18:19,21 20:7 20:10 25:24 83:7,8,10
**changed** 18:22
**changes** 83:6,13 84:9
**chapter** 62:12
**charge** 10:14,16 11:15
**charged** 51:2,7
**Charlie** 8:6
**check** 5:17
**checked** 58:24 59:2
**children** 9:21,22 10:6,8
**City** 1:23
**civil** 1:6 7:2,8
**claim** 29:3 51:10,17 52:19,21,23 53:1,3,5 53:15,18,24 54:3,14 54:17,23 70:12
**claiming** 52:11
**claims** 6:14 50:15 51:3 51:20 52:1,5
**clean** 66:10 78:10
**clear** 60:10
**clearance** 20:18 54:22
**clearances** 52:3
**clients** 53:19
**column** 83:6
**come** 16:14 18:2 64:7 71:14
**coming** 76:19
**commencing** 1:15
**commissary** 75:24
**commissioner** 1:7,17 82:4,14
**commit** 52:9
**Commonwealth** 1:18 82:4
**communicated** 55:16
**communicating** 55:12
**company** 21:5
**compensation** 62:10,15
**competent** 56:20 58:19 83:15
**complain** 51:2
**complained** 51:2
**complaint** 20:22 21:1,3 22:2,6,12,18 32:4 36:1 37:23 50:14,19

52:13
complete 49:6
completely 70:17
composure 28:1
concern 54:11
concerned 79:18
concerning 54:3
concluded 81:5
conclusion 49:8
condition 13:19 28:16
  55:11
conditions 46:10
conducted 50:2
Consent 45:20
consider 66:6
constant 19:1
constantly 17:7,16
consultation 44:17
contend 56:8 60:2
content 5:18
contention 48:15 49:15
  49:24 55:11,15 56:2,6
  56:13,16 57:17,20,24
  58:18 59:16 60:4,7
  61:3,8
contentions 59:8
continue 18:17 52:7
control 82:21
convicted 11:11,16,18
  12:8
conviction 12:11
convictions 10:24
copy 20:21 21:8 25:14
  29:14 40:11 49:11
corporate 55:2,3,8
correct 16:4 24:10
  25:23 29:1 50:24
  67:1 69:4 71:3 74:9
  79:19 80:15 84:7
correction 6:7 21:15
  25:3,6,9 32:2,6,8 36:3
  42:11,14 44:17 50:4
  85:4
correctional 1:9 2:6
  26:21 27:3 28:17
  50:12 60:14
corrections 55:13,17
  59:24
counsel 2:5,10 5:2
counseling 78:24 79:3
count 55:7
county 8:20,21
couple 14:16,22 35:21
  44:23 56:21 63:11
  64:15 66:23 71:7
court 1:1,16 6:11 21:2
  40:10 53:23 62:14
  82:3,13 83:18
CPS 33:7 41:7,21 42:1

48:2,10,18,20 49:19
  52:8 55:8,11 56:9,19
  57:3,20,24 58:18,22
  59:13 60:10 61:13,22
created 60:18
credibility 11:1
credulity 55:7
crime 12:9,9
criminal 7:2,3
crutches 15:6 21:21
  23:12 65:8
cry 28:13
current 21:1
currently 75:11 80:13

D

D 3:1
daily 65:6
damage 44:10 52:10
  77:20
damages 6:15 62:5,9
danger 55:20
darren 1:4,12 3:4 5:7
  6:12 7:12 47:10
  83:17 84:3,15 85:1,1
date 7:23 10:14 47:23
  48:16,17 83:10 84:17
dated 29:19 35:6 47:9
  49:12 82:15 84:6
day 13:8 15:12,15 17:3
  19:9 22:23 26:17
  34:3 68:24 70:7,16
  72:10
days 21:22 83:18
December 9:2,11
decision 41:4 71:10
Deeds 1:17 82:4,14
deemed 62:14
Defendant 2:5,10
defendants 54:3,9,15
  54:24
definition 38:9
degree 11:7
degrees 73:20,21
delay 29:24 44:11 45:2
  46:16,18 78:3
delayed 39:8,23 40:23
delays 39:17 48:7,10
  60:18
deletion 32:6
deliberant 29:6 48:21
deliberate 48:12
deliberately 48:4 56:9
denied 37:5 62:17
denise 2:8 63:1
DENNIS 1:7
department 52:3 54:21
  55:12,17 59:24
department's 37:24

