IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARREN JOHNSON | : | CIVIL ACTION |
| V. | : | NO. 00-CV-711 |
| NORMAN STEMPLER, M.D., DENNIS MOYER, M.D., et al. | : | JURY TRIAL DEMAND |

MOTION OF CORRECTIONAL PHYSICIANS SERVICES, INC.
<u>FOR SUMMARY JUDGMENT</u>

Defendant, Correctional Physician Services, Inc. ("CPS") respectfully requests that its motion for summary judgment be granted against Darren Johnson ("Johnson") and states in support thereof the following:

1. Johnson, an inmate in the correctional system of the Commonwealth of Pennsylvania, has filed a third amended complaint pursuant to 42 U.S.C. §1983 against CPS alleging that during his incarceration at the State Correctional Institution at Graterford ("SCI-Graterford"), CPS had a policy and practice of denying medical care to inmates in violation of the Eighth Amendment of the United States Constitution. See third amended complaint, Exhibit "A".

2. This Court has previously dismissed all the other defendants in this case and has dismissed the state law claim against CPS based on corporate negligence.

3. CPS seeks summary judgment concerning the remaining Eighth Amendment claim because Johnson has insufficient evidence to support a jury verdict on every issue on which he has the burden of proof. CPS has sufficient evidence to establish that no delay in the provision of medical care occurred. Any delay that did occur resulted from the actions of correctional officers and not from any CPS policy, practice, or custom.

4. CPS incorporates by reference as if set forth herein in full its entire brief in support

of its motion for summary judgment and its statement of uncontested facts.

      WHEREFORE, Correctional Physician Services, Inc. respectfully requests that its motion for summary judgment be granted.

                      GOLD & ROBINS, P.C.

            BY:      /S/ ALAN S. GOLD
                      ALAN S. GOLD
                      Attorney for Defendant,
                      Correctional Physician Services, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARREN JOHNSON | : | CIVIL ACTION |
| V. | : | NO. 00-CV-711 |
| NORMAN STEMPLER, M.D., DENNIS MOYER, M.D., et al. | : | JURY TRIAL DEMAND |

BRIEF OF CORRECTIONAL PHYSICIAN SERVICES, INC.
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

I. INTRODUCTION

Correctional Physician Services, Inc. ("CPS") has met its burden of establishing no genuine issue of material fact for a jury to try. No evidence exists sufficient to support a jury verdict that CPS had any policy, practice or custom of delaying necessary orthopedic operations for inmates at the State Correctional Institution at Graterford ("SCI-Graterford"). No evidence exists that CPS had any knowledge of any policy or custom that delayed the performance of surgery upon inmates at SCI-Graterford. CPS submits the deposition of Glen Jeffes ("Jeffes"), the Director of Operations for CPS, whose deposition establishes that no such policy existed. It also establishes that Jeffes knew of no instance in which any test was not approved. Exhibit "B", deposition of Jeffes, page 19. Jeffes also testified under oath that CPS had no control over when an inmate saw a specialist outside the prison because prison authorities determined the availability of escort officers and the time that the inmate would be transported. See Exhibit "B", page 23. CPS has also presented a verification of Jeffes in which he indicates that CPS had no authority to transport inmates off site and that prison officials had absolute control of the transporting of prisoners for medical treatment off site. See verification of Jeffes, Exhibit "C". CPS has submitted the verification of Kenan Umar, M.D. ("Umar"), the President of CPS, in which he

indicates that at no time did CPS do anything to delay medical treatment of any inmate. He also states that CPS never had a policy, practice or custom of delaying the treatment of inmates. He also indicates that CPS had no control over when inmates saw off site physicians because transportation and security came under the complete and absolute control of the Department of Corrections of the Commonwealth of Pennsylvania. See verification of Umar, Exhibit "D". At no time did any physician, including Richard Mandel, M.D. ("Mandel"), indicate that Johnson needed surgery on an emergency basis. At no time did Mandel indicate that the approval process had taken too long. See medical records, Exhibit "E".

