IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

-------------------------------------- X

DARREN JOHNSON,

                            Plaintiff       :

                                   :

      v.                         :  BRUCE W. KAUFFMAN, J.

                                   :

DOCTOR STEMPLER,               :

DOCTOR DENNIS MOYER,        :  Case Number: 00-CV-711

COMMISSIONER MARTIN HORN,   :  CIVIL ACTION

PRISON HEALTH SERVICES, INC., :

CORRECTIONAL PHYSICIAN SERVICES, INC., :

                 Defendants    :

-------------------------------------- X

*This is the 3rd Amended Complaint* (handwritten)

## PLAINTIFF'S SECOND AMENDED
## MEDICAL MALPRACTICE COMPLAINT

    Plaintiff Darren Johnson, pro se, for his second amended complaint pursuant to 28 U.S.C. §1983 against Doctor Stempler, Doctor Dennis Moyer, Commissioner Martin Horn, Prison Health Services, INC., Correctional Physician Services, INC., alleges as follows:

### JURISDICTION AND VENUE

    This action is brought pursuant to the Eighth and Fourteenth Amendments of the United States Constitution and the torts of negligence, medical malpractice. This court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and the aforementioned constitutional provisions. This court also has jurisdiction over Plaintiff's PENDENT State Claims pursuant to 28 U.S.C. §1367.

2.    Venue properly lies in this District pursuant to 28 U.S.C. §1391(b)(2), because the events giving rise to this cause of action occurred at the Department of Corrections (hereinafter "DOC")facility, which is the State Correctional Institute at Graterford, (hereinafter "SCI-Graterford" or "Graterford"), in Graterford, PA, which is located within the Easte[rn] ... of Pennsylvania.

DEFENDANT'S EXHIBIT A

215 560 7051          04/15 '02 10:16 NO.705  03/16

## PARTIES

3.   Plaintiff Darren Johnson( hereinafter "Johnson") is and was, at all times relevant hereto, a prisoner in the custody of the Department of Corrections (DOC). At the time of the events relevant hereto, Johnson was incarcerated at SCI-Graterford.

4.   Defendant Doctor Stempler(hereinafter "Stempler") was, at all times relevant hereto, a physician employed or retained by CPS or PCS to provide medical services at the DOC facility, which is SCI-Graterford. He is sued in his individual capacity.

5.   Defendant Doctor Dennis Moyer(hereinafter "Moyer"), was at all times relevant hereto, a physician employed or retained by either CPS or PHS to provide medical services at the DOC facility which is SCI-Graterford. He is sued in his individual capacity.

6.   Defendant Commissioner Martin Horn(hereinafter "Horn") was, at all times relevant hereto, Commissioner of the DOC, and SCI-Graterford. He is sued in his individual capacity.

7.   Defendant Prison Health Services, INC.(hereinafter "PHS")was, at all times relevant hereto, had a contract to provide medical services to inmates at SCI-Graterford. They are sued in their official capacity.

8.   Defendant Correctional Physician Services, INC.(hereinafter "CPS"), was, at all times relevant hereto, had a contract to provide medical services to inmates at SCI-Graterford. They are sued in their official capacity.

   All defendants have acted, and continue to act under color of state law at all times relevant to this complaint.

(1)

## FACTS

9.      On June 9, 1999, Johnson went to the main yard and while playing volleyball, injured his right knee.

10.     Johnson was taken to the institution's dispensary at approximately 1800 hours and was issued an ice pack and motrin. He was told to sign up for sick call for an x-ray and diagnosis.

11.     On June 10, 1999, Johnson went to sick call and received a 5 day medical lay-in and issued a pair of crutches.

12.     On June 12, 1999, Johnson received a pass to report to the dispensary. Plaintiff's right knee was then x-rayed.

13.     On June 14, 1999, Johnson signed up for sick call because the swelling was still present in his right knee.   It is the custom of the Medical Department that Sick Call passes be placed in a box on the middle of the block the night before.  Johnson had to get someone to place the request in the box and wait until the next morning.  He experienced sleepless nights.

14.     On June 15, 1999, Johnson went to sick call and spoke to Defendant Doctor Dennis Moyer, a defendant selected and retained by either CPS or PHS, who issued plaintiff a pass for the dispensary for 1400 hours to receive a knee tap.

15.     At approximately 1400 hours, Johnson arrived at the dispensary.  Defendant Doctor Dennis Moyer gave Johnson a knee tap without novocaine or any other local anestesia.

16.     The knee tap related supra was witnessed by a CO Snyder, who was assigned to that area that day.

17.     The performance of the knee tap without any local anestesia caused Johnson extreme and intense pain.  Johnson explained that he was in extreme pain and could not bend his knee because his kneecap was out of place. His knee was out of place, swollen, and painful.  Johnson also explained to the sick call

(2)

nurse that this may be the same thing that has happened to him earlier in his incarceration and showed her the scar on his left knee.

18.    On June 22, 1999, Johnson once again signed up for sick call because he was still experiencing pain and swelling in his right knee.    Johnson obtained another pass to the dispensary to see Doctor Dennis Moyer.

19.    Defendant Doctor Dennis Moyer gave Johnson another knee tap without any local anestesia.    Neither CPS or PHS questioned Doctor Dennis Moyer's actions.

20.    The performance of the second knee tap without any local anestesia caused Johnson extreme and intense pain.

21.    On July 2, 1999, Johnson received a pass to report to the Clinic Office to receive a knee brace.    While there, the Office Secretary, Rose, told Johnson that she was going to call Doctor Baddick because Johnson's "knee didn't look proper".    Doctor Baddick was the Supervising Doctor, either selected or retained by CPS or PHS.

