DARREN JOHNSON



**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3  - - -
4  DARREN JOHNSON        : BRUCE W. KAUFFMAN, J.
5    -vs-          : CASE NO. OO-CV-711
6  DOCTOR STEMPLER, DOCTOR    : CIVIL ACTION
7  DENNIS MOYER, COMMISSIONER :
8  MARTIN HORN, PRISON HEALTH :
9  SERVICE, INC., CORRECTIONAL :
10  PHYSICIAN SERVICES, INC.   :
11       - - -
12       Oral deposition of DARREN JOHNSON, was
13  taken pursuant to notice, held at GRATERFORD PRISON,
14  Route 29 & Gravel Hill Road, Graterford,
15  Pennsylvania, commencing at 11:15 a.m., on February
16  5, 2004, before Micheline Brown, Certified Court
17  Reporter and Commissioner of Deeds in the
18  Commonwealth of Pennsylvania, there being present:
19
20       - - -
21       ZANARAS REPORTING
        REGISTERED PROFESSIONAL REPORTERS
22       1616 Walnut Street, Suite 300
        Philadelphia, Pennsylvania  19103
23       2112 Bay Avenue
        Ocean City, New Jersey  08226
24       (215) 790-7857  1-877-GO-DEPOS

**Page 2**

1  A P P E A R A N C E S :
2
3   GOLD, BUCKOVITZ & ROBINS, P.C.
    BY:  ALAN BUCKOVITZ, ESQUIRE
4   7837 Old York Road
    Elkins Park, Pennsylvania  19027
5   (215) 635-2000
    Counsel for Defendant, Prison Health Services,
6   Inc., Correctional Physician Services, Inc.
7
    NAULTY, SACARICAMAZZA & McDEVITT, LTD.
8   BY:  DENISE P. MARTINDELL, ESQUIRE
    Suite 1600, One Penn Center at Suburban Station
9   1617 John F. Kennedy Boulevard
    Philadelphia, Pennsylvania  19103
10  (215) 568-5116
    Counsel for Defendant, Dr. Stempler
11
12
13
14
15
16
17
       - - -
18
19
20
21
22
23
24

**DEFENDANT'S EXHIBIT**

**Page 3**

1       I N D E X
2
3  WITNESS:    INTERROGATION BY       PAGE
4  Darren Johnson
5      Mr. Buckovitz       5
6      Ms. Martindell      62
7
8       - - -
9
10       E X H I B I T S
11
12  EXHIBIT NUMBER    DESCRIPTION       PAGE
13       (NONE MARKED)
14
15
16
17
18
19       - - -
20
21
22
23
24

**Page 4**

1       LITIGATION SUPPORT INDEX
2
3
4       DIRECTION TO WITNESS NOT TO ANSWER
5
6  PAGE LINE      PAGE LINE      PAGE LINE
7
8       (NONE)
9
10
11
12
13       REQUEST FOR PRODUCTION OF DOCUMENTS
14
15  PAGE LINE      PAGE LINE      PAGE LINE
16
17       (NONE)
18
19
20
21       STIPULATION
22
23       PAGE        LINE
24       5          1

DARREN JOHNSON

**Page 5**

1   (It is hereby stipulated and agreed by
2   and between counsel that sealing, filing and
3   certification are waived; and that all
4   objections, except as to the form of the
5   questions, be reserved until the time of
6   trial.)
7   DARREN JOHNSON, after having been first
8   duly sworn, was examined and testified as
9   follows:
10   MR. BUCKOVITZ:  Are you going to
11   require an opportunity to read the deposition
12   and sign it?
13   THE WITNESS:  Can you ask me again?  I
14   have no idea.
15   MS. MARTINDELL:  Well, whenever someone
16   gives a deposition they have an opportunity
17   to look at the deposition, check it for
18   errors not in the content of what you say.
19   Spelling errors and things of that nature and
20   then you get the chance to sign it.  So when
21   you say I reserve the right to read and sign
22   that is what you are saying on the record.
23   So you can reserve that right.
24   THE WITNESS:  Yes.

**Page 6**

1   MR. BUCKOVITZ:  Yes, what?
2   THE WITNESS:  Yes, I'll reserve the
3   right.
4   MS. MARTINDELL:  To read and sign.
5   BY MR. BUCKOVITZ:
6   Q.   I am Al Buckovitz.  I'm the attorney
7   for Dr. Moyer, the Correction Physician Services,
8   Inc. and for Physicians Health Services, Inc. We're
9   here today to take your testimony under oath in a
10   case that you have filed which is in the Federal
11   District Court in the Eastern District of
12   Pennsylvania, Darren Johnson versus Dr. Stempler,
13   et. al. I'm going to ask you a series of questions
14   about that case, about your claims, about your
15   damages.  If anything that I say you do not
16   understand would you please stop me and ask me to
17   explain it to you?
18   A.   Yeah.
19   Q.   Do you understand that everything that
20   you state today has to be orally and not by nods of
21   the head and gestures because it's all going to be
22   recorded stenographically.  Do you understand that?
23   A.   Yes.
24   Q.   Have you ever been a witness before?

**Page 7**

1   A.   No.
2   Q.   In any case, criminal or civil?
3   A.   I've been my own witness in a criminal
4   matter.
5   Q.   How many times did you do that?
6   A.   Three.
7   Q.   Three times.  Have you ever testified
8   in a civil case?
9   A.   No.
10   Q.   Have you ever given a deposition?
11   A.   No.
12   Q.   Okay.  Now, your name is Darren
13   Johnson; is that right?
14   A.   Yes.
15   Q.   Are you known by any other names?
16   A.   I have two aliases.
17   Q.   What's that?
18   A.   Shorty or Mouse.
19   MS. MARTINDELL:  I'm sorry, what was
20   the first one?
21   THE WITNESS:  Shorty.
22   BY MR. BUCKOVITZ:
23   Q.   What is your birth date?
24   A.   3/27/62.

**Page 8**

1   Q.   And your Social Security number?
2   A.   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.
3   Q.   And you have an inmate number?
4   A.   Inmate number is CF.
5   Q.   What is it?
6   A.   CF Charlie Frank 8751.
7   Q.   How long have you been incarcerated at
8   Graterford?
9   A.   Ten years.
10   Q.   So that's since 1994?
11   A.   No.  It was 12 years.  Since -- yeah, I
12   would say ten years.
13   Q.   Since 1994?
14   A.   Yes.
15   Q.   Where were you before that?
16   A.   SCI Camp Hill.
17   Q.   From when to when?
18   A.   From '93 to '94.
19   Q.   And where were you before Camp Hill?
20   A.   I was in county prison.
21   Q.   Philadelphia County?
22   A.   Yes.
23   Q.   Which prison?
24   A.   Holmesburg.

DARREN JOHNSON

**Page 9**

1  Q. From when?
2  A. From December 1992 to January 1993.
3  Q. Where were you before Holmesburg?
4  A. I was in Philly.
5  Q. Where did you live?
6  A. West Philadelphia.
7  Q. Do you remember the address?
8  A. 3936 Market Street.
9  Q. And how long did you live there?
10  A. For six months.
11  Q. That's from July of 1992 to December of
12  1992?
13  A. Yes.
14  Q. Who if anyone did you live with?
15  A. I had a girlfriend.
16  Q. What's her name?
17  A. Stephanie Moon.
18  Q. What's the last name?
19  A. Moon, M-O-O-N.
20  Q. Anybody else?
21  A. She had three children.
22  Q. How old were the children?
23  A. Two, six and seven.
24  Q. Okay. Is she still your girlfriend?

**Page 10**

1  A. No.
2  Q. Are you married?
3  A. No.
4  Q. Have you ever been married?
5  A. No.
6  Q. Do you have any children?
7  A. Yes.
8  Q. How many children?
9  A. Two.
10  Q. How old are they?
11  A. One is 11 and one is 18.
12  Q. And the time that you have been
13  incarcerated since you've been at Holmesburg up to
14  the present date is that on the same charge?
15  A. Yes.
16  Q. What is that charge?
17  A. I like to stipulate -- I'd like to
18  object to that question.
19  Q. On what basis?
20  A. Because the statue of limitations has
21  ran out.
22  Q. But you know that in order for us to
23  test a witness we are entitled to inquire the
24  certain kinds of convictions because they may have

**Page 11**

1  bearing on his credibility for truthfulness?
2  A. But it has nothing to do with the case.
3  Q. That is hard to determine without
4  knowing what the answer is?
5  A. Okay.
6  Q. So could you tell me what the --
7  A. Murder in first degree.
8  Q. What sentence are you serving?
9  A. Life.
10  Q. Now, have you previously been
11  convicted?
12  A. No.
13  Q. Of anything else?
14  A. No.
15  Q. This is the only charge you have ever
16  been convicted of?
17  A. Yes.
18  Q. Have you ever been convicted of theft
19  or perjury or fraud?
20  A. Prior to this?
21  Q. Yes.
22  A. Yes.
23  Q. What?
24  A. Retail theft.

**Page 12**

1  Q. When was that?
2  A. This is like -- I have no real memory
3  of it. It's about six, 12 years previous.
4  Q. Twelve years before 1992?
5  A. Yes.
6  Q. So approximately 1980?
7  A. Yes.
8  Q. Other than that were you ever convicted
9  of a theft crime or a crime effecting honesty?
10  A. No.
11  Q. Is that the only other conviction you
12  have for anything?
13  A. Yes.
14  Q. Did you ever have any injury to your
15  knee prior to the time you were in prison?
16  A. My right knee?
17  Q. Yes.
18  A. No.
19  Q. How about your left knee?
20  A. Yes.
21  Q. What injury is that?
22  A. Torn patella tendon.
23  Q. When did that happen?
24  A. In '93 -- I mean '94 up Camp Hill.

DARREN JOHNSON

**Page 13**

1    Q.   Was that in a sporting event?
2    A.   Yes.
3    Q.   What was the sport?
4    A.   Volley ball.
5    Q.   What treatment did you receive for
6    that?
7        A.   They took me out emergency treatment
8    the next day.
9    Q.   And what did they do for you?
10   A.   They gave me surgery, direct repair.
11   Q.   Do you know where that was performed?
12   A.   No.  I think Carlisle, PA, somewhere in
13   that area.
14   Q.   You don't know what hospital?
15   A.   No.
16   Q.   Do you know what doctor performed the
17   surgery?
18   A.   Not offhand.
19   Q.   What is the condition of your left knee
20   today?
21   A.   It's excellent.
22   Q.   Has it been excellent ever since the
23   time of the operation?
24   A.   Yes.

**Page 14**

1    Q.   Can you tell us about the accident that
2    is the subject of this case?
3        A.   Well, on June 9th somewhere around
4    there, I was out playing volley ball.
5    Q.   This is June 9th of what year?
6    A.   1999.
7    Q.   Right.
8    A.   And I injured my right knee.  I had
9    turned playing volley ball.
10   Q.   How did you injure it, just the turn?
11   A.   I think the turn, yes.
12   Q.   Then what happened?
13   A.   I was taken to the dispensary.
14   Q.   Who took you to the dispensary?
15   A.   The nurse came to the front door.  She
16   had a wheelchair there and a couple inmates and the
17   sergeant carried me up the steps to the wheelchair
18   and they transported me to the infirmary.
19   Q.   Do you know who the nurse it was?
20   A.   Not offhand.
21   Q.   Who were the inmates?
22   A.   Couple guys.
23   Q.   Do you know who they are?
24   A.   Not offhand.

**Page 15**

1    Q.   Who was the sergeant?
2    A.   I have no recollection.
3    Q.   They took you to the dispensary?
4    A.   Yes.
5    Q.   And what happened there?
6    A.   She gave me an ice pack, some crutches.
7    Q.   Who is she?
8    A.   The nurse that was on duty.
9    Q.   Do you know who that was?
10   A.   No, not offhand.
11   Q.   Did she give you any instructions?
12   A.   She said report the following day.
13   Q.   Did you do that?
14   A.   Yes.
15   Q.   Who did you see the following day?
16   A.   I talked to a Dr. Krusinak.
17   Q.   Krusinak?
18   A.   Yes.
19   Q.   And what did he do for you?
20   A.   He ordered X-rays.
21   Q.   Do you recall what you told Dr.
22   Krusinak?
23   A.   I didn't tell him anything.  I told
24   them I injured it playing volley ball.

**Page 16**

1    Q.   Okay.  And what if anything did he do
2    for you, just the X-ray?
3        A.   He told me I'll have a follow-up on
4    Monday the 14th.  I would like to correct that that
5    was Dr. Kimara.
6    Q.   You did see Dr. Krusinak first and then
7    Dr. Kimara or are you saying you saw Dr. Kimara
8    instead of Krusinak?
9    A.   I seen Dr. Kimara.
10   Q.   You did not see Dr. Krusinak?
11   A.   No.
12   Q.   Okay.  Dr. Kimara ordered the X-ray?
13   A.   Yes.
14   Q.   And Dr. Kimara told you to come back
15   on June 14th?
16   A.   Yes.
17   Q.   Did he give you a -- do you have a job
18   in the prison?
19   A.   Yes.
20   Q.   What is that job?
21   A.   I work in the shoe factory.
22   Q.   At the time of this injury was that
23   your job?
24   A.   Yes.

DARREN JOHNSON

Page 17

1   Q.   What do you do in the shoe factory?
2   A.   I operated the toe foreman machine.
3   Q.   How many hours a day do you do that?
4   A.   Six and a half.
5   Q.   Does that involve standing?
6   A.   Yes.
7   Q.   Are you constantly standing for the six
8   and a half hours?
9   A.   Yes.
10  Q.   Do you break for lunch or have other
11  breaks?
12  A.   We have an hour break from 11 -- 11:30
13  to 1:00.
14  Q.   When do you start work?
15  A.   7:30.
16  Q.   So 7:30 to 11:30 you are constantly on
17  your feet?
18  A.   No.  I have breaks on and off.
19  Q.   How many breaks do you have?
20  A.   About three or four.
21  Q.   Is there a set amount?
22  A.   No.  There is no specific time.
23  Q.   You have three or four breaks between
24  7:30 and 11:30?