deposition 1:12 5:11,16
  5:17 7:10 56:12 81:5
  83:5,5,12,14,19 84:6
  85:1
describe 26:19
described 29:8 64:24
description 3:12 39:15
determine 11:3 40:2
determining 38:22
device 65:1
diagnose 26:14
difference 33:17
different 33:24 46:11
  46:12,23,24
difficulty 51:22 76:17
  76:18 79:20
direct 13:10 82:21
direction 4:4 42:22
director 33:7
disability 54:13
discontinue 70:15
discretion 18:7
discuss 30:11,16,18,22
  31:4 68:3
discussed 31:12,13 43:1
  64:18 68:1
discussion 70:24
dismissed 51:6 52:21
  55:3
disorder 51:13,17
dispensary 14:13,14
  15:3 24:9 26:13,20,23
  27:11,13
distress 51:15 52:22
  53:2,21
district 1:1,2 6:11,11
doctor 1:6,6 13:16 27:4
  56:22,23 59:14 63:15
  63:23 77:19 78:2
doctors 57:7 64:15
  77:11
documents 4:13 22:9
doing 20:4 61:13 66:16
  67:12 72:22,23
dollars 51:2,8,11 71:21
done 53:23 75:14 80:15
  80:24
door 14:15
doors 80:9,10
down 18:22,23 28:7
  51:22 57:12 66:10
  68:4 70:8 76:19,22,23
  78:9,10
Dr 2:10 6:7,12 15:16,21
  16:5,6,7,7,9,10,12,14
  26:3,8,24 29:4,9,11
  29:22 30:1,7 31:4
  32:10,13,18,19,23
  33:4,6,10 34:16,21

35:1,2,5,7,9,12,18,22
  36:17,22 37:16 42:6
  42:21 43:6,7,10,11,14
  43:16,19 46:3,5 49:9
  55:19 56:24 57:7,8,17
  58:6,14,24 59:2,6
  61:12,21 63:1,3,5,12
  64:2,7,13,15,17,17,18
  64:23 66:3,5,22,24
  67:3,18 69:2,6,11,19
  69:22 70:13 74:20
  77:13,15 85:1
Drs 48:3
duly 5:8
during 18:12 20:15
  66:12 69:6 70:2
duty 15:8

E

E 2:1,1 3:1,10 82:1
earlier 31:2 32:1 74:3
eastern 1:2 6:11
edges 28:5,12
effect 71:17
effecting 12:9
efficiencies 48:5
efforts 62:11
either 21:24 37:18 50:3
Elkins 2:4
emergency 13:7 41:14
  48:8 59:18,22
emotional 51:15 52:22
  53:2,20
end 27:12 83:12
enforce 59:20
ensure 41:9 59:15
entire 73:3
entirely 80:16
entitled 10:23 20:21
  21:7,10 80:17
equipment 36:18
ERRATA 83:6,9,10,13
  83:17 84:10
ERROR 85:4
errors 5:18,19
escorted 26:22
ESQUIRE 2:3,8
et 6:13 85:1
Etna 50:15 71:13 81:2
Etta 71:8
Eugene 42:8
even 68:6
event 13:1
ever 6:24 7:7,10 10:4
  11:15,18 12:8,14
  13:22 23:15 24:4
  35:20 43:10,12 58:24
  76:16 79:24 80:20
everyone 62:21

everything 6:19 24:14
  24:16,18 25:1 38:17
evidence 41:16 42:1
  47:3,4,6 48:14,21
  49:1,7,15,23 56:1,6
  56:12,18 58:16,21
  59:5,7,15 60:4,7 61:2
  61:8,12,15,17,21 62:2
examination 33:3
examinations 48:8
examined 5:8
examining 17:12 36:5
example 71:22
exceeded 71:23
excellent 13:21,22
except 5:4 40:5 84:9
excused 20:14,14
exercise 79:24
exercises 67:16 68:11
  80:3
EXHIBIT 3:12
expended 71:16
expenses 79:16
expert 56:15 70:11,12
explain 6:17 36:13
extend 46:7
extended 64:10