In support of Johnson's position, Johnson has only submitted inadmissible hearsay evidence. Consequently, CPS has shown that summary judgment should be entered in its favor and against Johnson. The only evidence Johnson has that Mandel wanted to do the surgery before it actually occurred consists of a memo from somebody named Jack. Johnson never identifies that person. It attempts to set forth a conversation that supposedly took place between Jack and Dr. Mandel. This constitutes double hearsay. The conversation with Mandel constitutes hearsay. The memorandum constitutes hearsay.

## II. PROCEDURAL HISTORY

By memorandum and order, dated March 13, 2002, the District Court dismissed Counts II, IV and V of Johnson's complaint without prejudice and permitted him to proceed with Counts I and III. Johnson subsequently filed a third amended complaint. Dr. Moyer, Prison Health and CPS filed a motion to dismiss the third amended complaint. Commissioner Martin Horn filed a motion to dismiss the third amended complaint. The District Court granted Horn's motion and dismissed him from the third amended complaint with prejudice. The District Court granted part of the motion to dismiss of Dr. Moyer, CPS and Prison Health. It permitted Johnson to proceed

with Count II and IV.  It dismissed Count V with prejudice.

Dr. Moyer, Prison Health and CPS filed an answer and affirmative defenses to Johnson's third amended complaint on October 2, 2003.

Then, Dr. Stempler, Dr. Moyer, Prison Health and CPS' filed motions for summary judgment.  This Court in a memorandum and order of January 18, 2005 granted summary judgment to Dr. Moyer, Prison Health and Dr. Stempler on all claims and granted summary judgment to CPS on the state medical malpractice claim.  It denied CPS' motion for summary judgment concerning the deliberate indifference claim because it concluded that CPS had offered no explanation for the delay in treatment.  The Court appointed counsel for Johnson, established a new discovery schedule and permitted the filing of dispositive motions at the end of the discovery time period.

CPS now files a summary judgment motion which remedies the defects that the Court found in its first summary judgment motion.  The admissible evidence establishes that no delay occurred in care.  Johnson has no evidence of a delay except his own opinion.  The deposition testimony of Jeffes and the verification of Umar establish that any delay resulted from prison authorities in determining when they could transport Johnson.  CPS had no control over this.  No indication exists that anyone ever considered the surgery needed by Johnson as a medical emergency.  No one ever indicated that it was.  Dr. Mandel never indicated that it was.

## II. UNDISPUTED FACTS

The Commonwealth of Pennsylvania has incarcerated Johnson as an inmate in its correctional system since 1992.  See Exhibit "F", deposition of Johnson, page 12.  On June 9, 1999, while incarcerated at the State Correctional Institution at Graterford ("SCI-Graterford") he injured his right knee playing volleyball.  Exhibit "F", page 14.  Inmates took him to the

dispensary. A nurse came to the front door of the dispensary and had him carried up the steps to the wheelchair. They then transported him to the infirmary. Exhibit "F", page 14.

The nurse provided him with an ice pack and crutches. She informed him to report to the infirmary the following day. When he reported the following day, Dr. Kirnara examined him and ordered x-rays. Exhibit "F", pages 15-16. Dr. Kirnara told him to come back on June 14, 1999.

Johnson admits that his third amended complaint contains various errors. He concedes the accuracy of his medical records maintained by prison officials at SCI-Graterford. Exhibit "F", pages 21-23.

Johnson had his knee x-rayed on June 11, 1999. Exhibit "F", page 24. On June 15, 1999, Dr. Moyer examined him when he went to sick call. Johnson told Moyer that he still had a swollen knee. This constitutes the first time that Dr. Moyer saw him. He gave him a pass to report to the dispensary. He indicated that he would tap his knee, which he did. Exhibit "F", page 26.

Johnson asserts that Dr. Moyer caused him serious pain when he performed the procedure of tapping. Johnson did not scream. He gritted his teeth and squeezed the edge of his chair. After the procedure Dr. Moyer informed him that he would examine him in a week. Exhibit "F", page 28.