22.    Doctor Baddick arrived in the Examining Room a short while later.    After examining Johnson's right knee, Doctor Baddick stated that something is definitely wrong with Johnson's Patella.

23.    Doctor Baddick instructed Johnson to return to the dispensary at 1300.

24.    Johnson returned to the dispensary at 1300 hours.    Doctor Baddick informed Johnson that he was going to tap Johnson's knee.

25.    Doctor Baddick then assembled an assortment of equipment and administering a local anestesia of novocaine, Doctor Baddick also explained to Johnson that "your condition (injury in fact) was submitted to the Medical Departments Review Board (CPS and

(3)

PHS) to be voted on to be taken to an outside hospital, but it was denied, then a Doctor Eugene Pratt tapped Johnson's knee. Upon information and belief, the voting system is a practice used to determine if patients should be taken to outside facilities for medical treatment. Because of this denial to send Johnson to an outside hospital, Defendant's CPS and PHS failed to formulate, adopt, and enforce adequate rules and policies to ensure quality care for inmates at Graterford. Johnson also contends that because of this practice, CPS and PHS, with deliberate indifference to the consequences, maintained a practice of prioritizing inmates, which directly caused his harm in violation of the Eighth Amendment of the U.S. Constitution. On information and belief, this same practice has happened to Gregory Sourbeer, Mike Winters(affidavits submitted with the court), and Timothy Winder BQ-5101.

26.    Johnson experienced no pain as Doctor Pratt performed the knee tap.

27.    On July 9, 1999, Johnson was summoned to the dispensary and issued a knee brace by the Dispensary Secretary Ms. Rose, as well as authorization to wear/possess it for 30 days.

28.    On July 15, Johnson was seen at the Institutions Orthopedic Clinic by Defendant, Dr. Stempler, who told Plaintiff that nothing was wrong with his knee except a raised Patella.

29.    Johnson was told by Defendant Dr. Stempler, who is selected and retained by either CPS or PHS to "just do leg exercises and to take the knee brace off".

30.    On July 15, 1999, Johnson was taken to an outside MRI Center. Shortly thereafter, PHS and CPS received the MRI report that displayed the exact type of injury in fact that Johnson had. But nothing was said to Johnson. Even, assuming that PHS and CPS

(4)

possibly reviewed these reports within a minimum of 72 hours, it could be concluded that PHS and CPS had knowledge that Johnson had a serious injury, and therefore, at the first instance, actual knowledge from the medical records of Johnson, that created the injury in fact. Still, nothing was said to Johnson. Because CPS and PHS knew that Johnson had a serious injury (ruptured patella tendon), for several weeks, without any outside medical treatment.

31. The Doctor (Doctor Richard Mandel) at Suburban General Hospital informed Johnson that (because) of the (delay) in him being brought to Suburban General Hospital, they would have to operate in his knee and place a wire in his knee. Doctor Mandel then stated "As a matter of fact, I am going to call them (CPS and/or PHS at the institution) right now! At that point, CPS, and PHS had, the second instance, if even assuming, actual knowledge of the procedures that caused harm to Johnson. He then came back and said "Are you ready for the surgery? And the two guards that escorted me their said, "We weren't scheduled to stay". The delay was caused by the failure of Commissioner Martin Horn, CPS and PHS to oversee all persons who practice medicine within its walls as to patient care; and failed to formulate, adopt, and enforce adequate rules and policies to ensure quality care for inmates(patients). Because no guards were scheduled to stay for the surgery of Johnson, Johnson was brought back to the institution, and nothing else was said to Johnson.

32. Johnson was informed by a Doctor Richard Mandel, that he may experience pain on occasions after the operation and will not be able to extend or bend his leg fully. This was the same day as indicated in #31.

(5)

33.     Johnson was informed that these conditions would be permanent. Since the filing of the complaint, Johnson does have permanent damage to his injury in fact, right leg. This is the same day as indicated in #31.

34.     On July 30, 1999, Johnson went to the Institution's dispensary because of the pain in his right knee. Johnson was issued a prescription for Motrin by the dispensary nurse Ms. Carnes.

35.     Nurse Carnes charged Johnson $2.00 for the Motrin and another $2.00 for the visit to the dispensary for a total of $4.00.

36.     On September 17, 1999, 100 days later, Johnson went to the Mercy Suburban Hospital in Norristown, PA to have reconstructive surgery performed on his right knee which required 1 day of outside medical treatment. Because of the misdiagnosis and malpractice caused by Doctors Moyer and Stempler. Delays in scheduling, follow-up examinations, emergency medical treatment processing to an outside hospital were also delayed. PHS, CPS and Commissioner Martin Horn had subjective knowledge and their practice were deliberately indifferent to Johnson in violation of the Eighth Amendment of the U.S. Constitution.

37.     On November 23, 1999, Edna Rice, Physical Therapist had Johnson use weights to try and strengthen his knee.

38.     When Johnson returned to his physical therapy sessions on December 1, 1999, he explained to the physical therapist that he was experiencing pain on the left side of his knee.

39.     On January 4, 2000, the Physical Therapist, Edna Rice, took back the cane Johnson had been using notwithstanding the fact that he still needs it.