Page 18

1   A.   Yes.
2   Q.   Then you come back on at 1:00?
3   A.   Yes.
4   Q.   One o'clock to when?
5   A.   To 3:15.
6   Q.   Do you have any breaks then?
7   A.   If you want.  It's at your discretion.
8   Q.   At the time did you take breaks?
9   A.   Yes.
10  Q.   How many breaks would you take between
11  1:00 and 2:15 back in 1999?
12  A.   During the occurrence of this injury?
13  Q.   Before the injury.
14  A.   Before the injury about two, three.
15  Q.   So between the time that you saw --
16  between the time of the volley ball injury and June
17  14th did you continue to work in the shoe factory?
18  A.   Yes.
19  Q.   Was there any change in your routine?
20  A.   Yes.
21  Q.   What was the change?
22  A.   I had to sit down.  I changed jobs.  I
23  had to sit down and pull tacks out of the bottom of the
24  shoes.

Page 19

1   Q.   Is that constant sitting job?
2   A.   Yes.
3   Q.   Who is your supervisor in the shoe
4   factory?
5   A.   John Mellinger.
6   Q.   What is his last name?
7   A.   Mellinger, M-E-L-L-I-N-G-E-R.
8   Q.   Now, you still work at the shoe factory
9   to this day?
10  A.   Yes.
11  Q.   What is your job there now?
12  A.   Operator of a toe foreman machine.
13  Q.   So you are back to your original job?
14  A.   Yes.
15  Q.   When did you go back to your original
16  job?
17  A.   I never left.
18  Q.   Well, how long did you do the job that
19  involved sitting and pulling tacks out of the bottom
20  of shoes?
21  A.   About -- until after my physical
22  therapy was over.
23  Q.   Do you know when that was?
24  A.   It's about -- I'll say March 2000,

Page 20

1   March, April.
2   Q.   Okay.  And in this job where you're
3   pulling tacks out of shoes you're sitting for the
4   whole period of time that you're doing that?
5   A.   Yes.
6   Q.   Does the number of breaks increase or
7   change?
8   A.   Well, I took my breaks right here so it
9   didn't matter.
10  Q.   So there's no change in the number of
11  breaks?
12  A.   No.
13  Q.   Now, did somebody give you a note that
14  excused you from -- were you excused from work at
15  all during the period between the injury and June
16  14th?
17  A.   Nope.  I didn't receive any medical
18  clearance.
19  Q.   Did you get a five-day medical lay-in?
20  A.   No.
21  Q.   Do you have a copy of what's entitled
22  the second amended medical malpractice complaint?
23  A.   Yes.
24  Q.   I'm going to show it to you.  This is

DARREN JOHNSON

Page 21

1  the current amended complaint; is that right, it's
2  the one the court refers to as the third amended
3  complaint?
4      A.   Yes.
5      Q.   Do you have a company of this?
6      A.   Yes, I do.
7      Q.   On the section entitled facts -- if you
8  don't have it I can give you another copy.
9      A.   I have it.
10     Q.   Under section entitled facts under
11 paragraph 12 or paragraph 11, I'm sorry.  You say
12 that on June 10, 1999 you went to sick call and
13 received a five-day medical lay-up; is that
14 accurate?
15     A.   No.  I'd like to make a correction.
16 That was June 11th.
17     Q.   Other than that being June 11th is it
18 accurate?
19     A.   No.
20     Q.   What else is inaccurate about that?
21     A.   That I wasn't issued the crutches.
22     Q.   What about the five days medical
23 lay-in?
24     A.   I didn't receive that either.

Page 22

1      Q.   Why did you say that in this second
2  amended complaint?
3      A.   Because to my personal knowledge I was
4  incorrect.
5      Q.   Did you prepare this second amended
6  complaint yourself?
7      A.   Yes.
8      Q.   And did you refer it to any notes or
9  documents when you prepared it?
10     A.   No.
11     Q.   So are you saying now you prepared this
12 second amended complaint from memory?
13     A.   Yes.
14     Q.   Now you're saying that your memory is
15 wrong?
16     A.   Yes.
17     Q.   And you prepared this second amended
18 complaint on March 24, 2002?
19     A.   Yes.
20     Q.   This is almost two years later?
21     A.   Yes.
22     Q.   Why is -- why do you believe that your
23 memory is more accurate on this day than it was two
24 years ago?

Page 23

1      A.   Because I received medical records
2  later.
3      Q.   And as a result what does that mean?
4      A.   It means that I couldn't state what I
5  state now then because I had no, no records of it.
6      Q.   Are you saying you are revising what
7  you state to be the facts based on your reading of
8  the medical records?
9      A.   Yes.
10     Q.   So your testimony today is that you did
11 not get a five-day medical lay-in and you did not
12 get crutches on the June 10th or June 11th of 2002;
13 is that right?
14     A.   Yes.
15     Q.   Did you ever get a five-day medical
16 lay-in?
17     A.   No.
18     Q.   Okay.  Isn't that something you would
19 remember?
20     A.   Yes.
21     Q.   Okay.  Why do you think you could make
22 a mistake like that?
23     A.   Because I had -- yes, I remember.  I
24 had a weekend off.

Page 24

1      Q.   All right.
2      A.   And that is when I thought I had a
3  medical lay-in.
4      Q.   Do you ever have a weekend off in your
5  job?
6      A.   Yes.
7      Q.   Now, you state in paragraph 12 that on
8  June 12, 1999 you received a pass to go to the
9  dispensary and that your knee was then X-rayed?
10     A.   Yes.  And I would like to correct that
11 also.  That was June 11th.
12     Q.   That was June 11th?
13     A.   Yes.
14     Q.   So you're saying everything that you
15 say in paragraph 11 happened on June 11th and
16 everything you say in paragraph 12 happened on June
17 11th?
18     A.   Not everything on paragraph 11th
19 because I didn't receive a five-day medical lay-in.
20     Q.   So on paragraph 11 all you're saying is
21 that you went to sick call on June 11th; is that
22 right?
23     A.   Yes.
24     Q.   And on paragraph 12 you say that,

---

DARREN JOHNSON

**Page 25**

1 everything you say in paragraph 12 actually happened
2 on June 11th?
3   A.   Yes. I have another correction also.
4   Q.   Okay.
5   A.   That's it.
6   Q.   You want to make that correction?
7   A.   Yes. Number 21.
8   Q.   Well, I meant on paragraph 12. Is
9 there another correction on paragraph 12?
10   A.   No.
11   Q.   Do you know why you say the X-ray was
12 performed on June 11, 1999. Do you have some
13 particular record you are referring to?
14   A.   Yes. I have a copy of the X-ray
15 report.
16   Q.   Do you have that available?
17   A.   Yes.
18   Q.   Okay.
19   A.   It occurred on June 11th.
20   Q.   All right. The next paragraph 13 you
21 say that you signed up for sick call?
22   A.   Yes.
23   Q.   All right. Do you want to correct
24 anything in paragraph 13 or change anything?

**Page 26**

1   A.   No.
2   Q.   Then in paragraph 14 you say that you
3 saw Dr. Moyer on June 15, 1999; is that right?
4   A.   Yes.
5   Q.   What happened at that time?
6   A.   Well, I went to sick call. I told them
7 my knee was still swollen.
8   Q.   This is the first time you saw Dr.
9 Moyer for this problem; is that right?
10   A.   Yes.
11   Q.   What did he do for you?
12   A.   He gave me a pass to report to the
13 dispensary. He said he was going to tap my knee.
14   Q.   Did he diagnose the problem?
15   A.   I'm not aware of it.
16   Q.   Was that -- did he tap the knee the
17 same day?
18   A.   Yes.
19   Q.   Okay. Can you describe that procedure?
20   A.   Well, I arrived at the dispensary
21 around 2:30. So I met with a Correctional Officer
22 Snyder. She escorted me around to the side where
23 the dispensary room is and she said wait here for
24 Dr. Moyer.

**Page 27**

1   Q.   Then what happened?
2   A.   Around ten or five after 3:00
3 Correctional Officer Snyder came back around and
4 said you haven't seen the doctor yet. I said no.
5 So she went to go get him.
6   Q.   Then what happened?
7   A.   So when he came back he was kind of a
8 little irritated I would say, I recognized and he
9 said let's get this over with.
10   Q.   Then what happened?
11   A.   Then we proceeded into the dispensary
12 examining room and the far end inside of the
13 dispensary there was a chair. He told me -- I took
14 a seat and he took the other seat and he rolled up
15 and he said bend your leg and he pulled out a needle
16 so long and I told him I couldn't bend it. He said
17 well, if you can't bend it I'll bend it for you.
18   Q.   Is that what he did?
19   A.   No.
20   Q.   What happened?
21   A.   I tried to bend it as little as
22 possible.
23   Q.   Then what happened?
24   A.   Then he proceeded to stick me in my

**Page 28**

1 leg. I said hold up. I had to get my composure. I
2 had to hold onto the chair because this was a big
3 needle.
4   Q.   Then what happened?
5   A.   So then I grabbed the edges of the
6 chair and he proceeded to stick me in my knee all
7 the way down to the joint.
8   Q.   Then what happened?
9   A.   I was in serious pain.
10   Q.   Did you scream?
11   A.   No. I was shaking like gritting my
12 teeth and squeezing the edges of the chair.
13   Q.   Did you cry?
14   A.   Almost.
15   Q.   Was there anybody who saw you in this
16 condition?
17   A.   Yes. Correctional Officer Snyder.
18 It's a female.
19   Q.   Then what happened?
20   A.   Then he said I'll see you in a week or
21 so.
22   Q.   Did he give you any instructions?
23   A.   No.
24   Q.   Is there anything else on this page

DARREN JOHNSON

Page 29

1 that you wish to revise, correct in paragraph 17?
2    A.   No.
3    Q.   All right.  Now, are you making a claim
4 against Dr. Moyer for performing the knee tap
5 without anesthesia?
6    A.   And deliberant waiting.
7    Q.   But this incident that you have just
8 described is that one of the bases of your lawsuit
9 against Dr. Moyer?
10    A.   That is one of them.
11    Q.   Did you file a grievance against Dr.
12 Moyer on that issue?
13    A.   Yes.
14    Q.   Do you have a copy of that grievance?
15    A.   Yes.
16    Q.   This is grievance number GRA02192000;
17 is that right?
18    A.   Yes.
19    Q.   That is dated February 23, 2000?
20    A.   Yes.
21    Q.   Could you point out to me where in this
22 grievance you complain about Dr. Moyer's performance
23 of the knee tap?
24    A.   This happened because of the delay in

Page 30

1 treating and misdiagnosing of Dr. Stempler and
2 Moyer.
3    Q.   Is that the only statement you make in
4 the grievance that relates to the knee tap?
5    A.   Yes.
6    Q.   All right.  On paragraph 19 you say
7 that Dr. Moyer did another knee tap on -- is this
8 June 22, 1999?
9    A.   Yes.  Without any anesthesia on both
10 occasions.
11    Q.   Did you discuss with him the question
12 of anesthesia?
13    A.   Yes.
14    Q.   What did you say?
15    A.   No.  I didn't, no.
16    Q.   Did you discuss it --
17    A.   I didn't know.
18    Q.   Did you discuss it with him the first
19 time?
20    A.   No, I didn't, no.  I never had that
21 before.
22    Q.   And the second time you didn't discuss
23 it with him?
24    A.   No.  I didn't know nothing about it.

Page 31

1    Q.   Well, you knew that when you had that
2 procedure a week earlier that you had a lot of pain?
3    A.   Yes.
4    Q.   Did you discuss that with Dr. Moyer?
5    A.   The anesthesia?
6    Q.   Did you tell him you had a lot of pain
7 the first time you did it?
8    A.   Yes.
9    Q.   Did you ask for anything to help you
10 tolerate the pain?
11    A.   He said you don't need it, I never
12 discussed it.
13    Q.   You never discussed that?
14    A.   No, I didn't know.
15    Q.   Was there anybody present when the knee
16 tap was performed on June 22nd?
17    A.   I don't know the names offhand.
18    Q.   Who were they?
19    A.   The nurse.
20    Q.   And your only reference to the second
21 knee tap in the grievance was the same one you just
22 pointed out when I asked you about the first knee
23 tap; is that right?
24    A.   Yes.

Page 32

1    Q.   All right.  Now, earlier you said you
2 were going to make a correction to paragraph 21?
3    A.   Yes.
4    Q.   The second amended complaint.  So we're
5 now on the page and what's paragraph 21?  Can you
6 tell me what correction or deletion you want to
7 make?
8    A.   I would like to make a correction that
9 it's July 9, 1999 instead of July 2nd.
10    Q.   Now, you did see Dr. Kirnara again on
11 July 7, 1999; is that right?
12    A.   I have no recollection.
13    Q.   You don't know if you saw Dr. Kirnara
14 on July 2, 1999?
15    A.   I don't know who it was.
16    Q.   Do you know if you saw anybody on July
17 2nd?
18    A.   I seen Dr. Battick.
19    Q.   You're talking about seeing Dr. Battick
20 on July 9th; is that right?
21    A.   Yes.
22    Q.   I'm asking you if on July 2nd you saw
23 Dr. Kirnara.
24    A.   Yes.