F

F 2:9 82:1
facilities 38:23 40:3
facing 53:12
fact 34:19 45:6 48:19
  57:1 60:16,17 61:18
factory 16:21 17:1
  18:17 19:4,8
facts 21:7,10 23:7
  53:11
failed 41:8 48:23 55:21
  56:19 59:14,19 60:22
failure 60:10,13,20
familiar 39:19
far 27:12 73:17 79:18
  79:20,22
fear 54:3
February 1:15 29:19
  72:4 84:6 85:2
Federal 6:10
feet 17:17 67:8
female 28:18
few 63:2 70:22
file 29:11 47:10 50:9
filed 6:10 57:6
filing 5:2 83:14,18
final 62:17,20
first 5:7 7:20 11:7 16:6
  26:8 30:18 31:7,22
  34:7,9 35:17 62:7
  63:3

DARREN JOHNSON

ive 21:22 27:2 64:3 67:20
five-day 20:19 21:13 23:11,15 24:19
fluid 65:23
following 15:12,15 68:24 71:13 83:9
follows 5:9
follow-up 16:3 48:8
force 59:14
foregoing 82:5,19 84:6
foreman 17:2 19:12
form 5:4 83:6,8
formulate 41:8 59:14
forth 51:20 52:5 55:8 82:8
four 17:20,23 51:8 70:7 72:9,16
frame 44:12
Frank 8:6
fraud 11:19
from 8:17,18 9:1,2,11 17:12 20:14,14 22:12 34:2 39:2,20,24 40:7 40:8 47:8,10 49:9,16 51:13 52:3 53:22 54:12 58:14 59:6 65:1 66:21 67:9 71:11 72:13,18 74:14 75:24
front 14:15
Full 74:11
fully 46:8
future 52:8
F1 62:12

**G**
gave 13:10 15:6 26:12 33:2 51:8 74:24 75:1
general 43:20 54:11
gestures 6:21
girlfriend 9:15,24
give 15:11 16:17 20:13 21:8 28:22 68:10 70:5 71:14 75:19 78:7
given 7:10 64:11 65:18 84:8
gives 5:16
giving 65:11
glance 68:9,9
go 19:15 24:8 27:5 35:3 67:15 68:11 70:4,21 75:4
goes 65:1 73:17
going 5:10 6:13,21 20:24 26:13 32:2 34:24 36:15 44:10 45:3,6 51:22 53:12,24

58:9 62:11
GOLD 2:3
Good 62:24
grabbed 28:5
graterford 1:13,14 8:8 41:10 83:17,18
Graterford's 58:23
Gravel 1:14 83:17
GRA02192000 29:16
Gregory 40:5,6,7,13
grievance 29:11,14,16 29:22 30:4 31:21 50:9,11,20,23 62:4,12 62:16
grievances 57:6
gritting 28:11
guard 45:14 64:12
guards 44:23
guess 44:4
guys 14:22

**H**
H 3:10
half 17:4,8 72:16,19 73:22 79:22 80:7,14
hand 77:8
happen 12:23 54:7
happened 14:12 15:5 24:15,16 25:1 26:5 27:1,6,10,20,23 28:4 28:8,19 29:24 33:12 35:22 36:4 41:15 44:2,8 45:5,10,13,16 62:16 69:3
hard 11:3
hardly 66:7
harm 41:23 60:19 61:14,23
having 5:7 60:15 68:3 79:19
head 6:21
healed 67:5
health 1:8 2:5 6:8 50:4 60:13 80:19
hearsay 47:4
held 1:13 70:24
help 31:9 65:12
her 9:16
hereinbefore 82:8
Hill 1:14 8:16,19 12:24 83:18
him 15:23 27:5,16 30:11,18,23 31:6 35:3 35:21 36:17 37:17 43:18 45:7 58:12 59:1 63:7,10,14 64:5 67:7,12 69:8,10
hip 65:1
hired 57:3,20,24

hiring 58:19
hobbies 78:12
hold 28:1,2
Holmesburg 8:24 9:3 10:13
honesty 12:9
HORN 1:8
hospital 13:14 36:21 37:3 40:24 41:18 43:21 48:9 69:18
hour 17:12
hours 17:3,8 66:23 70:7 72:9,14,15,16,18 80:14
hurt 48:22 73:24 76:5