Johnson concedes that in his grievance he submitted no complaints about how Dr. Moyer performed the knee tap. He only objected to the alleged misdiagnosis by Dr. Moyer. Exhibit "F", page 29.

Johnson asserts that Dr. Moyer did another knee tap without anesthesia on June 22, 1999. Exhibit "F", pages 30 and 31.

Dr. Kirnara examined Johnson on July 7, 1999. Exhibit "F", page 31.

Dr. Moyer referred him to Dr. Stempler, an orthopedic surgeon, for treatment. Exhibit "F", pages 63-64. Dr. Stempler told him that there was nothing wrong with his leg. Exhibit "F", page 66. He told him to use the knee immbolizer and to do leg exercises. He had an MRI the following day. Exhibit "F", pages 66, 68, and 69. Johnson received physical therapy for several months. Exhibit "F", page 72.

On July 2, 1999, Dr. Kirnara gave him Motrin and set up an examination with Dr. Baddick. Exhibit "F", page 33.

Johnson also saw Dr. Baddick on July 9, 1999. Exhibit "F", page 32. When he saw Baddick on July 9, 1999, Baddick gave him a knee immbolizer. Exhibit "F", page 33. Before he received the knee immbolizer he only had an ace bandage. He received a knee brace on August 4, 1999. Exhibit "F", page 34.

Dr. Moyer referred Johnson to Dr. Stempler, an orthopedic surgeon. Stempler saw him on July 15, 1999.

On July 27, 1999, prison officials transported him to Dr. Mandel, an orthopedic surgeon at Suburban General Hospital for treatment. Exhibit "F", page 43. Johnson contends that Mandel informed him that because the delay in brining in to Mandel he would need reconstructive surgery and a wire in his knee. Exhibit "F", page 45. Mandel does not place this in his medical records. Mandel never indicates this. Johnson has no support for his contention as to what Mandel told him. His statement constitutes admissible hearsay. Mandel indicates nowhere in his records that he intended to perform surgery on July 27, 1999. See records of Mandel, Exhibit "E".

The only evidence of what Dr. Mandel recommended on July 27, 1999 consists of a chart note written on that date by Dr. Mandel following his examination of Johnson. In his note Dr. Mandel states that "Treatment options discussed with patient. It was explained that some

improvement may be achieved surgically.  However at this point in time there can be no assurance of success." Dr. Mandel further noted on that date that Johnson "would like to go ahead with surgical construction or repair and this will be scheduled in the future if approved." Dr. Mandel never indicated that it was an emergency.  He never indicated that he intended to perform the surgery on July 27, 1999.  His notes show that he did not intend to perform the surgery on that date.  See Exhibit "E", medical records of Dr. Mandel.

     The physician who wanted a referral would fill out a referral for the inmate which would then go to the medical director.  The medical director would review it and approve it.  It would then go to a nurse who would then schedule the appointment with the respective specialist, whoever that might be.  Deposition of Jeffes, Exhibit "B", p. 16.

     The doctors on site at SCI-Graterford for CPS functioned as independent contractors. Exhibit "B", p. 17.

     Since SCI-Graterford had a full-time x-ray technician and x-ray equipment on site when a physician ordered x-rays they were just scheduled by the x-ray tech, performed and then CPS had a radiologist under contract who read the x-rays on a daily basis.  Exhibit "B", pages 17 and 18.

     During the time he functioned as Director of Operations from the early 1990's until 1999 Jeffes cannot recall a single instance when a test ordered by a staff physician was disapproved. Whatever the staff physician recommended took place.  Exhibit "B", pages 18 and 19.

     Jeffes indicated that at all times the escort provided by the Department of Corrections to take the patient off-site for treatment stayed with the patient until the appointment had concluded. They waited until the test or whatever the physician needed to do was completed.  Exhibit "B", pages 21 and 22.

     CPS only had the responsibility to provide the medical care and schedule any appointment

that needed to occur off site.  Then the Department of Corrections of the Commonwealth of Pennsylvania had total responsibility for assigning the escort officers and transporting the inmate from the prison to wherever he needed to go and staying with him until the medical treatment or the tests needed to be done occurred and then at the completion of the process returning him to the prison.  If the doctor decided to move forward with an operation for an inmate the officers would be obliged to stay with the inmate.  Their obligation was to stay with the inmate until the treatment was completed.  Exhibit "B", pages 23 and 24.