(6)

215 560 1051                    04/15 '02 10:23 NO.705  10/16

43.     Soon after, Johnson filed administrative grievances all the way to Final Review.

## CAUSE OF ACTION

### COUNT I.        CRUEL AND UNUSUAL PUNISHMENT AGAINST

### DEFENDANTS DOCTORS DENNIS MOYER, AND DOCTOR STEMPLER

44.     Johnson incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

45.     Defendants Doctor Dennis Moyer and Doctor Stempler were both deliberately indifferent to Johnson's serious medical need in violation of the Eighth Amendment of the U.S. Constitution.

46.     Defendants, Doctor Moyer and Doctor Norman Stempler both knew of the obvious danger to Johnson if his condition remained untreated, yet they failed to treat his condition in a timely manner.

47.     As a result of their actions and omissions, Defendants Doctor Dennis Moyer and Doctor Stempler committed medical malpractice      under      the      State      Tort      claim      of

### COUNT II.CRUEL AND UNUSUAL PUNISHMENT AGAINST DEFENDANTS

### MARTIN HORN, PRISON HEALTH SERVICES, INC,

### AND CORRECTIONAL PHYSICIAN SERVICES, INC.

48.     Johnson incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

49.     Defendants, Martin Horn, Prison Health Services, Inc., and Correctional Physician Services, Inc.   were deliberately indifferent to Johnson in violation of the Eighth Amendment to the U.S. Constitution.

## DEFENDANT MARTIN HORN

50.    The failure of Defendant Martin Horn to take disciplinary or other actions to curb the known pattern and practice of medical malpractice and delays in treatment constituted deliberate indifference, and contributed to and proximately caused the above described violation of Eighth Amendment rights and Medical Malpractice.

51.    The failure of Defendant Martin Horn to act on prior complaints of Doctors Dennis Moyer, Doctor Stempler, PHS, and CPS, which he knew of or reasonable should have known that a practice and pattern of medical malpractice on inmates at SCI-Graterford has emerged, constitutes deliberate indifference and contributed to and proximately caused the above violation of the Eighth Amendment of the U.S. Constitution.

## PHS AND CPS

52.    Johnson incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

53.    The failure of PHS and CPS, after two seperate occasions of notification, that Johnson had a serious medical need, established and maintained a practice which directly caused Johnson to have permanent damage to his right leg, were deliberately indifferent to Johnson in violation of the Eighth Amendment of the U.S. Constitution.

## COUNT III.    MEDICAL MALPRACTICE AGAINST DEFENDANTS

### DOCTORS DENNIS MOYER AND DOCTOR STEMPLER

54.    Johnson incorporates by reference the allegations in the preceding paragraphs as if fully set herein.

(9)

55. Defendants Doctors Moyer and Stempler rendered treatment which fell below the standard of medical practice in the community in which they failed to diagnose or TIMELY treat the symptoms related to Johnson's injury.

56. The failure to diagnose and treat the symptoms related to Johnson's injury caused Johnson to suffer serious and permanent harm.

57. The failure of Doctors Dennis Moyer and Doctor Stempler to provide Johnson with adequate treatment of his injury in fact constitutes the tort of medical malpractice under the law of

58. The actions and omissions set forth above were willful and malicious and they were performed in wanton disregard for Johnson's health and safety.

COUNT IV.    CORPORATE NEGLIGENCE AGAINST DEFENDANTS

PRISON HEALTH SERVICES, INC., AND

CORRECTIONAL PHYSICIAN SERVICES, INC.

59. Johnson incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

60. Defendants Prison Health Services, Inc. and Correctional Physician Services, Inc. are liable to Johnson on a theory of Corporate Negligence in that they failed to select and retain only competent physicians and nurses, which was a breach of duty causing direct liable to Johnson.

61. Defendants Prison Health Services, Inc. and Correctional Services, Inc. failed to oversee all persons who practice medicine within its walls as to patient care, which was also a breach of duty and are directly liable to Johnson.

(10)

04/15 '02 10:25 NO.705 13/16

62.     Defendant Prison Health Services, Inc. and Correctional Physician Services, Inc. failed to formulate, adopt, and enforce adequate rules and policies to ensure quality care for patients was also a breach of duty and is therefore liable to Johnson.

63.     The failure of Prison Health Services, Inc. and Correctional Physician Services, Inc, after having actual knowledge on two seperate occasions, of Johnson's injury in fact, and procedures(delays) which created more harm to Johnson constitutes a cause of action under the torts of Corporate Negligence.

64.     The failure of Prison Health Services, Inc. and Correctional Physician Services, Inc to timely treat Johnson's injury in fact, with emergency medical treatment, caused Johnson to require a more extensive surgery, therefore, constitutes a cause of action under the torts of Corporate Negligence.


COUNT V.                 INTENTIONAL INFLICTION OF
            EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

65.     Johnson incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

66.     Because of the defendants conduct, Johnson is suffering from psychological and physical injuries for the negligent acts of the defendants.

(11)

COMMONWEALTH OF PENNSYLVANIA )
County of Montgomery            )        SS:

## AFFIDAVIT IN SUPPORT
## OF PLAINTIFF'S PHYSICAL AND PSYCHOLOGICAL
## INJURIES

I, Darren Johnson, plaintiff, hereby declare:

That on July 27, 2001, I went to sick call at SCI-Graterford, complaining of stomach problems. After further investigation, it was concluded that I have a stomach tumor caused by and incurred in military service. When I told the medical department at SCI-Graterford. They informed me that I would have to get minor surgery. I was sent a pass to report to the Dispensary. When I arrived at the dispensary, to at least get further tests to verify at least, if the tumor's extraction would cause me any future problems. When I arrived at one of the rooms to receive the surgery, it was a one, Doctor Dennis Moyer, to perform the task. He explained to me that I didn't need the surgery until I am released from prison. I was kind of relieved because of the fear of being subjected to another malpractice or medical mistake.