DARREN JOHNSON

Page 33

1   Q.   What did he do for you?
2   A.   He gave me Motrin.
3   Q.   And did he set up your examination with
4  Dr. Battick?
5   A.   Yes.
6   Q.   Is Dr. Battick an orthopaedist?
7   A.   Yes.  He's CPS director.
8   Q.   But he's also an orthopaedist, right?
9   A.   I don't know.
10   Q.   And you saw Dr. Battick on July 9th?
11   A.   Yes.
12   Q.   What happened then?
13   A.   Well, on July 9th I went to get -- I
14  had a pass to meet with Secretary Rhodes.
15   Q.   All right.
16   A.   To pick up a knee immobilizer.  See,
17  there's a difference between a knee immobilizer and
18  a knee brace.
19   Q.   Well, on July 2nd you got a pass to get
20  a knee brace; is that right?
21   A.   Well, the knee brace is the knee
22  immobilizer.
23   Q.   Why do you say that?
24   A.   Well, it's two different things because

Page 34

1  what I have here is a knee brace.  This is the knee
2  brace.  The knee immobilizer was longer from up to
3  the thigh to your ankle.  So on that day I went to
4  see Secretary Rhodes to pick up a knee brace, I mean
5  a knee immobilizer.
6   Q.   Was that after you had the knee brace
7  or did you get the knee immobilizer first?
8   A.   I didn't have anything but an Ace
9  bandage first.
10   Q.   Then what was the next thing that you
11  had?
12   A.   I had the knee immobilizer.
13   Q.   When did you get the knee brace?
14   A.   I got the knee brace on August 4th.
15   Q.   Now, on here it says that you got to
16  see Dr. Battick because Rose suggested it; am I
17  right?
18   A.   Yes.
19   Q.   Do you know if it's in fact she
20  suggested it or was it because whether it was
21  because it was scheduled by Dr. Kimara?
22   A.   I don't know.  No.  She seen me sitting
23  outside waiting for the brace and she wrote on the
24  pass that it didn't look right and she's going to

Page 35

1  call Dr. Battick.  She told me to sit here and she
2  wrote on the pass waiting for Dr. Battick and she
3  went to go get him.
4   Q.   Are you saying it's written on one of
5  these passes waiting to see Dr. Battick?
6   A.   Yes.  It's written on the pass dated
7  July 9, 1999 waiting for Dr. Battick.
8   Q.   Okay.  Did she indicate anything on
9  this pass that she was suggesting you see Dr.
10  Battick or that the knee didn't look right?
11   A.   No.  There is nothing on the pass.
12   Q.   Had you signed up to see Dr. Battick?
13   A.   No.
14   Q.   Before this?
15   A.   No.  I reported to pick up the knee
16  immobilizer.
17   Q.   All right.  Is this the first time you
18  saw Dr. Battick?
19   A.   Yes.
20   Q.   Ever?
21   A.   I seen him a couple times before.
22   Q.   What happened when you saw Dr. Battick
23  on July 9th?
24   A.   On July 9th?

Page 36

1   Q.   Right.  Second amended complaint you
2  refer to it as July 2nd; is that right?
3   A.   I requested that correction.
4   Q.   What happened when that came in?
5   A.   He proceeded me to the examining room
6  and I picked my leg up and put it on the table.  He
7  said yes, no problem.  He said -- he said
8  potentially patellar altered.
9   Q.   Yes. Patella altered?
10   A.   Yes.
11   Q.   Did you understand what that meant?
12   A.   No.
13   Q.   Did he explain it to you?
14   A.   No, he didn't.
15   Q.   Did he tell you what he was going to
16  do?
17   A.   Well, him and Dr. Pratt assembled some
18  tools -- I mean some medical equipment.
19   Q.   Right.
20   A.   And he said he made a request three
21  times for me to be taken outside to a hospital and
22  while he was telling me that Dr. Pratt was
23  assembling some Novocaine and some needles and he
24  was taking my knee brace -- my Ace bandage off at

DARREN JOHNSON

Page 37

1  the same time.
2      Q.   What did he tell you about requesting
3  you being taken to an outside hospital?
4      A.   He said that he put the request in to
5  be reviewed three times but they all were denied.
6      Q.   Did he say who they were -- was?
7      A.   No, they didn't say.
8      Q.   He said he put the request in three
9  times for what?
10     A.   To be taken outside for surgery.
11     Q.   Did he say where?
12     A.   No, he didn't say.
13     Q.   Did he tell you how it was that he
14  became aware of your case?
15     A.   No, he didn't tell me.
16     Q.   Did he say whether or not Dr. Moyer had
17  asked him to try to get you treatment outside?
18     A.   No.  He never said that either.
19     Q.   So you don't know whether that occurred
20  or not?
21     A.   I don't know.
22     Q.   All right.  In your second amended
23  complaint you say that he submitted your -- your
24  situation to the medical department's review board;

Page 38

1  is that right?
2      A.   Yes.
3      Q.   Other than what you have already
4  referred to is there anything between paragraphs 18
5  and 25 that you wish to revise or amend?
6      A.   I'd like to add something.
7      Q.   Does it relate to one of these
8  paragraphs?
9      A.   It relates to the definition of the
10  knee brace and a knee immobilizer.
11     Q.   Which paragraph are you referring us
12  to?
13     A.   I'm referring to 21.
14     Q.   What is it that you would add?
15     A.   Sign for the knee immobilizer on July
16  9th.
17     Q.   Other than that you stand by everything
18  else that you said in paragraphs 18 through 25?
19     A.   Yes.
20     Q.   All right.  In paragraph 25 on the
21  next -- you state your understanding about the
22  voting system about determining wether you should be
23  taken to outside facilities.  What is it about this
24  voting system?

Page 39

1      A.   Well, upon my information that I
2  received from unknown inmates they say that their
3  injuries would have to be voted on so that they can
4  receive surgery.
5      Q.   Well, what is the information that you
6  received?
7      A.   That is why their treatment is being
8  delayed.  It's word of mouth.
9      Q.   Does the information indicate who
10  votes?
11     A.   No.
12     Q.   What kind of vote is necessary to get
13  outside treatment?
14     A.   No.
15     Q.   Have you seen any written description
16  of a voting system?
17     A.   No.  All I have seen is delays in
18  treatment to outside people.
19     Q.   And other than that are you familiar
20  with rumors from inmates that there is some voting
21  system involved?
22     A.   Yes.  That is the only way I think that
23  I was delayed in treatment.
24     Q.   Other than the rumors from the inmates

Page 40

1  do you have any other information that there is a
2  voting system to determine whether patients should
3  be taken to outside facilities for medical
4  treatment?
5      A.   No, except for Gregory Sourber.
6      Q.   What is that, Gregory?
7      A.   I have two Affidavits from Gregory
8  Sourber and Mike Winters.  I don't have one from Tim
9  Motty.  These Affidavits have already been submitted
10  to the court.
11     Q.   Do you have a copy of it?
12     A.   The same practice.
13     Q.   Gregory, how do you spell that last
14  name?
15     A.   Sourber.
16     Q.   Do you know how to spell it?
17     A.   S-O-U-R-B-E-R.
18     Q.   And who is the other one?
19     A.   Mike Winters.
20     Q.   Are they both inmates?
21     A.   Yes.
22     Q.   And what does this Affidavit say?
23     A.   That they have been delayed treatment
24  to an outside hospital.

DARREN JOHNSON

Page 41

1    Q.    In their own case?
2    A.    Yes.
3    Q.    Does it say anything about a voting
4  system or how the decision is made to refer or not
5  to refer inmates?
6    A.    No.
7    Q.    Now in paragraph 25 you say that CPS
8  and PHS failed to formulate, adopt or have adequate
9  rules to ensure quality care for inmates in
10 Graterford?
11   A.    Yes.
12   Q.    What is the basis for your saying that?
13   A.    Because if they had adequate policies
14 for emergency medical treatment this would not have
15 happened to me.
16   Q.    So your evidence that they don't have
17 adequate policies, is what that you were not
18 immediately sent to an outside hospital on July 9th,
19 as of July 9, 1999?
20   A.    Me and several other inmates.
21   Q.    You also say in that paragraph that CPS
22 and PHS had a practice of prioritizing inmates which
23 caused you harm?
24   A.    Yes.

Page 42

1    Q.    What evidence do you have that CPS or
2  PHS had such a system?
3    A.    None.
4    Q.    None?
5    A.    At this time.
6    Q.    All right.  You say that Dr. Pratt
7  performed a knee tap; is that right?
8    A.    Yes.  Eugene Pratt.
9    Q.    And on paragraph 27 you say on July
10 9th --
11   A.    I would like to make that correction.
12   Q.    On paragraph 27?
13   A.    Yes.
14   Q.    What correction do you want to make to
15 paragraph 27?
16   A.    That it wasn't a knee brace.  It was a
17 knee immobilizer.
18   Q.    All right.  You say that on July 16,
19 1999 you were taken to an outside MRI center?
20   A.    Yes.
21   Q.    Was that because of Dr. Battick's
22 direction?
23   A.    I don't know.  Yes.
24   Q.    Do you know when the results of the

Page 43

1  MRI, were they discussed with you?
2    A.    They were never.
3    Q.    Do you know what action if any was
4  taken as a result of the MRI?
5    A.    Not that I know of.
6    Q.    Do you know if Dr. Battick referred you
7  to Dr. Mandel at that time?
8    A.    Not that I know of -- not to an
9  institution.
10   Q.    Did Dr. Battick ever tell you he was
11 referring you to Dr. Mandel?
12   A.    No.  No one ever told me about the MRI
13 or the X-ray on June 11th.
14   Q.    Is Dr. Mandel an orthopaedist?
15   A.    He's an orthopaedic surgeon.
16   Q.    All right.  Did you see Dr. Mandel?
17   A.    Yes.
18   Q.    When did you see him?
19   A.    I seen Dr. Mandel on July 27, 1999.
20   Q.    And is that at Suburban General
21 Hospital?
22   A.    Yes.
23   Q.    What did he do for you?
24   A.    He told me to stand up and see if I

Page 44

1  could bend my knee.
2    Q.    And then what happened?
3    A.    Well, I couldn't bend it all the way
4  because it was torn I guess.  I didn't know at the
5  time.
6    Q.    You couldn't bend it all the way?
7    A.    No.
8    Q.    Then what happened?
9    A.    Then he said it's possible that you're
10 going to have permanent damage to your right leg
11 because of the delay bringing you out here.
12   Q.    Did he tell you a time frame in which
13 he believed you should have been brought out there?
14   A.    No.
15   Q.    Who was present when you made this
16 statement?
17   A.    Correction Officer Pry.
18   Q.    Who?
19   A.    Pry, P-R-Y.
20   Q.    Pry?
21   A.    Yes.
22   Q.    Is that the only person?
23   A.    It was a couple other guards but I
24 don't know the names.

DARREN JOHNSON

Page 45

1    Q.   All right.  What else did he tell you?
2    A.   He told me because of this delay he was
3 going to have to do a reconstructive surgery and
4 place a wire in my knee.
5    Q.   What else happened?
6    A.   He said as a matter of fact, I'm going
7 to call him right now.
8    Q.   And did he?
9    A.   I don't know but he left out the room.
10    Q.   Then what happened?
11    A.   Then he came back and said all right,
12 are you ready for the surgery.
13    Q.   Then what happened?
14    A.   Then the guard said he wasn't scheduled
15 to stay out there so he left again.
16    Q.   Then what happened?
17    A.   Then he said well, just sign these
18 papers when you get back.
19    Q.   What were the papers?
20    A.   Consent to have surgery.
21    Q.   Were you brought back to the surgery?
22    A.   Yes.
23    Q.   When was that?
24    A.   September.

Page 46

1    Q.   September 17th?
2    A.   September 17th.
3    Q.   Was that by Dr. Mandel?
4    A.   Yes.
5    Q.   All right.  Paragraph 32 you said Dr.
6 Mandel informed you that you'd have pain after the
7 operation and wouldn't be able to extend or bend
8 your leg fully?
9    A.   Yes.
10    Q.   Did he say that these conditions would
11 have been different if the treatment had been
12 different?
13    A.   No.
14    Q.   Okay.  Is there anything --
15    A.   He said I will have a problem because
16 of the delay.
17    Q.   What was the problem that you would
18 have because of the delay?
19    A.   My tendons were shortened when I
20 received the surgery.  I received reconstructive
21 surgery.
22    Q.   Did he say that that would have been
23 any different if the treatment had been any
24 different?

Page 47

1    A.   He didn't say it to me.
2    Q.   Do you know if he said it to anyone?
3 Do you have any evidence that he said it?
4    A.   Well, that's hearsay.  I have evidence
5 that he said it to somebody.
6    Q.   What is your evidence?
7    A.   It was attached to my -- it's a memo
8 from Jack Myerson.
9    Q.   This is a memorandum dated November 15
10 1999 from Jack to the file regarding Darren
11 Johnson.  Who is Jack?
12    A.   He was an attorney trying to represent
13 me.
14    Q.   Do you wish to make any additions or
15 revisions to paragraphs 30, 31 and 32?
16    A.   Yes.
17    Q.   What?
18    A.   Twenty?
19    Q.   Thirty, 31 and 32?
20    A.   Yes.  I would like to make an addition
21 to number 31.
22    Q.   And what's that?
23    A.   That the date of this was July 27,
24 1999.