**I**
Iaccarino 77:14,15
Ibuprofen 75:23 76:2
ice 15:6
idea 5:14
immediate 49:4
immediately 41:18
immobilizer 33:16,17 33:22 34:2,5,7,12 35:16 38:10,15 42:17 64:24 65:19,23 66:2 67:10,13,16 70:15 74:8,11,19,21,24 75:3
inaccurate 21:20
inc 1:9,10 2:6,6 6:8,8
incarcerated 8:7 10:13
inches 76:12
incident 29:7
incompetent 57:3,17,20 57:24
Incorporate 60:14,14
incorrect 22:4
increase 20:6 72:14
INDEX 4:1
indicate 35:8 39:9
indicates 57:3
indicating 68:22 73:19 76:9,11
indifference 48:12,21
indifferent 56:9
infirmary 14:18
inform 57:6
information 39:1,5,9 40:1
informed 46:6
initial 49:20
injure 14:10
injured 14:8 15:24
injuries 39:3
injury 12:14,21 16:22 18:12,13,14,16 20:15 49:4 52:8 60:16,17 63:4 64:1,21,22 66:6

78:18 79:1,16
inmate 8:3,4
inmates 14:16,21 39:2 39:20,24 40:20 41:5,9 41:20,22 54:4
inquire 10:23
inside 27:12 80:5
instead 16:8 32:9
institution 43:9
instructed 75:8
instructions 15:11 28:22 65:18 68:10 75:5 83:2
intentional 51:15
INTERROGATION 3:3
involve 17:5
involved 19:19 39:21 69:12
involvement 69:16
irritated 27:8
issue 29:12 50:22 53:12
issued 21:21
items 55:24 56:11
I-A-C-C-A-R-I-N-O 77:14

**J**
J 1:4
Jack 47:8,10,11
January 9:2
Jersey 1:23
job 16:17,20,23 19:1,11 19:13,16,18 20:2 24:5 66:16 72:22 73:7 80:13
jobs 18:22
John 2:9 19:5
johnson 1:4,12 3:4 5:7 6:12 7:13 47:11 62:24 83:17 84:3,15 85:1,1
Johnson's 60:16
joint 28:7
July 9:11 32:9,9,11,14 32:16,20,22 33:10,13 33:19 35:7,23,24 36:2 38:15 41:18,19 42:9 42:18 43:19 47:23 49:9,12 63:4 64:3 67:1 69:9
June 14:3,5 16:15 18:16 20:15 21:12,16 21:17 23:12,12 24:8 24:11,12,15,16,21 25:2,12,19 26:3 30:8 31:16 43:13 56:4 58:11 64:2
just 14:10 16:2 29:7

31:21 45:17 54:11 58:8 59:5 61:18 63:2 63:7 65:17 68:4,17,21 74:1,15 75:6

**K**
KAUFFMAN 1:4
keep 65:18
keeping 75:6
Kennedy 2:9
kept 63:8 75:6
kind 27:7 39:12 63:15 70:5 75:10,22 78:5,19 78:23 80:20
kinds 10:24
Kirnara 16:5,7,7,9,12 16:14 32:10,13,23 34:21
knee 12:15,16,19 13:19 14:8 24:9 26:7,13,16 28:6 29:4,23 30:4,7 31:15,21,22 33:16,17 33:18,20,21,21 34:1,1 34:2,4,5,6,7,12,13,14 35:10,15 36:24 38:10 38:10,15 42:7,16,17 44:1 45:4 57:13,13 63:4 64:24 65:15,24 66:6 67:5,10,13,16 68:8,13 73:16,20,24 74:3,16,24 75:1,2,4 75:11,15,18 76:4,8,11 76:13 77:12 78:18,24 79:1,16 80:21,24
kneecap 67:17 68:22
knew 31:1 48:20,22 55:20 61:13,22
know 10:22 13:11,14 13:16 14:19,23 15:9 19:23 25:11 30:17,24 31:14,17 32:13,15,16 33:9 34:19,22 37:19 37:21 40:16 42:23,24 43:3,5,6,8 44:4,24 45:9 47:2 50:5,11 54:7 59:2 63:12,15 64:13,19 68:6 69:24 71:11,16,24 77:22 79:9,10,11,13 80:7 79:11,16 80:21,24
knowing 11:4
knowledge 22:3 48:2 48:11,15 49:3 50:6 60:15 63:22 69:11,14 69:15
known 7:15
Krusinak 15:16,17,22 16:6,8,10