In the early 1990's until 1999, according to Jeffes, no recommendation by a physician employed by CPS or acting as an independent contractor for CPS at SCI-Graterford that an inmate be seen by a specialist was ever disapproved.  Exhibit "B", deposition of Jeffes, page 15.

During the time period in which Johnson complains of a delay in medical treatment Peter J. Baddick, III, D.O. ("Dr. Baddick") was the medical director of Correctional Physician Services, Inc. ("CPS") at SCI-Graterford.  See verification of Baddick, Exhibit "G", paragraph 1.

Dr. Baddick became involved in the treatment of Johnson.  See verification of Baddick, Exhibit "G", paragraph 2.

According to Dr. Baddick, at no time did anyone from CPS do anything to delay Johnson's treatment.  Exhibit "G", paragraph 3.  At no time did Dr. Baddick or any other CPS or medical personnel under the supervision at SCI-Graterford do anything to delay Johnson's treatment.  Exhibit "G", paragraph 4.

At no time did CPS or the CPS medical department at SCI-Graterford have or follow any policy, practice or custom delaying the medical treatment of inmates either at SCI-Graterford or at any outside facility.  Exhibit "G", paragraph 5; verification of Jeffes, Exhibit "C"; verification of Umar, Exhibit "D".

Any delay in treatment of Johnson was caused by employees by the Commonwealth of Pennsylvania independent of CPS. Exhibit "G", paragraph 7; verification of Umar, Exhibit "D"; verification of Jeffes, Exhibit "C".

Dr. Baddick had no control over when prison officials would transfer inmates including Johnson for treatment by outside consultants or for surgery. Prison officials independent of CPS handled this. Exhibit "G", paragraph 9.

According to Dr. Baddick's review of the records of Dr. Mandel it is not true that Dr. Mandel on July 27, 1999 considered Johnson's condition to be an emergency requiring immediate surgery and that he sought to perform surgery on Johnson at that time. According to Dr. Mandel's chart note of July 27, 1999, the situation was not an emergency. Dr. Mandel wrote that he had discussed "treatment options" with Johnson and that he told Johnson that "some improvement may be achieved" through the use of surgery. Dr. Mandel told Johnson at that time there as "no assurance of success" even if surgery was performed. Dr. Mandel wrote that Johnson "would like to go ahead with surgical reconstruction or repair" and that the surgery will be scheduled in the future if approved. There is no indication either explicitly or based upon Dr. Baddick's professional and medical opinion implicitly in Dr. Mandel's chart noted July 27, 1999 that he considered Johnson's condition to be an emergency requiring immediate performance of surgery. In fact, his note that the surgery was to be "scheduled in the future if approved" demonstrates the opposite as this indicates that Dr. Mandel intended to proceed with the routine process of obtaining authorization to perform the surgical procedure. Exhibit "G", paragraphs 10, 11 and 12.

At no time did Dr. Mandel call Dr. Baddick and request emergency approval to perform surgery on Johnson on an immediate basis. Exhibit "G", paragraph 14.

As medical director at SCI-Graterford it was within Dr. Baddick's authority to consider if appropriate and approve an immediate request from an outside physician to perform surgery. Had Dr. Mandel believed it was medically necessary to perform the surgery in question on July 27, 1999 at a time when Johnson was already present at his office for an examination the proper protocol was to call the medical director, Dr. Baddick, at SCI-Graterford and seek authorization verbally. He never did this. Had he done so Dr. Baddick would have approved the immediate performance of the procedure based upon Dr. Mandel's recommendation. At no time did Dr. Mandel ever ask to have the surgery of Johnson scheduled on an emergency basis. Exhibit "G", paragraphs 15 and 16.

### III. ISSUES PRESENTED

Has CPS shown its entitlement to summary judgment against Johnson when Johnson has not set forth any evidence, practice, policy, or custom that caused him injury and when CPS has shown that no delay occurred in medical treatment and that it did nothing to cause any such delay?