No tests were done to inquire if this same tumor that I still have is causing any problems to my stomach. Therefore, I still have the physical injury.

## DECLARATION

I, Darren Johnson, declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Signed this __24__ day of March, 2002

```
 1              IN  THE  UNITED  STATES  DISTRICT  COURT
         FOR  THE  EASTERN  DISTRICT  OF  PENNSYLVANIA
 2
                        -   -   -
 3
     DARREN  JOHNSON          :      CIVIL  ACTION
 4                                   NO.  00-CV-711

         vs.                  :
 5
     NORMAN  STEMPLER,  M.D.,    :
 6   DENNIS  MOYER,  M.D.,  et al
                        -   -   -
 7
 8               October  19,  2005
 9
                        -   -   -
10
11
                  Oral  telephone  deposition  of  GLEN  JEFFES,
12
     taken  pursuant  to  notice,  was  held  at  the  Law  Offices
13
     of  ANGUS  R.  LOVE,  ESQUIRE,  924  Cherry  Street,  Suite  523,
14
     Philadelphia,  Pennsylvania  19107,  beginning  at  2  o'clock
15
     p.m.,  on  the  above  date,  before  Joshua  Lieberman,  a
16
     Federally  Approved  Registered  Professional  Reporter
17
     and  Notary  Public  in  and  for  the  Commonwealth  of
18
     Pennsylvania.
19
                        -   -   -
20
21
               ESQUIRE  DEPOSITION  SERVICES
22                      12th  Floor
              1600  John  F.  Kennedy  Boulevard
23                  Four  Penn  Center
             Philadelphia,  Pennsylvania  19103
24                  (215)  988-9191
```

DEFENDANT'S EXHIBIT

```
 1   APPEARANCES:

 2

 3                    ANGUS R. LOVE, ESQUIRE
                      924 Cherry Street
 4                    Suite 523
                      Philadelphia, Pennsylvania 19107
 5                    (215) 925-2966
                      For the Plaintiff
 6

 7                    GOLD, BUTKOVITZ & ROBBINS, P.C.
                      BY:   ALAN S. GOLD, ESQUIRE
 8                    Manor Professional Building
                      7837 Old York Road
 9                    Elkins Park, Pennsylvania 19027
                      For the Defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Glen Jeffes

```
1                     EXAMINATION BY
2    MR. LOVE:
3            Q.      Okay.  Mr. Jeffes, I know you
4    well, but for the sake of the record, if you
5    could briefly summarize your educational and
6    employment background.
7            A.      I have a master's degree from
8    Michigan State University.  My employment
9    background, I started in Corrections
10   approximately 1959 at the United States Federal
11   Penitentiary in Atlanta where I was a Navy school
12   instructor. I then spent five years in Iowa's
13   prison system as a personal administrator.  I
14   spent three years in the Idaho prison system as
15   the deputy warden at the Idaho State
16   Penitentiary.  I came to Pennsylvania in 1972 as
17   the first deputy for treatment at the State
18   Correctional Institution of Rockview.  From there
19   I moved to the State Correctional Institution in
20   Dallas where I was a superintendent for ten
21   years, and then was temporarily the
22   superintendent at Graterford in 1983 for
23   approximately six months.  I then was appointed
24   Acting Commissioner by Governor Thurnburg.
```

Glen Jeffes

1    During this period the Bureau of Corrections was

2    elevated to department level status, and I was

3    the first secretary of Corrections for the

4    Commonwealth.  I retired in 1990, and actually in

5    1987 there was a change in administrations.  I

6    then worked at Lehigh County as director of

7    Corrections.  In 1991 I went into the private

8    sector and worked for Correctional Physician

9    Services which later became Prison Health

10   Services and I retired in 2001.

11              Q.    And you're currently retired?

12              A.    Yes.

13              Q.    And your current address?

14              A.    Is 3 Pleasanton,

15   P-L-E-A-S-A-N-T-O-N, Drive, East Berlin,

16   Pennsylvania 17316.

17              Q.    I'd like to focus on your career

18   with CPS.  It's Correctional Physician Services;

19   is that correct?

20              A.    That's correct.

21              Q.    And were you the founder of that

22   organization?

23              A.    No, I was not.

24              Q.    Can you tell us a little bit

Glen Jeffes

1    about how it got set up and what your role was.

2              A.      The founder and president was Dr.

3    Keenan Umar. The founder was Dr. Keenan Umar who

4    formed his own company Correctional Physician

5    Services.  Their initial contract was at the

6    State Correctional Institution at Graterford.  At

7    the early point in time, I was the director of

8    Corrections in Lehigh County.  He asked me if I

9    would help him with the contract at Graterford.

10   I then left Lehigh and actually was the site

11   administrator for CPS or the Graterford contract.

12   When that contract ended, CPS bid on the eastern

13   region which involved those prisons.  Let's see,

14   I think there were six or seven altogether, and I

15   then moved to their corporate headquarters in

16   Blue Bell, and basically was director of

17   operations for the company overseeing the

18   contracts in Pennsylvania, Virginia and Florida.

19             Q.      Now, when you were the site

20   administrator at Graterford, what were your job

21   duties?

22             A.      Basically my job duties were to

23   oversee the day to day operation of the

24   contracted responsibility of CPS in the delivery

Glen Jeffes

1    of basically health-care services.  CPS was

2    responsible for delivering health-care services

3    with the exception of nursing services.

4            Q.      And what were the dates for that

5    particular job?

6            A.      I started in April, 1991, and I'm

7    trying to think, maybe a year or two, I don't

8    recall when that contract ended, and then from

9    there, of course, we bid on the state-wide

10   contract.  I don't recall the date.

11           Q.      Then you became the director of

12   operations somewhere in '93-ish?

13           A.      Somewhere in the early '90s,

14   whenever they were awarded the state contract for

15   the eastern region.  The state was divided up

16   into three regions medically, the eastern, the

17   central and the western.  And CPS bid and was the

18   successful bidder for those institutions in the

19   eastern region.

20           Q.      And how long did you have that

21   position?

22           A.      Until the company was sold, I

23   think, in 1999 to Prison Health Services.

24           Q.      Do you recall when in 1999 it was

Glen Jeffes

1    sold?

2              A.     No. I think it was the early part

3    of 1999, but I don't recall.

4              Q.     Okay.  And tell us about your job

5    as director of operations.  What did that entail?

6              A.     Basically that position involved

7    overseeing our delivery of contracted services in

8    those states, in those areas for which we held

9    contracts, and some were full contracts.  By that

10   I mean full service medical contracts.  Others

11   were just partial.  So it depended on the

12   contract and the services that were awarded.

13                    In Pennsylvania, the eastern

14   region was basically full service with the

15   exception of nursing at Graterford.

16             Q.     And describe what full service

17   means.

18             A.     Well, full service basically was

19   medical services which included dental and

20   pharmacy, medical dental pharmacy.

21             Q.     And were the doctors employees of

22   CPS?

23             A.     Most of the doctors were

24   independent contractors with the exception of the

Glen Jeffes

1   corporate medical director.

2        Q.     Now, you said it was sold to PHS.

3   Did they assume all of those contracts when they

4   bought the company?

5             MR. GOLD:  Objection for "sold."

6        The company wasn't sold.  The contract

7        was sold, if I recall.  I just want to

8        make no one was speaking here.

9   BY MR. LOVE:

10        Q.     Okay.  If you could make that

11   distinction, I'm not sure what that means.

12             So CPS had contracts and those

13        contracts were sold to Prison Health

14        Services; is that correct?

15        A.     To the best of my knowledge.

16   Again I was not directly involved in the sale.

17        Q.     Do you know what happened to CPS

18   after the contracts were bought by PHS?

19        A.     To the best of my knowledge, CPS

20   ceased to exist, at least from my perspective,

21   because I went to work for Prison Health

22   Services.  They picked up the Pennsylvania

23   contract from CPS and I went to work for them.

24        Q.     Was that contract in midstream or

Glen Jeffes