Page 48

1    Q.   Okay.  All right.  In paragraph 36 you
2 say that PHS and CPS had subjective knowledge that
3 this misdiagnoses of malpractice of Drs. Moyer and
4 Stempler and therefore, they have deliberately
5 efficiencies.  Do you see that?
6    A.   Yes.
7    Q.   You refer to delays in scheduling,
8 follow-up examinations, emergency medical treatment
9 processing to an outside hospital resulting in
10 delays and you say that PHS and CPS had subjective
11 knowledge of this and that this practice was
12 deliberate indifference?
13    A.   Yes.  I see.
14    Q.   What evidence do you have that supports
15 that contention that they had subjective knowledge?
16    A.   The staff of -- the MRI reports date
17 stamped, all the consultation reports date stamped
18 by CPS.
19    Q.   Are you saying that the fact that PHS
20 and CPS knew how long it was taking that that's your
21 evidence of deliberant indifference?
22    A.   Well, they knew that I was hurt and
23 they failed to do anything.  I had a serious medical
24 need.

DARREN JOHNSON

Page 53

1    A.   I'm withdrawing the claim I have to
2  emotional distress?
3    Q.   Okay.  Are you still pressing a claim
4  with regard to weight loss or are you withdrawing
5  that claim?
6    A.   Withdrawing a part.
7    Q.   You're withdrawing a part?
8    A.   Yes.
9    Q.   Well, what part are you withdrawing?
10   A.   I will withdraw it in case I can prove
11  facts before trial.
12   Q.   Are we going to be facing an issue in
13  trial about weight loss or not?
14   A.   After surgery, no.
15   Q.   You're not making a claim for weight
16  loss?
17   A.   No.
18   Q.   Are you making a claim for weight loss
19  at any time against any of our clients?
20   A.   No.  Not according to emotional
21  distress.
22   Q.   Well, I'm asking you aside from what
23  the court has done what is your position?  Are you
24  going to press that claim or are you withdrawing it?

Page 54

1    A.   No.  I'll withdraw it.
2    Q.   All right.  Are you still pressing a
3  claim against any of the defendants concerning fear
4  of other inmates or possible random acts of
5  violence?
6    A.   Well, I can't predict that because I
7  don't know if it will happen or not.
8    Q.   Does that have anything to do with any
9  of the actions taken by any of the Defendants?
10   A.   No.
11   Q.   Is that just a general concern you
12  would have from being in prison?
13   A.   Yes, and my medical disability.
14   Q.   Well, are you pressing a claim against
15  any of the Defendants on that sentence?
16   A.   Yes.
17   Q.   You make a claim in paragraph 42
18  regarding staying on a top level tier?
19   A.   Yes.
20   Q.   And why are you on a top level tier?
21   A.   Because medical -- department never
22  sent anybody any medical reports I mean clearance.
23   Q.   So is that part of the claim you're
24  making against the Defendants?

Page 55

1    A.   Yes.  Part of their negligence,
2  corporate negligence.
3    Q.   Corporate negligence was dismissed?
4    A.   It was?
5    Q.   Yes.
6    A.   Can I see that.  It says the Plaintiff
7  shall receive with count credulity is repentant (ph)
8  and shall forth corporate negligence against CPS and
9  PHS.
10   Q.   You're right.  My mistake.  You make a
11  statement, a contention in paragraph 42 about CPS'
12  negligence in communicating with department of
13  corrections staff?
14   A.   Yes.
15   Q.   What is that contention?
16   A.   Because if they would have communicated
17  with the Department of Corrections staff I wouldn't
18  have still been on the top tier.
19   Q.   All right.  In paragraph 46 you say Dr.
20  Moyer knew of obvious danger to you if your
21  condition remained untreated but he failed to treat
22  you?
23   A.   Yes.
24   Q.   Other than the items you have already

Page 56

1  referred to do you have any other evidence to
2  support that contention?
3    A.   Yes.  I have the radiological reports
4  of June 11, 1999.
5    Q.   Other than that do you have any other
6  evidence to support that contention?
7    A.   Not at this moment.
8    Q.   All right.  In paragraph 49 you contend
9  that CPS and PHS were deliberately indifferent to
10  you in violation of the 8th Amendment.  Other than
11  the items you have already referred to in this
12  deposition do you have any evidence to support that
13  contention?
14   A.   Not right now.
15   Q.   Do you have any expert opinion to
16  support your contention of medical malpractice?
17   A.   Not right now.
18   Q.   In paragraph 60 what evidence do you
19  have that PHS and CPS failed to select and retain
20  only competent physicians and nurses?
21   A.   Well, there's a couple mistakes in the
22  medical records that the doctor wrote.
23   Q.   Which doctor are you referring to?
24   A.   Dr. Moyer.

DARREN JOHNSON

Page 57

1   Q.   So are you saying that the fact that
2   Moyer made some mistakes in the medical records
3   indicates that PHS and CPS hired an incompetent
4   physician?
5   A.   Yes.  I can produce Affidavits that
6   inform many grievances has been filed against these
7   doctors, Dr. Moyer.
8   Q.   What are the mistakes that you say Dr.
9   Moyer made in the medical records?
10   A.   He never reviewed my X-ray reports.
11   Q.   Anything else?
12   A.   And he wrote down that I was supposed
13   to be X-rayed for the left knee, not right knee.
14   Q.   Anything else?
15   A.   Not at this moment.
16   Q.   And is that the basis of your
17   contention that Dr. Moyer was incompetent?
18   A.   In part.
19   Q.   And is that in turn your basis of your
20   contention that CPS and PHS hired incompetent
21   physicians and nurses?
22   A.   In part.
23   Q.   Well, what else is part of your
24   contention that CPS and PHS hired incompetent

Page 58

1   physicians and nurses?
2   A.   I can prove that he showed apathy.
3   Q.   Apathy?
4   A.   Yes.
5   Q.   Who did?
6   A.   Dr. Moyer.
7   Q.   How did he show apathy?
8   A.   Because he just didn't care what the
9   outcome was going to be.
10   Q.   What's your basis for saying that?
11   A.   Because on June 22nd he never told me
12   anything.  I didn't see him after.  If I wouldn't
13   have seen Secretary Rhodes there was no physical
14   therapy from Dr. Moyer.
15   Q.   Other than that is there any other
16   evidence?
17   A.   Not at this point.
18   Q.   To support the contention that CPS and
19   PHS were not hiring competent physicians and nurses?
20   A.   Not at this moment.
21   Q.   In paragraph 61 what evidence do you
22   have that PHS and CPS didn't oversee the people who
23   were practicing medicine within Graterford's walls?
24   A.   Because nobody ever checked on Dr.

Page 59

1   Moyer after three times I went to see him.
2   Q.   How do you know no one checked on Dr.
3   Moyer?
4   A.   He still did the same thing.
5   Q.   So is your evidence just the nature of
6   the treatment you received from Dr. Moyer or is that
7   the nature of the evidence that you have to make the
8   contentions you do in paragraph 61?
9   A.   That's the partial basis.
10   Q.   Do you have any other bases on top of
11   that?
12   A.   Not at this moment.
13   Q.   Paragraph 62 you say that PHS and CPS
14   failed to formulate a doctor to force adequate rules
15   and policies to ensure quality care.  What evidence
16   do you have to support that contention?
17   A.   The policy was for me to receive
18   emergency outside treatment called a serious medical
19   need and they failed to adhere to that, adopt or
20   enforce it.
21   Q.   So you're saying that -- whose policy
22   are you saying was that you received emergency
23   outside medical care?
24   A.   Department of Corrections.

Page 60

1   Q.   Are you saying the passage of time
2   between the time that you contend you should have
3   received that treatment and the time you did is the
4   evidence you have to support that contention?
5   A.   Part of it.
6   Q.   Other than that do you have any other
7   evidence to support that contention?
8   A.   Not at this time.
9   Q.   Then in paragraph 63 you say that the
10   failure of PHS and CPS it's not clear to me what you
11   are saying in paragraph 63.  Can you tell me what
12   the allegation is in paragraph 63?
13   A.   The failure of Prison Health Services
14   Incorporate and Correctional Physicians Incorporate
15   after having actual knowledge on two separate
16   occasions of Johnson's injury and fact torn patellar
17   altered.  That is my injury in fact and procedures,
18   delays in my receiving surgery which created more
19   harm to me.  I received reconstructive surgery.
20   Q.   But what is the failure you're
21   referring to?
22   A.   He failed on several occasions to send
23   me out for surgery.  He sent me out there and brung
24   me back.

DARREN JOHNSON

Page 61

1    Q.   Other than what you have already
2  testified to today do you have any evidence to
3  support that contention?
4    A.   I have medical records and that is all
5  I have right now.
6    Q.   All right.  In paragraph 64 other than
7  what you have already testified to today do you have
8  any evidence to support your contention in paragraph
9  64?
10    A.   Yes.  I had the prison medical records
11  and I have the outside medical records.
12    Q.   Do you have any evidence that Dr. Moyer
13  or CPS or PHS knew of what they were doing to you
14  was causing you harm?
15    A.   No, I don't have any other evidence
16  right now.
17    Q.   You don't have any evidence of that
18  fact what I just said?
19    A.   Not right now.  I do have it through --
20  say that question again?
21    Q.   Do you have any evidence that Dr. Moyer
22  or CPS or PHS knew that their acts or omissions were
23  causing you harm?
24    A.   I have it through the medical records.

Page 62

1    Q.   Other than medical records do you have
2  any other evidence of that?
3    A.   Not right now.
4    Q.   In your grievance do you ask for money
5  damages?
6    A.   Yes, sir, in my appeal.  And I think on
7  the bottom of the first page according to --
8    Q.   Can you show me where you made the
9  request for money damages?
10    A.   Right near here.  What compensation
11  efforts are going to be made to resolve this
12  grievance.  And according to section six chapter F1
13  and A4 amended policy I am requesting relief as
14  deemed by any court of law.  That is pertaining to
15  compensation.
16    Q.   What happened to this grievance?
17    A.   It was denied by final review.
18    Q.   How many appeal levels did you take it
19  through?
20    A.   I took it all the way up to the final
21  review.  I took it through everyone.
22    MR. BUCKOVITZ:  That is all I have.
23  BY MS. MARTINDELL:
24    Q.   Good afternoon, Mr. Johnson.  My name

Page 63

1  is Denise Martindell.  I represent Dr. Stempler.  I
2  just have a few questions for you.  The records show
3  that the first time you saw Dr. Stempler in relation
4  to your right knee injury was July 15, 1999.  My
5  question is have you seen Dr. Stempler at any time
6  for any reason prior to that?
7    A.   No.  I haven't seen him.  And they just
8  kept telling me I would.
9    Q.   And who was that that told you you
10  would see him?
11    A.   A couple nurses.
12    Q.   The nurses.  Did you know who Dr.
13  Stempler was?
14    A.   No.  I never seen him before.
15    Q.   Did you know what kind of a doctor he
16  was?
17    A.   No.
18    Q.   Do --
19    A.   Until I received the pass.
20    Q.   Then what to do?
21    A.   To see an ortho.
22    Q.   So to your knowledge he is an
23  orthopaedic doctor?
24    A.   Yes.

Page 64

1    Q.   Now, you would agree that your injury
2  occurred on June 9th and you saw Dr. Stempler on
3  July 15th approximately five weeks had passed?
4    A.   Yes.
5    Q.   And you had not seen him prior to that?
6    A.   Yes.
7    Q.   Now, how did you come to see Dr.
8  Stempler you may have told me this before I
9  apologize for asking again?
10    A.   I was extended a pass to my cell.
11    Q.   And you were given a pass by who?
12    A.   By the guard, officer.
13    Q.   Do you know who referred you to Dr.
14  Stempler?
15    A.   I think Dr. Moyer did, a couple doctors
16  did and Battick according to the medical records.
17    Q.   Do you recall whether Dr. Moyer or Dr.
18  Battick discussed sending you to Dr. Stempler?
19    A.   I didn't know it would be Stempler.
20  All they said was ortho referral.
21    Q.   Now, in between the time of your injury
22  let me back up.  In between the time of your injury
23  and in between the time that you saw Dr. Stempler
24  you had a knee immobilizer and you described that as

DARREN JOHNSON

Page 65

1  a device that goes approximately from your hip to
2  your ankle?
3      A.   Yes.
4      Q.   And you were using that?
5      A.   Yes.
6      Q.   Were you using that on a daily basis?
7      A.   Yes.
8      Q.   Were you using crutches?
9      A.   Yes.
10     Q.   Were you taking anything for pain?
11     A.   He was giving me Motrin.
12     Q.   Did that help you?
13     A.   In a way.
14     Q.   And in a way what do you mean?
15     A.   My leg, I couldn't bend it.  My knee
16 was out of place.  It was painful but after a
17 certain time just like popping pills.
18     Q.   Were you given instructions to keep the
19 immobilizer on all the time?
20     A.   Yes.
21     Q.   You don't bend it?
22     A.   No.  I still couldn't bent it without
23 the immobilizer because fluid had naturally built up
24 around my knee.