**L**

ast 9:18 19:6 40:13 71:12
later 22:20 23:2 78:4
lateral 76:11,13
law 62:14
lawsuit 29:8
LAWYER'S 86:1
lay-in 20:19 21:23 23:11,16 24:3,19
lay-up 21:13
left 12:19 13:19 19:17 45:9,15 57:13 67:9 73:13
leg 27:15 28:1 36:6 44:10 46:8 52:10 65:15 67:15,15,16,22 68:5,11 70:3 73:12,13 73:14 77:1,21
length 74:11
let 64:22 70:21
letter 49:9
let's 27:9 72:3 73:18,20
level 54:18,20
levels 62:18
life 11:9 66:6
like 10:17,17 12:2 16:4 21:15 23:22 24:10 28:11 32:8 38:6 42:11 47:20 51:9 65:17 66:10 67:23 68:9,9 71:21,22 75:19 76:22
limitations 10:20
LINE 4:6,6,6,15,15,15 4:23 85:4 86:2
LITIGATION 4:1
little 27:8,21 77:8
live 9:5,9,14
long 8:7 9:9 19:18 27:16 48:20 67:18 71:5 76:15
longer 34:2
look 5:17 34:24 35:10 68:7,7 73:8
looked 67:14 70:3
looking 68:4
loss 52:12,15,17,24 53:4,13,16,18
lot 31:2,6 66:7,23
LTD 2:7
lunch 17:10

M
machine 17:2 19:12
made 36:20 41:4 44:15 50:19 57:2,9 62:8,11 71:10 83:7,13
make 21:15 23:21 25:6 30:3 32:2,7,8 42:11

42:14 47:14,20 50:14 52:1 54:17 55:10 59:7 83:5
making 29:3 53:15,18 54:24 83:8
malpractice 20:22 48:3 56:16
Mandel 43:7,11,14,16 43:19 46:3,6 49:9
many 7:5 10:8 17:3,19 18:10 57:6 62:18
March 19:24 20:1 22:18 72:4,4
MARKED 3:13
Market 9:8
married 10:2,4
MARTIN 1:8
martindell 2:8 3:6 5:15 6:4 7:19 62:23 63:1 70:20 71:1 73:18,23 76:10,14 81:3
matter 7:4 20:9 45:6
may 10:24 64:8 83:15
maybe 72:4
McDEVITT 2:7
meals 51:23
mean 12:24 23:3 34:4 36:18 51:19 54:22 65:14 73:11 76:21
means 23:4 82:21
meant 25:8 36:11
medical 20:17,19,22 21:13,22 23:1,8,11,15 24:3,19 36:18 37:24 40:3 41:14 48:8,23 49:2,16 52:2,3 54:13 54:21,22 56:16,22 57:2,9 59:18,23 61:4 61:10,11,24 62:1 64:16 70:11,12
medication 51:3 75:22
medicine 58:23
meet 33:14
Mellinger 19:5,7
memo 47:7
memorandum 47:9
memory 12:2 22:12,14 22:23 79:19
met 26:21
Micheline 1:16 82:3,12
might 75:12
Mike 40:8,19
mile 79:23 80:8
minutes 67:20 70:22
misdiagnoses 48:3
misdiagnosing 30:1
miss 66:21
missed 66:23
mistake 23:22 55:10

mistakes 56:21 57:2,8
moment 56:7 57:15 58:20 59:12
Monday 16:4
money 51:8 62:4,9
month 76:3
months 9:10 49:18 71:7 72:3
Moon 9:17,19
more 22:23 49:4 60:18 71:15 72:15
Motrin 33:2 65:11
Motty 40:9
Mouse 7:18
mouth 39:8
moyer 1:7 6:7 26:3,9,24 29:4,9,12 30:2,7 31:4 37:16 48:3 55:20 56:24 57:2,7,9,17 58:6,14 59:1,3,6 61:12,21 64:15,17
Moyer's 29:22
MRI 42:19 43:1,4,12 48:16 49:5 68:24 70:16
Murder 11:7
must 83:14
Myerson 47:8
myself 78:10
M-E-L-L-I-N-G-E-R 19:7
M-O-O-N 9:19