### IV. ARGUMENT

In his complaint Johnson identifies CPS as a corporation that had a contract to provide health services. CPS, as a private corporation, has no liability pursuant to 42 U.S.C. §1983 unless Johnson can identify a policy or practice of CPS that violates the Constitution and which CPS knew presented a substantial risk of harm to Johnson. As a matter of law a private corporation may be held liable for a constitutional violation if "it knew of and acquiesced in the deprivation of the plaintiff's rights". Miller v. Hoffman, C.A. No. 97-7987 (E.D. Pa. 1998), Exhibit "H", p. 11. To meet this burden with respect to a private corporation a plaintiff must show that the private corporation "deliberately indifferent to the consequences, established or maintained a policy,

practice or custom which directly caused [plaintiff's] constitutional harm." Id. Exhibit "H", p. 11, quoting Stoneking v. Bradford Area School District, 882 F.2d 720, 725 (3d Cir. 1989) cert. den., 493 U.S. 1044 (1990).

Johnson bases his entire contention of liability against CPS upon an alleged delay in medical treatment. He contends that he should have had surgery on July 27, 1999 at the office of Dr. Mandel but that it never occurred because prison officials removed him from the office before Dr. Mandel had the opportunity to do the surgery. The undisputed evidence establishes that CPS had no control over the prison guards. It did not tell them when to transport Johnson or when to remove him. See verification of Baddick Exhibit "G", paragraph 8; verification of Jeffes, Exhibit "C"; verification of Umar, Exhibit "D"; deposition of Jeffes, Exhibit "B", pages 21-22.

Johnson has no evidence that Mandel intended to do surgery on July 27, 1999. Instead, he presents what he contends Dr. Mandel told him. That constitutes inadmissible hearsay. It fits within no exception of the hearsay rule. To establish a genuine issue of material fact sufficient to defeat summary judgment Johnson must establish that he has sufficient admissible evidence to support his burden of proof on every element of his claim. Williams v. Borough of West Chester, Pa., 891 F.2d 458 (3d Cir. 1989).

This Court denied the first summary judgment motion of CPS because:

> Considering the evidence, this Court cannot conclude that no reasonable jury could find deliberate indifference in the part of CPS, when it inexplicably delayed Plaintiff's necessary orthopedic surgery and referral to outside specialists for treatment...

Opinion of the Court, January 18, 2005, page 11.

CPS has now produced evidence undisputed by any admissible evidence by Johnson establishing that no delay occurred. No indication exists that Dr. Mandel ever recommended that

surgery take place on July 27, 1999.  No indication exists that Dr. Mandel ever believed that a delay had occurred in necessary surgery.  The only evidence of what Dr. Mandel recommended on July 27, 1999 consisted of a chart note written on that day by Dr. Mandel following his examination of Johnson.  In his note Dr. Mandel states that "treatment options discussed with patient.  It was explained that some improvement may be achieved surgically.  However, at this point in time there can be no assurance of success."

Dr. Mandel further noted on that date that Johnson "would like to go ahead with surgical construction and repair and is to be scheduled in the future if approved."  Dr. Mandel never indicated that an emergency existed.  Dr. Mandel never indicated that he intended to perform the surgery on July 27, 1999.  His notes show that he did not intend to perform the surgery on that date.  See Exhibit "E", medical notes of Dr. Mandel.

Dr. Umar, Jeffes and Baddick, the medical director of SCI-Graterford, have all produced signed verifications indicating that CPS did nothing to delay Johnson's treatment.  All three state that no policy or practice existed that prevented appropriate medical care to any inmate including Johnson.  All three have submitted verifications in which they state that they had no control over the transport of prisoners to outside specialists.  The Department of Corrections had complete and total authority in this area.  The prison guards did not report to CPS.  The prison guards took their orders directly from the Department of Corrections.  See Exhibits "C", "D" and "G".