```
 1   was it renegotiated?
 2          A.      The contract was ongoing.  The
 3   contract was still in place.
 4          Q.      So they just became --
 5          A.      They just became Prison Health
 6   Services.
 7          Q.      And you continued to function
 8   with them?
 9          A.      Right.
10          Q.      And as part of your job as
11   director of operations, was Graterford one of the
12   institutions that had the contract?
13          A.      Yes.
14          Q.      And did you do anything at
15   Graterford in those days?
16          A.      I'm not clear what you mean.
17          Q.      That was a poor question.
18                  What were your responsibilities as
19                  director of operations with regard to
20                  the State Correctional Institute at
21                  Graterford?
22          A.      Basically Prison Health Services
23   was to oversee the contracted health services at
24   Graterford and all the other institutions in the
```

Glen Jeffes

```
 1   eastern regions which Prison Health Services
 2   took over from Correctional Physician Services.
 3   That basically was to ensure that those contracts
 4   for which services were required, that they were
 5   provided.
 6              Q.    Do you know any of the terms of
 7   the agreement between PHS and CPS?
 8              A.    No, I do not.
 9              Q.    Did you gain financially from the
10   sale of the company?
11              A.    No, I did not.
12              Q.    So you just became an employee of
13   a different company; is that correct?
14              A.    That's correct.
15              Q.    Did you own any stock in CPS?
16              A.    No.
17              Q.    Any stock in PHS?
18              A.    I did have -- I did own some
19   stock in PHS, which they had a profit or stock
20   purchase program for employees.
21              Q.    And where is PHS located?
22              A.    They're in Tennessee.  I'm going
23   to say Asheville, but it's a suburb of Nashville.
24              Q.    Do you offhand have that address?
```

Glen Jeffes

1          A.      Not right off the top of my head.

2          Q.      Okay.

3          A.      They're in Nashville.  They're a

4    public health cooperation and they're traded

5    outright.  I think they still trade on either

6    NASDAQ or the New York Stock Exchange, one or the

7    other.

8          Q.      Do you know if they're paying

9    Mr. Gold for representation in this case?

10         A.      I have no idea.

11         Q.      Now, going back to 1999.  I'd

12   like to get an understanding of the limits of the

13   contract at Graterford with regard to the role of

14   the Department of Corrections, the role of CPS

15   and the role of in-house doctors and the role of

16   outside consultants.  Can you discuss that a

17   little bit, please?

18         A.      Well, in terms of what?  Each

19   institution had a medical director on site.  The

20   corporation had a corporate medical director.

21         Q.      Do you know the name of that

22   individual at Graterford at that time?

23         A.      Let's see here.  I can't remember

24   whether it was Dr. Moyer.  We had two or three

Glen Jeffes