Page 66

1      Q.   When would you take it off the
2  immobilizer and there is -- I'm talking about prior
3  to seeing Dr. Stempler?
4      A.   I would take it off when I slept.
5      Q.   And prior to seeing Dr. Stempler would
6  you consider your knee injury life threatening?
7      A.   No, but I couldn't hardly do a lot of
8  things.
9      Q.   And what things?
10     A.   Like clean up, walk down the steps, use
11 the bathroom.
12     Q.   And were you working during that time?
13     A.   Yes.
14     Q.   And you were working at the shoe shop?
15     A.   Yes.
16     Q.   And the job that you were doing was
17 removing the tacks?
18     A.   Removing the tacks, yes.
19     Q.   And you can sit?
20     A.   Yes.
21     Q.   Did you miss any time off from work
22 prior to seeing Dr. Stempler?
23     A.   I missed a lot, a couple hours, yes.
24     Q.   And when you went to see Dr. Stempler

Page 67

1  that would be on July 15, 1995; is that correct?
2      A.   Yes.
3      Q.   Tell me about your visit with Dr.
4  Stempler.
5      A.   Well, at that point my knee had healed
6  and normally.  So the swelling wasn't as big as it
7  used to be.  So when I went to see him he was
8  sitting approximately about three, two to three feet
9  from me.  So he was sitting to my left and I was
10 taking off the knee immobilizer and he was writing
11 something over here and he had a nurse standing by
12 him.  She was doing something with the records.  So
13 by the time I took my knee, the immobilizer off and
14 the Ace bandage he looked and said there is nothing
15 wrong with your leg.  Go back to your leg, take the
16 knee immobilizer off and do leg exercises and my
17 kneecap is over here.
18     Q.   How long was your visit with Dr.
19 Stempler?
20     A.   About five minutes.
21     Q.   So you're saying that he did not touch
22 your leg?
23     A.   No.  He was sitting like sideways.
24     Q.   Do you recall anything else he

Page 68

1  discussed with you at the time?
2      A.   That is all he said.
3      Q.   Did he discuss having seen X-rays?
4      A.   No.  He was just looking down writing.
5      Q.   So he didn't refuse to treat your leg?
6      A.   I don't even know if he treated me.
7      Q.   But he did look at it?  He did look at
8  your knee?
9      A.   Like a glance, yes, like a glance.
10     Q.   And he did give you instructions?
11     A.   Go back to your cell, do leg exercises.
12     Q.   Did he tell you what he thought was
13 wrong with your knee?
14     A.   No.  He said it was a raised patellar.
15     Q.   Patellar altered?
16     A.   He didn't say patellar altered.
17     Q.   He just said raised patellar?
18     A.   Yes.
19     Q.   Now, what was your understanding of a
20 raised patella at the time?
21     A.   I think it was just my understanding
22 was that because my kneecap was up here (indicating)
23 that is what I thought it was.
24     Q.   And you had an MRI the following day?

DARREN JOHNSON

Page 69

1    A.   Yes.
2    Q.   Now, between Dr. Stempler's visit and
3  your repair which happened it was in September of
4  1999; is that correct?
5    A.   Yes.
6    Q.   Did you see Dr. Stempler at all during
7  that time?
8    A.   No. I seen him once before surgery.
9  That's July 15th. That is the one time.
10    Q.   The one time you saw him before the
11  surgery. So to your knowledge Dr. Stempler wasn't
12  involved in any way in your approval process for
13  this surgery?
14    A.   Not to my knowledge.
15    Q.   And to your knowledge did he have
16  any -- did he have any involvement in your surgery
17  at all?
18    A.   No. I went to an outside hospital.
19    Q.   That was Dr. Novell?
20    A.   Yes.
21    Q.   And how about after the surgery, did
22  you see Dr. Stempler after?
23    A.   Yes.
24    Q.   Do you know when that was?

Page 70

1    A.   September 23rd.
2    Q.   And what occurred during that visit?
3    A.   He said my leg looked okay with the
4  cast on. He said I can go back to work.
5    Q.   Did he give you some kind of paperwork
6  to send you back to work?
7    A.   He said I can work four hours a day
8  sitting down.
9    Q.   Did you agree?
10    A.   Yes.
11    Q.   And do you have a medical expert or a
12  medical expert report to support your claim of
13  negligence against Dr. Stempler?
14    A.   No. I had proof that he said
15  discontinue my immobilizer and take the brace off
16  and prove that the MRI the next day said that my
17  patella was completely torn.
18    Q.   Anything else?
19    A.   Not right now.
20        MS. MARTINDELL: I think that is all
21  the questions I have. Let me go over my
22  notes for a few minutes.
23        (Whereupon, a brief off-the-record
24        discussion was held.)

Page 71

1  BY MS. MARTINDELL:
2    Q.   Now, after your surgery you had
3  physical therapy; is that correct?
4    A.   Yes.
5    Q.   How long was your physical therapy?
6    A.   It was quite a while. I think it was a
7  couple months.
8    Q.   And was that always with Etta Rice?
9    A.   Yes.
10    Q.   And who was it that made the decision
11  to release you from physical therapy, do you know?
12    A.   The last time I had physical therapy I
13  came that following week and I talked to Etna Rice
14  and she said you can't come in because we can't give
15  you any more physical therapy because you already
16  expended your amount, you know, she said something
17  to the effect it was a certain amount that I had to
18  do for physical therapy.
19    Q.   It was your understanding this certain
20  amount was?
21    A.   Like say a thousand dollars or
22  something like that for example. She said I
23  exceeded my amount.
24    Q.   Do you know who set the amount?

Page 72

1    A.   No, I don't.
2    Q.   So you went for a period of several
3  months for physical therapy. So we are in to let's
4  say maybe March of 2000, February or March?
5    A.   Yes.
6    Q.   Does that sound right?
7    A.   About that time.
8    Q.   When you had stopped. Okay. So you
9  had been released to return to work four hours a
10  day?
11    A.   Yes.
12    Q.   You had been released for physical
13  therapy. After you were released from physical
14  therapy did you increase your work hours?
15    A.   Yes. Two more hours. I was only
16  allowed to work four hours. Well, two and a half.
17    Q.   So after you -- after you were released
18  from physical therapy you worked six hours total?
19    A.   Yes. Six and a half.
20    Q.   And where did you work?
21    A.   Shoe shop.
22    Q.   And what job were you doing there?
23    A.   I was doing -- it's called a back
24  something.

DARREN JOHNSON

Page 81

1   bending all the way?
2        A.   No, not since Etna Rice.
3             MS. MARTINDELL:  I think that's all I
4   have for you.  Thank you.
5             (Whereupon, the deposition concluded at
6   1:01 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 83

1        - - -
2        INSTRUCTIONS TO WITNESS
3        - - -
4
5        Read your deposition over carefully.
    It is your right to read your deposition and make
6   changes in form or substance.  You should assign a
    reason in the appropriate column on the ERRATA SHEET
7   for any change made.
8
        After making any change in form or
9   substance, and which have been noted on the
    following ERRATA SHEET, along with the reason for
10  change, sign your name on the ERRATA SHEET and date
    it.
11
        Then sign your deposition at the end of
12  your testimony in the space provided.  You are
13  signing it subject to the changes you have made in
    the ERRATA SHEET, which will be attached to the
14  deposition before filing.  You must sign in the
    space provided.  The witness need not be a Notary
15  Public.  Any competent adult may witness your
    signature.
16
17       Return the original ERRATA SHEET to
    Darren Johnson, Graterford Prison, Route 29 & Gravel
18  Hill Road, Graterford, Pennsylvania 19426.  Court
    rules require filing within 30 days after you
19  receive the deposition.
20
21
22
23
24

Page 82

1        C E R T I F I C A T I O N
2
3        I, Micheline Brown, a Court Reporter
4   and Commissioner of Deeds for the Commonwealth of
5   Pennsylvania, do hereby certify the foregoing to be
6   a true and accurate transcript of my original
7   stenographic notes taken at the time and place
8   hereinbefore set forth.
9
10
11       _____
12       Micheline Brown
13       Court Reporter
14       Commissioner of Deeds
15  DATED:_____
16
17
18
19       (The foregoing certification of this
20  transcript does not apply to any reproduction of the
21  same by any means, unless under the direct control
22  and/or supervision of the certifying shorthand
23  reporter.)
24

Page 84

1        SIGNATURE PAGE
2             OF
3        DARREN JOHNSON
4
5        I hereby acknowledge that I have read
6   the foregoing deposition dated February 5, 2004, and
7   that the same is a true and correct transcription of
8   the answers given by me to the questions propounded,
9   except for the changes, if any, noted on the
10  attached ERRATA SHEET.
11
12  SIGNATURE
13
14  _____
15  DARREN JOHNSON
16
17  WITNESSED BY:        DATE:
18
19  _____   Mar 11, 04
20
21  ADDRESS:
22  HCF 9251
23  P.O. Box 244, Graterford, PA 19426
24

DARREN JOHNSON

Page 85

1   CASE: Darren Johnson vs. Dr. Stempler, et al.
      DEPOSITION OF: Darren Johnson
2   TAKEN: February 5, 2004
3
4   PAGE LINE ERROR  CORRECTION  REASON
5   change all "Battick" to "Baddick"
6   change all "Kirnara" to "Kanera"
7   change all "Krusinak" to "Korszniak"
8   change all "Rhodes" to "Rose"
9   pg. 55:6-9 change to "Plaintiff
10   shall be permitted to proceed
11   with Count IV against CPS and PHS".
12   change all "altered" to "alta"
13   change all "Sourber" to "Sourbeer"
14   pg. 29:6 change to "deliberately delaying".
15   change all "Etna" and "Etta" to "Edna"
16
17
18
19
20
21
22
23
24

Page 86

1           LAWYER'S NOTES
2   LINE PAGE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARREN JOHNSON                    :        CIVIL ACTION

        V.                        :        NO. 00-CV-711

NORMAN STEMPLER, M.D., DENNIS     :        JURY TRIAL DEMAND
MOYER, M.D., et al.

## VERIFICATION OF PETER BADDICK, III, D.O.

I, Peter Baddick, III, D.O., being of full age, do hereby verify the following:

1.      During the time period in which Plaintiff, Darren Johnson, complains of a delay in medical treatment, I was the Medical Director of Correctional Physician Services, Inc. ("CPS") at the State Correctional Institution at Graterford ("SCI-Graterford").

2.      I became involved in his care.

3.      At no time did anyone from CPS do anything to delay Mr. Johnson's treatment.

4.      At no time did I, or any of the CPS medical personnel under my supervision at SCI-Graterford do anything to delay Mr. Johnson's treatment.

5.      At no time did CPS or the CPS medical department at SCI-Graterford, have or follow any policy, practice or custom of delaying the medical treatment of inmates either at SCI-Graterford or at any outside facility.

6.      At no time did CPS or the CPS medical department at SCI-Graterford, do anything to delay the treatment of Mr. Johnson.

7.      Any delay in treatment of Mr. Johnson was caused by employees of the Commonwealth of Pennsylvania, independent of CPS.

8.      I had no control over when prison officials would transport inmates, including Darren Johnson, for treatment by outside consultants or for surgery. Prison officials independent of CPS handled this.

9.      CPS was a private corporation under contract to the Department of Corrections of the Commonwealth of Pennsylvania.

DEFENDANT'S EXHIBIT

10.     It is my understanding that Mr. Johnson is alleging in his complaint that when he was seen by Dr. Mandel in his office on July 27, 1999, that Dr. Mandel considered Mr. Johnson's condition to be an emergency requiring immediate surgery, and that he sought to perform surgery on Mr. Johnson at that time. Based upon my review of the records, Dr. Mandel's chart note of the examination, and personal knowledge, I can state that this is not true.

11.     According to Dr. Mandel's chart note of the July 27, 1999 examination of Mr. Johnson, the situation was not an emergency. Dr. Mandel wrote that he had discussed "treatment options" with Mr. Johnson, and that he told Mr. Johnson that "some improvement may be achieved" through the use of surgery. Dr. Mandel told Mr. Johnson at that time that there was "no assurance of success," even if surgery was performed. It appears that Dr. Mandel and Mr. Johnson agreed to pursue the surgical route, as Dr. Mandel wrote that Mr. Johnson "would like to go ahead with surgical construction and repair," and that the surgery "will be scheduled in the future if approved."

12.     There is no indication, either explicitly, or in my professional medical opinion, implicitly, in Dr. Mandel's chart note of July 27, 1999, that he considered Mr. Johnson's condition to be an emergency requiring immediate performance of the contemplated surgery. In fact, his note that the surgery was to be "scheduled in the future if approved" demonstrates the opposite in my opinion, as this indicates that Dr. Mandel intended to proceed with the routine process of obtaining authorization to perform the surgical procedure.

13.     In addition, Dr. Mandel's July 27, 1999 evaluation of the prospects for the outcome of Mr. Johnson's surgery further demonstrates his lack of urgency in scheduling the procedure: Dr. Mandel's opinion that "some improvement may be achieved," but that there was "no assurance of success," indicates, in my opinion, that he did not consider that procedure to be of an emergent nature.

14.     What Dr. Mandel failed to do on July 27, 1999, while Mr. Johnson was present in his office for the examination, further demonstrates that he did not consider the surgery being contemplated to be an emergency: At no time did Dr. Mandel call me at SCI-Graterford and request emergency approval to perform the surgery on an immediate basis.

15.     As Medical Director at SCI-Graterford, it was within my authority to consider, and if appropriate, approve such an immediate request from an outside physician. Had Dr. Mandel believed that it was medically necessary to perform the surgery in question on July 27, 1999, at a time when Mr. Johnson was already present in his office for examination, the proper procedure for him to follow was to call the medical director at the inmate's facility and seek authorization verbally.

16.     The proper procedure for Dr. Mandel to have followed on July 27, 1999, had he believed that the surgery for Mr. Johnson was in fact an emergency, would have been for him to have telephoned the medical director at SCI-Graterford (myself), and to have asked for authorization. Had he done so, I would have approved the immediate performance of the procedure. Dr. Mandel placed no such call to me on July 27, 1999, or at any other time, seeking to perform surgery on Mr. Johnson on an emergency basis. It is therefore reasonable to conclude that Dr. Mandel did not consider the procedure to be an emergency.

     I hereby verify that the above statements are true and correct to the best of my knowledge, information and belief. I also understand that the statements contained herein are subject to the penalty of perjury pursuant to 28 U.S. §1746 relating to unsworn falsification to authorities.

PETER BADDICK, III, D.O.