N
N 2:1 3:1 82:1
name 7:12 9:16,18 19:6 40:14 62:24 83:10
names 7:15 31:17 44:24
naturally 65:23
nature 5:19 59:5,7
NAULTY 2:7
near 62:10
necessary 39:12
need 31:11 48:24 49:2 59:19 83:14
needed 49:3
needle 27:15 28:3
needles 36:23
negligence 55:1,2,3,8 55:12 70:13
negligent 52:9
never 19:17 30:20 31:11,13 37:18 43:2 50:22 51:7 52:2 54:21 57:10 58:11 63:14 80:4,22
New 1:23
next 13:8 25:20 34:10 38:21 70:16

nobody 58:24 79:2
nods 6:20
none 3:13 4:8,17 42:3,4
Nope 20:17
normal 78:10
normally 67:6
Notary 83:14
note 20:13
noted 83:9 84:9
notes 22:8 70:22 82:7 86:1
nothing 11:2 30:24 35:11 67:14
notice 1:13 74:2
Novell 69:19
November 47:9
Novocaine 36:23
numb 76:6,7,8,15
number 3:12 8:1,3,4 20:6,10 25:7 29:16 47:21
nurse 14:15,19 15:8 31:19 67:11
nurses 56:20 57:21 58:1,19 63:11,12

O
O 82:1
oath 6:9
object 10:18
objections 5:4
obvious 55:20
occasions 30:10 60:16 60:22
occurred 25:19 37:19 64:2 70:2
occurrence 18:12
Ocean 1:23
off 17:18 23:24 24:4 36:24 66:1,4,21 67:10 67:13,16 70:15 74:19 74:21 75:23
offhand 13:18 14:20,24 15:10 31:17
officer 26:21 27:3 28:17 44:17 64:12
off-the-record 70:23
often 76:1
okay 7:12 9:24 11:5 16:1,12 20:2 23:18,21 25:4,18 26:19 35:8 46:14 48:1 51:1 52:19 53:3 70:3 72:8
old 2:4 9:22 10:10
omissions 61:22
once 69:8
one 2:8 7:20 10:11,11 18:4 21:2 29:8,10 31:21 35:4 38:7 40:8

40:18 43:12 50:15 51:3,5 59:2 69:9,10 75:7
only 11:15 12:11 30:3 31:20 39:22 44:22 56:20 72:15
onto 28:2
OO-CV-711 1:5
open 80:9,10
operated 17:2
operation 13:23 46:7 78:24
Operator 19:12
opinion 56:15
opportunity 5:11,16
Oral 1:12
orally 6:20
order 10:22
ordered 15:20 16:12
original 19:13,15 82:6 83:17
ortho 63:21 64:20
orthopaedic 43:15 63:23
orthopaedist 33:6,8 43:14
other 7:15 12:8,11 17:10 21:17 27:14 38:3,17 39:19,24 40:1 40:18 41:20 44:23 49:7,14,14 51:24 52:1 52:4 54:4 55:24 56:1 56:5,5,10 58:15,15 59:10 60:6,6 61:1,6 61:15 62:1,2 75:21 77:6 78:16,17
out 10:21 13:7 14:4 18:23 19:19 20:3 27:15 29:21 31:22 44:11,13 45:9,15 60:23,23 65:16
outcome 58:9
outside 34:23 36:21 37:3,10,17 38:23 39:13,18 40:3,24 41:18 42:19 48:9 59:18,23 61:11 69:18 80:4
out-of-pocket 79:15
over 19:22 27:9 49:18 67:11,17 70:21 73:7 83:24
oversee 58:22
own 7:3 41:1 75:11
o'clock 18:4

P
P 2:1,1,8
PA 13:12