Jeffes in his deposition indicated that all times the escort reported to the Department of Corrections.  Jeffes indicated that if the doctor wanted to move forward with an operation the officer would be obliged to stay with the inmate.  Their obligation was to stay with the inmate until the treatment was completed.  Exhibit "B", pages 23 and 24.

Jeffes stated that he could not recall a single incident from the early 1990's until 1999

when a test ordered by a staff physician was disapproved. Exhibit "B", pages 18 and 19. He also indicated that he could not remember a single instance where a recommendation by a physician or an independent contractor was ever disapproved. Exhibit "B", page 15.

Dr. Baddick in his verification indicated that at no time did Dr. Mandel ask him to approve emergency treatment for Johnson. If he had been asked if he would have approved the operation on an emergency basis. Dr. Mandel never made any such request. Dr. Baddick approved the operation in due course. The operation occurred. Exhibit "G", paragraphs 15 and 16.

The evidence shows that no delay occurred in Dr. Moyer recommending an in-house orthopedic evaluation of Johnson. Dr. Moyer in the beginning of his treatment did not realize that Johnson needed a recommendation to an orthopedic surgeon. The expert report of Dr. Meller supports this. See Exhibit "A" to the reply brief of Moyer, CPS and PHS in support of their motion for summary judgment to address issues at oral argument. It is also attached hereto as Exhibit "I". According to Dr. Meller, the injuries suffered here, a patella tendon rupture, is often misdiagnosed initially. This is particularly true Dr. Meller indicated where one sees a painful swollen knee with symptoms being referred to as the effusion of bloody fluid and less attention is directed toward the site of the injury which is the disrupted tendon. This does not generally show up on an x-ray. See Exhibit "J", page 3. In spite of the severity of this, this by no means is an emergent injury, according to Dr. Meller. Dr. Meller believed that Johnson received appropriate treatment.

He also believed that Johnson provided inadequate history which complicated the diagnosis by Dr. Moyer. In spite of this misleading information Dr. Moyer established the diagnosis by the second visit. Dr. Meller concluded that this was quite laudable and reasonable. He contends that there was no unreasonable delay in regards to diagnosis and the presentation to

an orthopedic surgeon. See Exhibit "J", page 4. Dr. Meller also concluded that any delay in the diagnosis or referral to the orthopedic surgeon failed to cause any injury to Johnson. See Exhibit "J", page 5. Johnson admitted that he stood and walked between the time of the injury and until the repair and had done so without any noticeable complaints. Exhibit "J", page 5.

Johnson has no admissible evidence to contradict Dr. Meller's opinion.

The four affidavits that Johnson had originally submitted to support his claim fail to do so. They fail to constitute sufficient evidence of a policy and practice by CPS. None of the individuals who submit the affidavits identify any policy or practice which they contend caused them injury. None of them identify an injury similar to that of Johnson's. None of them identify who caused the delay in their receiving care. Most of them do not even identify the prison where they believed they received inadequate care. They all provide disagreements with the medical care provided. They do not attribute those disagreements to a policy or practice.

Johnson has presented no evidence that CPS had knowledge of a policy or practice which it knew presented a substantial risk of harm to him. The testimony of Umar, Jeffes, and Baddick show that they knew of no policy or practice. Exhibits "B", "C", "D" and "G". The evidence shows no such policy or practice existed.

## CONCLUSION

In the light of the foregoing, Correctional Physician Services, Inc., respectfully requests that its motion for summary judgment be granted.

GOLD & ROBINS, P.C.

BY: /S/ ALAN S. GOLD
ALAN S. GOLD
Attorney for Defendant,
Correctional Physician Services, Inc.

CERTIFICATE OF SERVICE

       I hereby certify that I have sent a true and correct copy of defendant, Correctional Physician Services, Inc.'s Motion for Summary Judgment, along with supporting Brief and Exhibits via First Class Regular Mail on this date to the following individuals:

Angus Love, Esquire
Pennsylvania Institutional Law Project
924 Cherry Street, Suite 523
Philadelphia, PA 19107

                                       /s/ ALAN S. GOLD
                                  ALAN S. GOLD

DATE: March 8, 2006