```
 1    and I don't remember specifically.  I know Dr.
 2    Moyer was a medical director at one point in
 3    time, but I can't give you the -- I don't know
 4    the dates.  I don't recall the dates.
 5              Q.      And he would have been an
 6    employee of CPS?
 7              A.      He was an employee of CPS.
 8              Q.      Okay.  And what else can you tell
 9    me about the relationship between the doctors the
10    department and CPS?
11              A.      Well, basically the contract set
12    forth the services that were to be provided to
13    the institution and generally provided a full
14    range of medical services, which involved daily
15    sick call.  Inmates would put in a request to be
16    seen on sick call.  They were seen on a daily
17    basis by a physician. Later we did add, and I
18    can't give you the dates of physician assistants.
19    So they were either seen by a physician or
20    physician assistant who would evaluate the
21    individual, make a diagnosis, and to my knowledge
22    lay out a course of treatment.  And if other
23    tests were needed, that physician could order
24    those tests, or if the services of a specialist
```

Glen Jeffes

1   might be needed, then the physician could make a

2   recommendation that the individual be seen by a

3   specialist.

4            Q.      And who would that recommendation

5   go to?

6            A.      The recommendation usually went

7   to the medical director.  And generally speaking,

8   those were -- I'm not aware of any that were

9   generally disapproved.  But we were instructed --

10  I know that the medical director, Dr. Domino for

11  the company, he made it clear to our physicians

12  that he expected them to provide the same level

13  of care for inmates that they provided for their

14  patients in the private sector.  So if the clinic

15  or if the specialist had to see less than five

16  patients, they could be seen on site.  If they

17  had to be -- excuse me, let me see here.  I'll

18  make sure I got this right.  If it was less than

19  five patients, they could be taken off site.  If

20  it was more than five patients, then the

21  specialist had to come on site.

22           Q.      And the medical director made

23  that final determination of when to consult an

24  outside specialist; is that correct?

Glen Jeffes

```
1              A.      No, generally what would happen,
2    the physician would fill out a referral form
3    which would go to the medical director.  The
4    medical director would review it, and to my
5    knowledge, approve it.  It would then go to a
6    nurse who would then schedule the appointment
7    with the respective specialist, whoever that
8    might be.
9                    We had several clinics that we ran
10   on a regular basis, on a monthly basis.  For
11   example, neurology, we had a monthly clinic on
12   site for neurology; we had one for optometry; we
13   had one for oral surgery.
14             Q.      Didn't you also have one for
15   orthopedics?
16             A.      Yes. Yes, we did have an
17   orthopedic.
18             Q.      Now, the monthly or orthopedic
19   clinic, was that conducted by an outside
20   specialist who came to Graterford?
21             A.      Yes.
22             Q.      Do you recall who that was back
23   then?
24             A.      As I recall, I think it was Dr.
```

Glen Jeffes

1   Stempler, Norman Stempler.

2          Q.     Do you know what hospital he was

3   affiliated with?

4          A.     Suburban General.

5          Q.     Now, are the physicians'

6   assistants employees of CPS?

7          A.     The physician assistants at that

8   time were employees of CPS.

9          Q.     Okay.  But the doctors were not?

10         A.     Pardon?

11         Q.     The doctors, other than Dr.

12  Moyer, --

13         A.     The consultants were basically

14  independent contractors.

15         Q.     And the doctors on site, other

16  than Dr. Moyer, were also independent

17  contractors; is that correct?

18         A.     Generally, yes.

19         Q.     Okay.  Now, what would be the

20  procedure if a doctor ordered X-rays?

21         A.     If the doctor ordered X-rays,

22  Graterford was one of the few institutions that

23  we had a full-time X-ray technician and X-ray

24  equipment on site, so the X-rays would be done on

Glen Jeffes

```
 1   site by the X-ray technician, depending upon what

 2   the physician ordered to be X-rayed.

 3          Q.       And did that have to be approved

 4   by Dr. Moyer or was that just based on --

 5          A.       Well, no.  In most cases when a

 6   physician ordered X-rays, they were just

 7   scheduled by the X-ray tech and followed through

 8   and then the department had or we had a

 9   radiologist under contract who read the X-rays

10   on, if I remember, correctly on a daily basis

11   and the results were reported back to the

12   institution.

13          Q.       Now, what about procedures for an

14   MRI?

15          A.       In terms of what?

16          Q.       Would it be different than the

17   X-ray?  If the doctor says, "We need an MRI," you

18   do it," or does it have to be approved by

19   somebody?  And that I don't believe was in-house.