Date: 2-7-2006

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES MILLER                          :     CIVIL ACTION
                                      :
        v.                            :     FILED   JUN 2 2 1999
                                      :
STANLEY HOFFMAN, M.D. and             :
DONNA HALE                            :     NO. 97-7987

## MEMORANDUM AND ORDER

HUTTON, J.                                        June 21, 1999

Presently before the Court are the Motion for Summary
Judgment of Defendant Donna Hale ("Hale") (Docket No. 53) and the
Plaintiff James Miller's response thereto (Docket No. 59).  Also
before the Court is the Motion for Summary Judgment by Defendant
Stanley Hoffman, M.D. ("Hoffman") (Docket No. 58), the Plaintiff's
response thereto (Docket No. 60), and Dr. Hoffman's Reply Brief
(Docket No. 66).  For the reasons stated below, Defendant Hale's
Motion for Summary Judgment is **GRANTED** and Dr. Hoffman's Motion for
Summary Judgment is **DENIED**.

## I. INTRODUCTION

James Miller ("Miller" or "Plaintiff") filed this civil
rights action against Stanley Hoffman, M.D. ("Hoffman"), the former
medical director at SCI-Graterford and Plaintiff's former treating
physician, Joseph Dimino, M.D. ("Dimino"), the corporate medical
director for Correctional Physician Services, Correctional

-1-



DEFENDANT'S
EXHIBIT

Physician Services ("CPS"), the Commonwealth of Pennsylvania, Department of Corrections, and the following SCI-Graterford officials: Superintendent Donald T. Vaughn, Deputy Superintendent David Diguglielmo, former Deputy Superintendent Henry Jackson, Officer James Davis, and Health Care Administrator, Donna Hale ("Hale").

Plaintiff alleged that all of the defendants violated his Eighth Amendment rights for denying him adequate medical care. Additionally, he asserted a medical malpractice claim against Drs. Hoffman and Dimino and CPS. On April 17, 1998, this Court approved a stipulation voluntarily dismissing all of the Plaintiff's claims against the Department of Corrections. Defendants Dimino and CPS filed a motion to dismiss, which this Court granted as to CPS only. This Court granted the Plaintiff's motion under Federal Rule of Civil Procedure 21 to dismiss all claims against defendants Vaughn, Diguglielmo, Jackson, and Davis. It also granted Dimino's unopposed motion to dismiss all claims against him. Therefore, Plaintiff's only remaining claims are that Dr. Hoffman and Donna Hale were deliberately indifferent to his medical needs and that Dr. Hoffman was reckless and negligent under state law.

## II. BACKGROUND

Taken in the light most favorable to the nonmoving party, the facts are as follows. Miller is not really James Miller. His actual name is Timothy Miller. When he was arrested he assumed the

-2-

identity of his brother, James Miller.   Miller was first
incarcerated at SCI-Graterford in 1989, was transferred to other
state correctional institutions from 1990 to 1994, and returned to
Graterford in 1994, where he has since remained.   The events
leading to this case began on April 16, 1997, when Miller fell and
injured his left elbow while working in the main kitchen at
Graterford.

After his fall, Miller went to see his supervisor who
sent him to the prison hospital.   At the hospital, Miller was
placed on sick call for the next morning.   The next day Miller's
elbow began to swell.   He attempted to report to sick call to have
his elbow examined.   On the way to the hospital, however, Miller
got into a confrontation with a guard.   As a result, Miller was
placed in the Restricted Housing Unit ("RHU") rather than being
allowed to proceed to the infirmary.

Approximately ten days later, on April 26, 1997, Miller's
initial injury was seen by a prison physician for the first time.
On May 2, 1997, Miller was seen by Defendant Hoffman.   At this
time, Hoffman attempted to drain fluid from Miller's swollen elbow.
After two unsuccessful attempts, Hoffman drained some fluid from
Miller's elbow, but was unable to get all of the fluid out.
Hoffman then injected 250 milligrams of a steroid called solumedrol
into Miller's elbow.   Approximately ten days later, the wound at
issue appeared on Miller's left elbow and began draining blood and

-3-

fluid.  For about four months, Miller was treated with "dressings and soaks" for this condition.

During this time, Miller repeatedly requested another physician's opinion of the treatment.  Consequently, Miller filed grievances with Donna Hale, the Health Care Administrator responsible for scheduling referrals to specialists.  As Health Care Administrator, Hale is part of the executive staff at Graterford and attends weekly executive staff meetings with the Superintendent of Graterford and various other high-level staff members.  Her responsibilities as Health Care Administrator include supervising staff, responding to inmate grievances and monitoring referrals of prisoners for consultations with outside physicians or specialists.

Three months after the wound appeared, in August of 1997, Hale met with Hoffman to discuss plans for Miller to be referred to a specialist.  Hoffman did not schedule Miller for a consultation after this meeting.  Instead, on August 13, 1997, Nuhad Kulaylat, M.D. ("Kulaylat") referred Miller to a visiting orthopedic specialist named Norman Stempler, M.D. ("Stempler").  When Hoffman learned about this referral, he immediately canceled the appointment.  Nonetheless, Miller managed to be seen by Stempler despite Hoffman's cancellation of the appointment.  Miller had inadvertently been issued two passes for the consultation.  Hoffman--who apparently did not know this--caused just one pass to be confiscated.  Miller used the other to go to the appointment

-4-

that Kulaylat had scheduled for him, and was treated by Stempler. After examining Miller, Stempler concluded that if his wound did not heal, he would consider "elliplisiging and primary closure by general surgery." Hoffman was very upset with both Stempler and his staff for allowing the consultation. After Miller was treated by Stempler, Hoffman declared in Miller's medical chart that Stempler had "assumed responsibility for [Miller's] wound care."

A month later, Hoffman's supervisor referred Miller to see another physician for a second opinion. On September 10, 1997, after a CPS Administrator named Frank Bott contacted him from the prison and requested him to do so, Dimino, the Corporate Medical Director for CPS, referred Miller for a consultation with an outside general surgeon named Dr. Botempo. Again, upon discovering the appointment had been scheduled, Hoffman canceled it immediately. And again, Hoffman was angry and wrote in Miller's medical chart that Miller's care was "transferred" to Dimino. Hoffman also noted that Dimino would be guilty of patient abandonment if he failed to check on Miller daily. Neither Stempler nor Dimino made daily visits or even weekly visits to the prison. Dimino conceded that Hoffman's comment was inappropriate.

In September of 1997, four months after incurring the initial injury, Miller contacted an attorney who requested that Miller be allowed to see another doctor. On October 17, 1997, Miller was sent to see Ernest Rosato, M.D. ("E. Rosato"), a general surgeon at Thomas Jefferson University Hospital. E. Rosato

-5-

recommended that Miller "have [the wound on his left elbow] re-excised and closed primarily." After conferring with a plastic surgeon, E. Rosato decided that an orthopedic hand surgeon should perform the surgery. Dr. Rosato advised Dr. Hoffman of his diagnosis and provided him with a list of specialists to consult with respect to the surgery.

In September of 1997, suggested in front of other inmates that Miller might have AIDs. Miller had already been tested several months before and was known by medical care providers at Graterford to not have AIDs. Hoffman decided to confine Miller in "reverse isolation," a status for patients with compromised immune systems. Hoffman recorded in Miller's chart that Miller was manipulating his own wound and causing it not to heal. Miller also noted that Miller was manipulating the Pennsylvania Department of Corrections.

On October 17, 1997, Miller has seen by Dr. Ernest Rosato, M.D. ("E. Rosato"), a general surgeon at Thomas Jefferson University Hospital. E. Rosato recommended that Miller "have [the wound on his left elbow] re-excised and closed primarily." After conferring with a plastic surgeon, E. Rosato decided that an orthopedic hand surgeon should perform the surgery. E. Rosato informed Hoffman of his diagnosis and forwarded him a list of several such specialists to consult with respect to the surgery. On October 22, 1997, Randall Sears, Deputy Chief Counsel for the Pennsylvania Department of Corrections, advised Miller's counsel by

-6-

letter that if his wound did not heal by "Thursday," October 23, 1997, surgery would be performed on Miller's elbow.  Despite the wound not healing, no surgery was performed.

On December 5, 1997, Miller was examined by Francis Rosato, M.D. ("F. Rosato").  F. Rosato advised Dr. Hoffman that Miller's elbow did not require surgery at that time.  However, he also said that should the wound reappear, then "the recommendation previously made [of surgery] should be followed."  F. Rosato wrote that although there was "some soft tissue swelling" it was "without bone abnormality."

On December 1, 1998, Hale filed a motion for summary judgment.  On December 15, 1998, the Plaintiff filed his response in opposition.  On December 8, 1998, Dr. Hoffman filed a motion for summary judgment.  On December 22, 1998, the Plaintiff filed his response in opposition.  Dr. Hoffman filed a Reply Brief on January 12, 1999.  Because the Defendants' motions are ripe, the Court considers the motions for summary judgment.

### III. <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party moving for summary judgment has the initial burden of showing

the basis for its motion.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial.  See id. at 324.  A genuine issue is one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the nonmovant.  See Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).  Moreover, a court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent.  See id.  Nonetheless, a party opposing summary judgment must do more than rest upon mere allegations, general denials, or vague statements.  See Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir. 1992).

## IV. DISCUSSION

### A. Hoffman's Motion for Summary Judgment

In his motion, Hoffman raises essentially four general issues regarding Miller's Complaint.  First, Hoffman claims that Miller's § 1983 Claim for Medical Maltreatment must be dismissed

-8-

because: (1) Miller has not produced sufficient evidence that Hoffman had actual knowledge that his treatment of Miller presented a substantial risk of harm to Miller; (2) Hoffman is entitled to qualified immunity; and (3) Hoffman has a good faith defense, which Miller lacks the ability to rebut.   Second, Hoffman claims that Miller's claim for intentional infliction of emotional distress is fatally flawed because: (1) Hoffman's alleged conduct was not "outrageous;" and (2) Miller suffered no physical injury.   Third, Hoffman claims that Miller's malpractice claim must be dismissed because Miller has failed to produce sufficient expert testimony. Fourth, and finally, Hoffman contends that Miller's entire suit must be dismissed because he has sued in the wrong name.   The Court will address each of the arguments asserted by Defendant Hoffman.

### 1. 42 U.S.C. § 1983 Medical Maltreatment Claim

#### a. Standard

The validity of an inmate's claim for medical maltreatment depends on whether it represents cruel and unusual punishment.   In _Estelle v. Gamble_, the Supreme Court held that "the deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment."   429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).   This standard has been split into a two part test: (1) deliberate indifference by the prison official

-9-

and (2) serious medical need by the prisoner. <u>West v. Keve</u>, 571 F.2d 158, 161 (3d Cir.1978).

A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." <u>Monmouth County Correctional Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir.1987) (citing <u>Pace v. Fauver</u>, 479 F. Supp. 456, 458 (D.N.J.1979), <u>aff'd</u>, 649 F.2d 860 (3d Cir. 1981)). In addition, "[t]he seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment"; e.g., the suffering of a "lifelong handicap or permanent loss." <u>Id.</u> at 347.

The Supreme Court clarified the mental state required to show an official's deliberate indifference in <u>Farmer v. Brennan</u>, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Court held that an official shows deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety: the official must both be aware of facts from which the inference could be drawn that a substantial harm exists, and he must also draw the inference." <u>Id.</u> at 837. In other words, deliberate indifference does not occur where the official fails to alleviate a significant risk that he should have identified but failed to do so. <u>Id.</u>

In <u>Estelle</u>, the Court identified three situations where deliberate indifference to serious medical needs may be manifested: (1) "by prison doctors in their response to the prisoner's needs,"

-10-

(2) "by prison guards in intentionally denying or delaying access to medical care," or (3) by prison guards in "intentionally interfering with the treatment once prescribed." Estelle, 429 U.S. at 104-05 (footnotes omitted). Nevertheless, claims for negligent diagnosis or treatment do not rise to the level of deliberate indifference. Id. at 106. A doctor's decision whether to order specific diagnostic techniques or forms of treatment is within his medical judgment, and it does not represent cruel and unusual punishment under the Eighth Amendment. Id. at 107. Even "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Id. at 106.

"Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim." Norris v. Frame, 585 F.2d 1183, 1186 (3d Cir.1978). Consequently, a claim for the violation of the Eighth Amendment will not succeed unless the medical treatment received consists of "act[s] which were either intentionally injurious, callous, grossly negligent, shocking to the conscience, unconscionable, intolerable to the fundamental fairness or barbarous." Id.

Inadequate medical treatment claims under § 1983 must be denied where the medical treatment provided by officials does not comport to the inmate's specific requests since "complaints merely reflect a disagreement with the doctors over the proper means of treat[ment]." Boring v. Kozakiewics, 833 F.2d 468, 473 (3d Cir.

-11-

1987); see also Holly v. Rapone, 476 F.Supp. 226 (E.D. Pa. 1979)
(claim under § 1983 denied where medical treatment was provided but
prisoner claimed that he did not receive proper medications and an
X-ray).  Dismissal of a complaint is not proper, however, where
prisoners allege, for example, that on numerous occasions a prison
doctor intentionally inflicted pain, continued ineffective courses
of treatment and refused to prescribe appropriate medications.
White v. Napoleon, 897 F.2d 103 (3d Cir.1990).

    b. **Analysis**

        The Court finds that Miller has produced sufficient
evidence for a reasonable jury to conclude that Hoffman was
deliberately indifferent to Miller's serious medical needs.  If the
Court accepts the reading of the evidence most favorable to Miller,
the alleged misconduct violates the Eighth Amendment.  Hoffman
refused to allow Miller to be seen by a specialist, although the
treatment he was rendering failed to work after several months.
Hoffman canceled consultations with orthopedic surgeons and did not
approve other consultations with orthopedic surgeons.  On the two
occasions that Miller managed to see a specialist, Hoffman did not
follow the recommendations of those specialists.  Moreover, Hoffman
knew that Miller was in a state of pain and suffering during this
time.