20          A.       I really don't recall.  I'm not

21   sure.  Generally tests that were ordered by staff

22   physicians, to the best of my knowledge, were

23   almost -- I mean, to my knowledge, I can't recall

24   any that were disapproved.  They were whatever
```

Glen Jeffes

1    the staff physician recommended be done.  Those

2    were generally followed through by the site

3    medical director.  An MRI would have had to have

4    been done off site.

5            Q.     And where would that have been,

6    Suburban General, if you recall?

7            A.     Yes, I think so.

8            Q.     Now, as with Mr. Johnson in this

9    case, would the normal procedure or routing be

10   that if it's an orthopedic issue and he was dealt

11   with by the regular doctor, he'd first go to the

12   orthopedic clinic before there would be a

13   consideration of an outside consultant or does it

14   not matter?

15           A.     Well, I'm not sure how this case

16   was handled.  But initially, procedurally what

17   should have happened or would have happened is

18   the individual probably would have initially

19   showed up on sick call.  Or if he had been

20   injured, let's say, in yard out, he would then go

21   to the clinic area in the medical unit for

22   initial examination.

23                  If he was seen by a nurse, the

24   nurse would, you know, do whatever they were

Glen Jeffes

1    taking the inmate from the prison to where the

2    appointment was; stayed with the inmate until the

3    appointment was completed and then return him to

4    the institution.

5            Q.     So they would stay as long as it

6    was necessary or was there a timeframe on these

7    escort services?

8            A.     No, there was never a time on the

9    escort.  When we went, the inmate was taken out

10   for the appointment.  They stayed with him until

11   whatever needed to be done was completed.

12           Q.     So whatever the outside

13   consultant felt needed to be done, they would

14   stay there until then?

15           A.     Until the tests or whatever they

16   were doing was completed, that's correct.

17           Q.     Okay.  So they were under the

18   direction at that point of the outside consultant

19   and not your organization or the Department of

20   Corrections?

21           A.     No, our responsibility

22   contractually was to provide the medical care,

23   schedule any appointment that needed to be

24   scheduled off site.  Then the Department of

Glen Jeffes

1   Corrections, in this case then Graterford would

2   be responsible for assigning the escort officers

3   and the vehicle; take the inmate from the prison

4   to wherever he needed to go; stay with him until

5   whatever medical treatment and/or tests needed to

6   be done, and that at the completion of that,

7   return him to the institution.

8           Q.       Now, let me give you a

9   hypothetical.  If the outside consultant said,

10  "Gee, there's a big problem here; I have to deal

11  with it immediately;" the escorts would be

12  required to stay until that was completed?

13          A.       Well, I'm not sure.  What are you

14  saying, in dealing were the inmate or some other

15  inmate or some other problem?

16          Q.       No, if the outside consultant --

17  well, I'll just tell you, in Mr. Johnson's case

18  the outside consultant looked at Mr. Johnson and

19  said, "You need an operation immediately;"

20  would the escort then be obliged to wait until

21  that operation was finished?

22          A.       If the doctor wanted to move

23  forward with the operation, he was going to do it

24  immediately like within the next hour or so, the

Glen Jeffes

1   officers would stay with the, they would stay

2   with the inmate.  They would call back to the

3   institution generally and/or either call or radio

4   and advise them what they were going to do.  But

5   their responsibility was to stay with the inmate

6   until the treatment was completed or whatever was

7   ordered as a part of it by the specialist.

8           Q.     Now, going back to CPS, if the

9   specialist said, "I need to do something right

10  away," would he have to contact CPS to get

11  approval or could he just go right ahead?

12          A.     Well, I would suspect that he

13  would probably have called the medical director

14  if it was more than what they recommended.  In

15  other words, if he had been scheduled for tests,

16  they took him out and the tests were conducted

17  and then the specialist felt that he needed to go

18  in another direction, then I think as part of

19  protocol, I'm assuming he would call the medical

20  director and advise him as to what the

21  recommendations, what his recommendations for

22  course of treatment would be.  I mean, I would

23  think, but I don't have any personal knowledge.

24          Q.     And it would be up to the medical

Glen Jeffes

1  director whether or not to approve the additional

2  emergency treatment?

3           A.      The medical director had that

4  authority.  The medical director on site had that

5  authority.

6                      MR. LOVE:  Okay.  I think that's

7              all I have.  Thank you very much former

8              Secretary Jeffes.

9                  ´   THE WITNESS:  Okay.  Thank you.

10                     COURT REPORTER:  Mr. Gold, do you

11             want a copy, sir?

12                     MR. GOLD:  Yes.

13                     MR. LOVE:  Thank you, Alan.

14                     MR. GOLD:  Thank you.

15                     (Whereupon the oral telephone

16             deposition was concluded at 2:25 p.m.)

17

18                          0Oo○0O

19

20

21

22

23

24

1                    C E R T I F I C A T I O N

2

3

4              I hereby certify that the

5       proceedings, evidence and objections noted

6       are contained fully and accurately in the

7       notes taken by me on the hearing of the

8       above deposition, and that this is a

9       correct transcript of the same.

10

11

12

                ------------------------------

13              Registered Professional Reporter

                October 26, 2005

14

15

16

17

18              (The foregoing certification of

19      this transcript does not apply to any

20      reproduction of the same by any means, unless

21      under the direct control and/or supervision

22      of the certifying reporter.)

23

24

```
 1                    INSTRUCTION TO WITNESS

 2          Read your deposition over carefully.  It is

 3   your right to read your deposition and make changes

 4   in form or substance.  You should assign a reason in

 5   the appropriate column on the errata sheet for any

 6   change made.

 7          After making any change in form or

 8   substance which has been noted on the following

 9   errata sheet, along with the reason for any change,

10   sign your name on the errata sheet and date it.

11          Then sign your deposition at the end of

12   your testimony in the space provided.  You are

13   signing it subject to the changes you have made in

14   the errata sheet, which will be attached to the

15   deposition before filing.  You must sign in front of

16   a witness in the space provided.  The witness need

17   not be a notary public.  Any competent adult may

18   witness your signature.

19          Return the original errata sheet and

20   transcript to the deposition attorney (attorney asking

21   questions) promptly.  Court rules require filing

22   within 30 days after you receive the deposition.