        Hoffman contends that he had concluded that orthopedic
surgeons had nothing to offer in the treatment of Miller.  The

-12-

reasonableness of this conclusion is a question for the jury.  As noted above, denying an inmate access to a physician capable of assessing the need for treatment and/or preventing inmate from receiving a recommended treatment is deliberate indifference. Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979).  Deliberate indifference to serious medical needs can be reasonably inferred from persistent conduct in the face of resultant pain and risk of permanent injury.  Napoleon, 897 F.2d at 109.

Reviewing the evidence in the light most favorable to the Plaintiff, a reasonable juror might conclude that Hoffman took extraordinary measures to deny Miller access to alternative medical care in order to avoid review of the propriety of his initial treatment.  After Hoffman's initial treatment of Miller's injury, the elbow began to swell and drain fluid.  This condition remained unchanged for several months.  Hoffman denied Miller access to other physicians capable of assessing his wound.  Indeed, Hoffman became irate after learning that other doctors had scheduled Miller to be seen by other specialists and attempted to cancel those appointments.  Hoffman prevented consistent treatment recommendations from respected orthopedic specialists from being implemented.

Hoffman also noted without a factual basis that Miller's wounds may not be healing due to self-manipulation and AIDS.  No evidence indicates that Miller was manipulating his wound.  Miller

-13-

had also tested negatively for AIDs.  Nonetheless, Hoffman had
Miller placed in "reverse isolation" due to his "high risk"
condition.  This confinement isolated Miller from his attorney and
the "outside world" because Miller was denied all phone privileges.
Hoffman also refused to allow Miller to change doctors within the
prison system.  Hoffman knew that Miller's injury was causing him
pain.  Reviewing the evidence before the Court in the light most
favorable to Miller, a reasonable juror could conclude that Hoffman
knew that his refusal to allow Miller to see other doctors would
cause harm to Miller and yet proceeded with this treatment anyway.
Thus, the Court finds that Hoffman has failed to carry his burden
of showing an absence of material issues of fact in light of Eighth
Amendment standards.  Accordingly, summary judgment in favor of
Hoffman regarding Miller's § 1983 Medical Maltreatment Claim is not
warranted.

c. Qualified Immunity and Good Faith

        Hoffman argues that Miller has failed to overcome his
"good faith defense."  Hoffman states that as a prison physician,
he is entitled to assert a good faith defense, which the Plaintiff
must overcome with proof that Hoffman subjectively understood his
conduct violated the Plaintiff's constitutional rights.  For this
Hoffman relies on Jordan v. Fox, Rothschild, O'Brien & Frankel, 20
F.3d 1250 (3d Cir. 1994).  The Court in Jordan held that private
individuals invoking state attachment laws subsequently held

-14-

unconstitutional had a defense of good faith.  Id. at 1276.  Like the subjective knowledge component of an Eighth Amendment claim itself, bad faith can be inferred from circumstantial evidence. Id. at 174.  It is "virtually inconceivable" that a medical professional working in a prison would be unaware that preventing necessary medical care to a patient in pain for a period of months in order to avoid discovery of his possible malpractice violated his constitutional rights.  See Pearson v. City of Philadelphia, Civ.A. No.97-1298, 1998 WL 721076, *2 (E.D. Pa. Oct.15, 1998).  If the jury were to credit the Plaintiff's evidence and reject Defendant Hoffman's, it could reasonably conclude that Hoffman did not act in good faith.

Hoffman also alleges that he is entitled to a qualified immunity defense.  Hoffman concedes that he is a private actor, however, he asserts that he functioned in the same way as a physician who was employed by the Commonwealth of Pennsylvania. Qualified immunity has been afforded to private individuals who at the behest of state officials perform governmental functions.  See Warner v. Grand County, 57 F.3d 962, 965-67 (10th Cir. 1995); Williams v. O'Leary, 55 F.3d 320, 323 (7th Cir.1995); Burwell v. Board of Trustees of Georgia Military College, 970 F.2d 785, 795 (11th Cir.1992), cert. denied, 507 U.S. 1018, 113 S.Ct. 1814, 123 L.Ed.2d 445 (1993).  Whether such immunity remains available in these circumstances is questionable after the recent five to four holding of the Supreme Court that private prison guards, at least

-15-

those who act without meaningful government supervision or direction, do not enjoy qualified immunity from suit under § 1983. See Richardson v. McKnight, 521 U.S. 399, 117 S.Ct. 2100, 2109, 138 L.Ed.2d 540 (1997). In any event, construing the record in a light most favorable to the Plaintiff as the Court must when asked to grant summary judgment, Hoffman's conduct violated a clearly established right to treatment for serious medical needs of which a reasonable prison health care professional would have been aware. Thus, the Court finds that Hoffman is not entitled to qualified immunity from Miller's § 1983 claim.

## 2. Intentional Infliction of Emotional Distress

To prevail on a claim of intentional infliction of emotional distress, the plaintiff must prove that defendant, by extreme and outrageous conduct, intentionally or recklessly caused the plaintiff severe emotional distress. Motheral v. Burkhart, 400 Pa.Super. 408, 583 A.2d 1180 (1990). Liability will be found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Restatement (Second) of Torts, § 46 comment d. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" Id. The extreme and outrageous character of conduct may arise from an abuse

-16-

by a person in a position of actual or apparent authority over another, or by one with the power to affect the other's interests. Restatement (Second) of Torts § 46 comment e.

Regarding Miller's claim for intentional infliction of emotional distress, Hoffman asserts two arguments.  First, Hoffman contends that no evidence establishes that Miller's alleged injuries resulted from emotional distress.  Second, Hoffman asserts that Miller has failed to produce evidence establishing that Miller's conduct was so extreme and outrageous as to be offensive to the moral values of society.  The Court will address each of Defendant's arguments in turn.

### a. Outrageous Conduct

It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.  Restatement (Second) of Torts § 46 comment h.  Motheral, at 423, 583 A.2d at 1188. Where reasonable persons may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.  Restatement (Second) of Torts § 46 comment h; Motheral, at 423, 583 A.2d at 1188.

In his motion, Hoffman cites various cases in an attempt to demonstrate that his conduct is not outrageous enough to support a claim for intentional infliction of emotional distress.

-17-

Pennsylvania courts, however, have held that conduct much less outrageous than that alleged here was sufficient to support such a claim. See, e.g., Pierce v. Penman, 357 Pa. Super. 225, 236, 515 A.2d 948, 953 (1986) (finding sufficiently outrageous conduct where defendant engaged in repeated failure over a period of years to provide records to former patient with known emotional difficulties), allocatur denied, 515 Pa. 608, 529 A.2d 1082 (1986). Pennsylvania court have also indicated that they will be more receptive to find outrageous conduct and permit recovery in intentional infliction of emotional distress cases where, like here, there is a continuing course of conduct. Williams v. Guzzardi, 875 F.2d 46, 52 (3d Cir. 1989) (citing Pierce, 357 Pa. Super at 236, 515 A.2d at 953)).

If the Court construes the evidence in the light most favorable to the Plaintiff, Hoffman's conduct in this case is sufficiently extreme and outrageous to permit recovery based upon intentional infliction of emotional distress. Miller contends, and has presented evidence to support, that Hoffman engaged in a deliberate course of conduct to prevent Miller from obtaining the appropriate and recommended medical care for his injury. Hoffman unsuccessfully treated Miller's injury for several months. Other physicians that had examined Miller recommended alternative medical care, which Hoffman did not implement. Throughout the entire course of this conduct, Miller was under the control of Hoffman. Not only did Hoffman refuse Miller's requests to see other

-18-

physicians, but he canceled scheduled appointments with specialists made by other physicians.  Hoffman also placed Miller in "reverse isolation" which shut-off Miller from the outside world.

As stated above, a reasonable juror could conclude that Hoffman violated Miller's civil rights and subjected him to cruel and unusual punishment by deliberately preventing him from receiving the necessary medical care.  The Court has also noted that Miller has provided sufficient evidence for a reasonable juror to conclude that Hoffman knew that Miller was in pain and suffered as a result of his deliberate intervention of Miller's medical treatment.  Accordingly, the Court finds that Miller has produced sufficient evidence of outrageous conduct to support a jury verdict for intentional infliction of emotional distress.

### b. Physical Harm

In order to state a claim for intentional infliction of emotional distress, "a plaintiff must allege "physical injury, harm, or illness caused by the alleged outrageous conduct." Corbett v. Morgenstern, 934 F.Supp. 680, 684 (E.D.Pa. 1996); see also Rolla v. Westmoreland Health Sys., 438 Pa.Super. 33, 651 A.2d 160, 163 (1994).  "[D]epression, nightmares, stress, and anxiety" have been found to be physical manifestations of emotional distress and sufficient to sustain a claim.  Love v. Cramer, 414 Pa.Super. 231, 606 A.2d 1175, 1179 (1992).  Hoffman alleges that Miller's claim must fail because he has no evidence that he suffered

-19-

physical injury from the alleged intentional infliction of emotional distress.

In this case, however, Miller has produced his medical chart that is riddled with notations by various doctors and nurses that Miller was upset or worried about Hoffman's behavior. If the Court accepts the reading most favorable to Miller, then Plaintiff if given the opportunity could prove physical injury arising from his emotional distress and mental anguish. Accordingly, Hoffman is not entitled to summary judgment of Plaintiff's claim for intentional infliction of emotional distress.

## 3. <u>Medical Malpractice</u>

To establish a prima facie case of negligence in a medical malpractice action alleging deviation from the standard of care, "a plaintiff must present expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury." <u>Gardner</u>, <u>supra</u>, 150 N.J. at 375, 696 A.2d 599 (citations omitted). Hoffman alleges that Miller has failed to produce sufficient evidence of the prima facie case. This Court must disagree.

Miller has produced the report of Robert Dunn, M.D. ("Dunn"). First, regarding the standard of care, Dunn opined that "[g]ood and proper medical care mandate that a draining wound such as this be attended to by a surgeon and be irrigated and debrided and then either closed primarily or allowed to heal by secondary

-20-

intention." Thus, Plaintiff has satisfied the first element of the prima facie case.

Second, the report indicates to a reasonable degree of medical certainty that "Dr. Hoffman deviated from the accepted standard of care by failing to refer Mr. Miller to an orthopedic surgeon, plastic surgeon or a general surgeon for appropriate care of his draining wound sinus." The second element of the prima facie is, therefore, satisfied.

Third, Dunn opined that Hoffman's conduct was the proximate cause of Miller's damage. More specifically, the report states that Hoffman's failure to provide Miller the accepted standard of care "increase[d] the risk of an infection to the adjoining joint and cause increased scarring in the surrounding tissues." Dunn also opined that Hoffman's conduct "not only exposed him to increased risk and damage but also others who were caring for him." Thus, Miller has satisfied the third element of the prima facie case.

Hoffman suggests that Miller's claim for medical malpractice must fail because Miller relies on "only one" expert report. Hoffman, however, fails to cite to any authority to support this contention. Thus, despite the Plaintiff's reliance on just one expert report, the Court finds that Miller has satisfied the prima facie case of medical malpractice, and summary judgment is therefore not warranted.

## 4. **Wrong Name**

The Court declines Hoffman's invitation to dismiss Miller's entire action because he brought this action as "James Miller" and not "Timothy Miller." While Plaintiff concedes that his birth name is Timothy Miller, it is uncontroverted that "James Miller" is the name under which the Plaintiff was convicted and sentenced. Hoffman's sole reliance on Prince v. Delaware County, Civ.A. No.92-1942, 1993 WL 141711 (E.D. Pa. May 3, 1993) (Kelly, J.) is misguided. In Prince, a plaintiff who had filed numerous pro se civil rights actions under his "real" name, Brian Winward, filed additional actions in the same court under a complete alias, Julian Prince, sometimes suing the same defendants under both names. Prince, 1993 WL 141711, at *2. Judge Kelly found that "this conduct is the type that constitutes fraud on the court because it clearly tampers with the judicial machinery and subverts the integrity of the court itself." Id.

In the present matter, no evidence suggests that Miller intended to commit fraud on the Court or on anyone else. Miller volunteered the information during his deposition that the first name given to him at birth was "Timothy" and not James. Moreover, Hoffman does not refute that every record pertaining to him bears the name James Miller and the prisoner number BD-4691. Indeed, prison regulations provide that while incarcerated, prisoners must respond to the name under which the prisoner was convicted. See

-22-

K.A.R. 44-12-506; <u>Kirwan v. Larned Mental Hlth</u>, 816 F. Supp. 672, 673 (D. Kan. Mar. 19, 1993). Thus, the Court finds that Miller's use of the name "James Miller" does not constitute fraud, and dismissal of this action is not warranted on that basis.

## B. Hale's Motion for Summary Judgment

In her motion, Hale asserts two defenses against Miller's § 1983 Medical Maltreatment claim. First, Hale contends that Miller's failure to receive the responses he wanted to his grievances does not state a viable claim against Defendant Hale. Second, Hale claims that the evidence before the Court irrefutably shows that Hale was not deliberately indifferent to Plaintiff's medical needs. Because the Court finds that Hale was not deliberately indifferent to Miller's medical needs, the Court need not consider Hale's other argument.

### 1. Deliberate Indifference

In order for an individual defendant to be liable under § 1983, he or she must have participated in or had personal knowledge of and acquiesced in the actions which deprived plaintiff of his or her constitutional rights. <u>Pierce v. Pennsylvania Dept. of Corrections</u>, 1992 WL 131882 (E.D.Pa. June 5, 1992); <u>see also</u> <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1294 (3d Cir. 1997). The mere fact that a defendant holds a supervisory position is insufficient to find liability, because there is no vicarious

liability or respondeat superior in § 1983 cases. <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 69 n. 14 (3d Cir. 1993).