23

24
```

```
 1                        ERRATA SHEET

 2     PAGE          LINE              CORRECTION

 3     _____        _____      _____

 4     _____        _____      _____

 5     _____        _____      _____

 6     _____        _____      _____

 7     _____        _____      _____

 8     _____        _____      _____

 9     _____        _____      _____

10     _____        _____      _____

11     _____        _____      _____

12     _____        _____      _____

13     _____        _____      _____

14     _____        _____      _____

15     _____        _____      _____

16     _____        _____      _____

17     _____        _____      _____

18     _____        _____      _____

19     _____        _____      _____

20     _____        _____      _____

21     _____        _____      _____

22     _____        _____      _____

23     _____        _____      _____

24     _____        _____      _____
```

CERTIFICATION PAGE

      I hereby acknowledge that I have read the aforegoing transcript dated _____ and the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the Errata Sheet.

SIGNATURE:        _____

DATED:           _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARREN JOHNSON                  :        CIVIL ACTION

    V.                          :        NO. 00-CV-711

NORMAN STEMPLER, M.D., DENNIS    :        JURY TRIAL DEMAND
MOYER, M.D., et al.

<u>VERIFICATION</u>

    I, Glen Jeffes, hereby verify the following:

    1.    During the time period from 1990 through 2000 I was an administrator at Correctional Physician Services, Inc. in charge of insuring that health care was provided to inmates at the State Correctional Institution at Graterford.

    2.    At no time during that time period did Correctional Physician Services, Inc. have any policy or practice of delaying surgery or other healthcare for inmates at the State Correctional Institution at Graterford.

    3.    I never knew of any such policy.  I never approved of any such policy.

    4.    On occasion prison officials in the employ of the Commonwealth of Pennsylvania, without the consent of Correctional Physician Services, Inc., would delay the sending of inmates to outside consultants for examinations and to hospitals for treatment for security reasons or other administrative reasons.

    5.    At no time did Correctional Physician Services, Inc. approve of this.  Most of the time Correctional Physician Services, Inc. was not even aware of it until after the fact.

    6.    Correctional Physician Services, Inc. had no control over when inmates saw outside consultants.

    I hereby verify that the above statements are true and correct to the best of my knowledge, information and belief.   I also understand that the statements contained herein are subject to the penalty of perjury pursuant to 28 U.S. §1746 relating to unsworn falsification to authorities.

                                                     GLEN R. JEFFES

Date: 2/12/05



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARREN JOHNSON                    :          CIVIL ACTION

    V.                             :          NO. 00-CV-711

NORMAN STEMPLER, M.D., DENNIS      :          JURY TRIAL DEMAND
MOYER, M.D., et al.

<u>VERIFICATION</u>

I, Kenan Umar, M.D., hereby verify the following:

1.      During the time period from 1990 through 2000 I functioned as the President of Correctional Physician Services, Inc.

2.      At no time during that time period did Correctional Physician Services, Inc. have any policy or practice of delaying surgery or other healthcare for inmates at the State Correctional Institution at Graterford.

3.      I never knew of any such policy.  I never approved of any such policy.

4.      On occasion prison officials in the employ of the Commonwealth of Pennsylvania, without the consent of Correctional Physician Services, Inc., would delay the sending of inmates to outside consultants for examinations and to hospitals for treatment for security reasons.

5.      At no time did Correctional Physician Services, Inc. approve of this.  Most of the time Correctional Physician Services, Inc. was not even aware of it until after the fact.

6.      Correctional Physician Services, Inc. had no control over when inmates saw outside consultants.

7.      Correctional Physician Services, Inc. did not participate in the transportation or security of inmates.  It was not told of these arrangements.  It could only recommend treatment.

I hereby verify that the above statements are true and correct to the best of my knowledge, information and belief.  I also understand that the statements contained herein are subject to the penalty of perjury pursuant to 28 U.S. §1746 relating to unsworn falsification to authorities.

_K. Umar, M.D._

KENAN UMAR, M.D.

Date: _3. 5. 2005_



July 27, 1999

CHART NOTE
Re: Darren Johnson                    CF8751

37 year old inmate at Greaterford who states that he sustained a twisting injury to the right knee while playing volleyball about seven weeks ago.  Since then he has been unable to actively extend the right knee.  He states that the knee has been giving away during ambulation intermittently. He notes no history of prior right knee injury but does have a history of patellotendon rupture of the left knee secondary to sports in 1993.  That knee was operative repaired and the patient has been satisfied with the repair.  The past history is otherwise negative.  He denies any history of any other systemic illnesses.  General health is excellent.  He is taking no medications.  He denies allergy.

On examination, there is a small effusion of the right knee.  There is marked patella alta.  He lacks 30-35 degrees of active knee extension.  Passive motion is full.  There is no ligamentous laxity. There is only slight tenderness over the patellar tendons which to palpation appears attenuated.  Distal neurovascular status is intact.  There is a transverse incision over the patellar tendon on the left with full active extension on the left.

**IMPRESSION:**

Status-post patellar tendon rupture.  Treatment options discussed with the patient.  It was explained that some improvement may be achieved surgically.  However, at this point in time there can be no assurance of success.  It is quite possible there will be an improvement in active extension but there may be some associated loss of active flexion.  He would like to go ahead with surgical construction and repair and this will be scheduled in the future if approved.

Richard J. Mandel, M.D.

RJM/vms

DEFENDANT'S
EXHIBIT
E

Peter J. Baddick, D.O.
Medical Director

Diagnostic Reports
Name:
Date/Time: 8/3-99
N            NCS
Requires a DC 472 SOAP Note