In <u>Durmer</u>, the Third Circuit held that prison officials who are not physicians cannot be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor. <u>Durmer</u>, 991 F.2d at 68. District courts have also refused to find health care administrators deliberately indifferent when the prisoner is receiving treatment from a doctor. See <u>Hull v. Dotter</u>, 1997 WL 327551, *4 (E.D. Pa. Jun.12, 1997) (finding health care administrator cannot be liable under § 1983 for refusal to permit prisoner to consult with outside physician); <u>Freed v. Horn</u>, 1995 WL 710529, *3-4 (E.D. Pa. Dec.1, 1995) (finding health care administrator and other prison officials who may have had supervisory positions over treating physician were entitled to summary judgment because they did not personally participate in treating plaintiff's medical condition); <u>see also</u> <u>McAleese v. Owens</u>, 770 F. Supp. 225, 262 (M.D. Pa. 1991) (finding health care administrator entitled to summary judgment because he was not a physician and was not in position to assess the reasonableness of prison doctor's treatment).

In the present case, Hale could not and did not make any medical decisions regarding the course of treatment for Plaintiff's elbow. Hale is not a physician. She does not prescribe medications or make decisions regarding the course of treatment

-24-

prescribed to inmates, nor does she make referrals to outside physicians. Such decisions are left to the medical staff employed by CPS. Hale is the health care administrator at Graterford. As this title suggests, her duties are purely administrative and include supervising the nursing staff, dental staff, and the medical records director and her staff, monitoring physician and psychiatrist contracts, hiring and disciplining staff, responding to inmate grievances, providing documentation for ACA standards and proof of practice, and monitoring time frames for referrals or prisoners to outside physicians.

Moreover, "[i]n order to succeed in an action claiming inadequate medical treatment, a prisoner must show more than negligence; he must show 'deliberate indifference' to a serious medical need." Durmer, 991 F.2d at 67. No evidence has been produced that Hale was "deliberately indifferent" to Miller's injury or medical needs. On the contrary, Hale responded to Plaintiff's complaints, she referred Miller to outside physicians, and then followed up to ensure that Plaintiff was seen by those physicians. Based on Plaintiff's medical records, Hoffman was actively treating Plaintiff's elbow. No evidence has been produced that would suggest that Hale should have known that Hoffman's treatment of Miller's elbow may have been inadequate. Thus, no evidence shows that Hale violated Miller's Eighth Amendment rights.

Accordingly, Hale's motion for summary judgment is granted, and judgment is entered in her favor and against Miller.

An appropriate Order follows.

-26-

VERIFICATION

JONESSA MILLIKEN hereby verifies the following:

1.    I am an employee of Prison Health Services, Inc.;

2.    I have knowledge of when Prison Health Services, Inc. assumed responsibility to provide medical care for the inmates at the State Correctional Institution at Graterford.

3.    Prison Health Services, Inc. had no such responsibility in 1999.

4.    Prison Health Services, Inc. did not assume responsibility for these inmates until May, 2000.  That constituted the effective date of the contract entered into between Prison Health Services, Inc. and the Commonwealth of Pennsylvania's Department of Corrections.

I hereby certify that the above statements are true and correct to the best of my knowledge, information and belief.   I also understand that the statements contained herein are subject to the penalty of perjury pursuant to 28 U.S. §1746 relating to unsworn falsification to authorities.

JONESSA MILLIKEN

DATE: 4/13/04



MENACHEM M. MELLER, MD, PhD
DEPARTMENT OF ORTHOPEDIC SURGERY
501 SOUTH 54ᵀᴴ STREET, SUITE G-28
PHILADELPHIA, PA 19143
215 748-9863 (VOICE)
215 748-9717 (FAX)

DIPLOMATE,
AMERICAN BOARD OF
ORTHOPEDIC SURGERY

FELLOW, AMERICAN
ACADEMY OF ORTHOPEDIC
SURGEONS

February 29, 2004


Gold, Butkovitz and Robbins, P.C.
Attorneys at Law
Manor Professional Building
7837 Old York Road
Elkins Park, PA   19027

Attn:        Shawn Robbins, Esq.
Phone No.:  215-635-2000
Fax No.:     215-635-2543

Re:   Darren Johnson vs Dennis Moyer, M.D., et al
File No.:     1065

Dear Mr. Robbins:

I had the opportunity to review the records forwarded to my attention 02/27/04

## REVIEW OF RECORDS:

This includes the complaint titled: "Plaintiff's second amended medical malpractice complaint."

Included are treatment records of the Pennsylvania Department of Corrections.

The records relating to the current complaint begin 06/11/99.

"Subjective volleyball injury  Objective pain with tenderness right knee. Swelling and can't flex right knee, constant extension like position."

Assessment was right knee injury rule out patella dislocation vs internal derangement. Evaluating physician was Dr. Kaneria.

A note of 06/15/99 reveals left knee pain follow-up, marked effusion left knee with decreased range of motion continued in left knee, rule out cartilage tear.  Assessment - aspirate left knee.  X-ray to follow-up.

Procedure note - aspirated 20 cc bloody fluid from right knee. Return to clinic in one week.



February 29, 2004
Shawn Robbins, Esq.
Re: Darren Johnson
Page: 2

06/22/99 reveals still swelling right knee, lower amount of fluid, slight decreased motion, traumatic effusion right knee, CTO.

Follow-up procedure from the same day revealed right knee aspirate 5 cc serous sanguinous fluid, tolerated well, called and cancelled, etc.

Note of 07/20/99 reveals pain in right knee joint persists, increased pain in walking, right knee kept high position, small effusion. Assessment right knee strain with patella alta. Orthopedic consult, Motrin.

Note of 07/09/99 reveals assessment suspect patella tendon rupture, ortho ASAP. Note of 07/10/99 reveals patient called down for crutches. Patient ambulates well with knee immobilizer without difficulty and states would rather not have crutches.

Note of 07/14/99 revealed patient sent down for crutches again and states would rather not have and ambulates with immobilizer without difficulty, states stands at job and advised not to stand on leg for long times, to sign for a sick call for laying if needed, was advised to rest leg.

07/15/99 reveals seen ortho surgeon clinic.

07/20/99 reveals MRI reviewed with complete avulsion of patella tendon, will refer to Dr. Mandel ASAP, etc.

The records further indicate the patient had medical history of punctured ear drum in 1980, a fractured jaw in 1992 treated at Presbyterian Hospital.

He had a prior patella tendon disruption to the opposite left knee in 04/04 requiring a repair which occurred approximately two months later on 06/94. The index injury occurred on or about 06/11/99 with a reconstructed right patella 09/10/99. This required post operative casting. The note of 11/15/99 revealed cast removed right leg, right leg x-rayed, ace wrap 60 days, crutches 60 days, physical therapy consult.

Physical therapy records indicate 11/19, 11/23, 11/30, 12/01, 12/07, 12/09, 12/14, 12/16, 12/21/99, 01/04, 01/06, 01/13/00.

Progress note reveals good mobility right knee. Can actively flex to 90 degrees, strength 4/5, patient is coming along nicely, independent ambulation. Final plan notes since patient is progressing well PT sessions will be reduced to one time per week.

On 01/13/00 it notes complaints of numbness lateral knee and pain pointing to the medial aspect of the right knee.

Case 2:00-cv-00711-JPH   Document 138-3   Filed 03/08/06   Page 52 of 54

February 29, 2004
Shawn Robbins, Esq.
Re: Darren Johnson
Page: 3

**IMPRESSION:**

In my opinion the injury described is a patella tendon rupture, i.e., a disruption of the extensor mechanism. This is the type of injury where the quadriceps which actively extend the knee have been fully or partly disconnected from the attachment at the leg or the tibial tubercle. Although the joint can be moved passively as this is not really a joint problem, it is more of a motor problem. In the orthopedic literature such as the orthopedic knowledge update #6, page 551 this is described as an uncommon injury. Although the injury may be uncommon in the population, it is certainly common enough in an orthopedic practice where one sees perhaps a handful of these each year. The described mechanism is that of an eccentric quadriceps contraction, i.e., while the body is descending the muscles are actually attempt to counteract the gravitational pull and must forcefully elevate the body against gravity including any inertial or dynamic forces. Due to the fact that this is a sudden dramatic snapping movement particularly in someone in their 30's where the tissues begin weakening with age, the rupture occurs. It can occur on both sides simultaneously in the context of certain medical conditions such as end stage renal disease with hemodialysis and occurs more commonly in individuals who previously have had similar opposite injuries. The common mechanism may be the underlying weakness or the collagen, the inherent strength of the soft tissues as well as any lifestyle choices such as smoking addiction or drug abuse both of which have been known to cause deleterious effects or "weakening" on the soft tissues.

As further described a number of these injuries are misdiagnosed initially. Particularly this is true where one sees a painful swollen knee with symptoms being referred to the effusion or the bloody fluid and less attention is directed towards the site of the injury per se which is the disrupted tendon.

Often times an accurate history such as going for a lay up can tip off the examiner as what is the true entity, however, as this is soft tissue in nature it generally does not show up on an x-ray other than a patella alta referring to high riding as opposed to altered which the claimant appears to be of the opinion that he has. There is no such condition as an altered patella, patella alta is a specific diagnostic entity, diagnosed on radiograph and requires clinical correlation.

In spite of the severity of the discomfort this by no means is an emergent injury. In point of fact in my opinion he was treated appropriately and specifically with aspiration of the knee following which approximately 20 cc was aspirated which often is both therapeutic and diagnostic in part. I note the patient takes great exception to the fact that no local anesthetic was used. One should appreciate that after 15 years of practice and having aspirated thousands of knees, I routinely perform these aspirations without local anesthetic injection. It should be noted that this procedure was carried out commonly with the patient's informed consent. The way this is commonly coached is that one can aspirate

Case 2:00-cv-00711-JPH   Document 138-3   Filed 03/08/06   Page 53 of 54

February 29, 2004
Shawn Robbins, Esq.
Re: Darren Johnson
Page: 4

the knee with a single stick which there is some significant discomfort or requiring two sticks which may in fact provide additional discomfort. The local anesthetic by no means makes the procedure entirely comfortable and the suggestion that the use of the Lidocaine local anesthetic could have avoided any feeling with regards to the procedure is simply not based on clinical practice or commonplace experience.

In spite of the inadequate history as of 07/21/99, approximately five weeks following the event the diagnosis was in fact confirmed.

At that time it was recommended that he be seen by an orthopedic surgeon. In point of fact arrangements were made for him to be seen by Dr. Mandel, however, due to logistics surgical treatment could not be carried out until 09/18/99.

I note with some interest that the claimant reports the left knee is fine and fully functional in spite of a two month interval delay between diagnosis and treatment. In this case there is a three month interval delay following which he takes great exception and the fact that he has numerous difficulties with regards to the knee. From a practical standpoint there is no rational explanation why one case should be fine and the other one should not be especially if both sides having been described as having been carried out in a technically correct manner.

One should appreciate that the initial presented complaint spoke against an extensor mechanism disruption. In point of fact maintaining the knee in hyperextension or full extension is somewhat ordinarily cannot be done with a ruptured patella tendon. Being unable to flex the knee is not something which one would see in this context. Presenting with a straight, stiff immobile knee would be a misleading presentation to a clinician for ruptured patella tendon and in spite of that the diagnosis was established at the second visit which is quite laudable and reasonable and speaks against any untoward delay with regards to diagnosis.

With regards to the so called reconstruction, a reconstruction by definition is a repair where a body part is replaced as the original component is not repairable. There is nothing to suggest that anything other than a primary repair was carried out or that any tissue was transferred or substituted. The loop of wire from the tibia to the patella has shielded the repair known as a McConnell loop is something which is done to protect the repair and to allow earlier or more aggressive rehabilitation.

As of the time of the oral deposition of Mr. Johnson there is no rational explanation why he would have 45 degrees of flexion when at the completion of the therapy program he was noted to have at least 90 degrees of functional knee motion. Anything beyond 90 degrees is super physiologic or beyond what one needs to get out of a chair, climb steps, squat or

February 29, 2004
Shawn Robbins, Esq.
Re: Darren Johnson
Page: 5

even kneel. Allegations that he is unable to do so clearly is contradicted by the observed measurement noted by the trained physical therapist.

Allegations of being unable to stand or walk for long periods of time likewise could not be explained following a repaired patella tendon. In point of fact he was standing and walking between the time of the injury until the repair and had done so without any noticeable complaints and was given various accommodations including given the option of crutches which he declined.

In my opinion the ruptured patella tendon occurred entirely as a result of the vigorous eccentric contraction during the volleyball injury. Diagnosis was made in a reasonable period of time and accordance to that which would be seen in the private sector in the absence of any logistical issues. The current practice in the community is that these injuries are seen in the emergency room, referred for orthopedic consultation, may be diagnosed on the first or second visit and thereafter scheduled for the next operative block time which could be a few weeks subsequent. In this case there were logistical issues and in spite of that there is nothing in the records which supports his allegations of being harmed as a result of the two month interval till the surgery occurred or that he currently has any impairment or disability as a result. Certainly being informed that his knee is not 100% is completely accurate. A repaired tendon is not brand new, however, it is very functional. In my opinion he has no specific restrictions. In principal he could return to playing volleyball if he so choose. I obviously would recommend caution considering the two injuries which have occurred. More practically it is not reasonable to continue with sports indefinitely in life and typically as one approaches middle age his activities tend to decrease.

Please note my opinions are based on the records available to date, the history obtained, the clinical exam and are to within a reasonable degree of medical certainty.

Sincerely,

Menachem M. Meller, M.D., Ph.D.

MMM:bmts/sr