**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DARREN JOHNSON** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 00-711** |
| | : | |
| **NORMAN STEMPLER, M.D., et al.** | : | |

## MEMORANDUM AND ORDER

**Kauffman, J.**                                                                 **March 27, 2007**

Plaintiff Darren Johnson ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983

against Defendants Norman Stempler, M.D. ("Dr. Stempler"), Dennis Moyer, M.D. ("Dr.

Moyer"), Prison Health Services, Inc. ("PHS") and Correctional Physician Services, Inc. ("CPS")

alleging that, during his incarceration at the State Correctional Institution at Graterford ("SCI-

Graterford"), Defendants failed to provide him with timely and adequate medical treatment, in

violation of the Eighth Amendment. Plaintiff also asserts state law medical malpractice and

corporate negligence claims.

In a Memorandum and Order dated January 18, 2005, this Court granted in part

Defendants' Motions for Summary Judgment, dismissing all of Plaintiff's claims other than the

Eighth Amendment claim brought against CPS. Now before the Court is CPS's Second Motion

for Summary Judgment ("Second Motion") as to Plaintiff's Eighth Amendment claim. For the

reasons that follow, CPS's Motion will be denied.

## I.  Background

CPS is a private corporation contracted to provide medical services for inmates at SCI-

Graterford. See Plaintiff's Third Amended Complaint ("Complaint") ¶ 8. During the relevant

time period, CPS employed doctors as independent contractors to provide medical services on-site at SCI-Graterford.  <u>See</u> Second Motion at Exhibit B, Deposition of Dr. Glen Jeffries ("Jeffries Dep."), at 17.  However, CPS also referred some medical services to off-site medical consultants.  <u>See</u> <u>id.</u> at 14-16.  For those off-site services, CPS scheduled the necessary appointments, but the Department of Corrections was responsible for assigning escort officers, transporting prisoners to the appointments, and remaining with the prisoners until the treatments were completed.  <u>See</u> <u>id.</u> at p. 22-24.

On June 9, 1999, while incarcerated at SCI-Graterford, Plaintiff injured his right knee playing volleyball.  <u>See</u> Deposition of Darren Johnson ("Plaintiff's Dep.") at 14; Second Motion at 4.  He was taken to the prison dispensary where he received an ice pack and crutches, and was told to sign up for sick call.  Plaintiff's Dep. at 15-16; Second Motion at 4.  The next day, Plaintiff went to sick call, where Dr. Kirnara ordered an x-ray.  Plaintiff's Dep. at 16; Second Motion at 4.  On June 11, 1999, the x-ray was performed.  Complaint ¶ 12; Second Motion at 4.  According to a June 15, 1999 report prepared by Dr. Peter Gregory, the x-ray revealed that Plaintiff's "patella [was] in high position suggesting the possibility of compromise of the patellar ligament."  Plaintiff's Motion in Opposition to Motion for Summary Judgment of Defendants Dr. Moyer, CPS, and PHS, ("First Opposition") at Exhibit 1.[1]  A date-stamp on the report indicates that it was received by the prison on June 16, 1999.  <u>Id.</u>

Over the next few weeks, Plaintiff continued to have problems with pain and swelling in his knee.  On June 15, 1999, Plaintiff signed up for sick call and was seen by Dr. Moyer, who

---

[1]     Plaintiff's brief in opposition to Defendant's Second Motion incorporates by reference his First Opposition.  <u>See</u> Plaintiff Johnson's Motion in Opposition to Defendant CPS' Motion for Summary Judgment ("Second Opposition") at 1.

conducted a knee tap.  Plaintiff's Dep. at 26-27; Complaint ¶ 14-15; Second Motion at 4.

Plaintiff contends that this procedure caused him intense pain.  Plaintiff's Dep. at 28.  He further

states that his kneecap was out of place, swollen, painful, and that he was not able to fully bend

his knee.  Complaint ¶ 17; Plaintiff's Dep. at 28.  Dr. Moyer's report from that day details

swelling and bloody fluid in the right knee.  See First Opposition at Exhibit 1.

On June 22, 1999, Plaintiff again signed up for sick call due to the pain and swelling in

his right knee.  Complaint ¶ 18; Plaintiff's Dep. at 31.  Again, he received a pass to see Dr.

Moyer, who conducted a second knee tap.  Complaint ¶¶ 19-20; Second Motion at 5.  Plaintiff

alleges that this second knee tap also caused him intense pain.  Complaint ¶¶ 19-20.  A report

from that day indicates that Dr. Moyer observed swelling and fluid in the right knee.  See First

Opposition at Exhibit 1.  As with the previous examination, Dr. Moyer prescribed Motrin and

recommended the use of an ace bandage.  Id.  On July 9, 1999, Plaintiff reported to the clinic and

was given a knee immobilizer.  Complaint ¶ 21; Plaintiff's Dep. at 32-33; Second Motion at 5.

At that time, the clinic secretary, Ms. Rose, contacted Dr. Baddick, the supervising doctor, to

look at Plaintiff's knee because it "didn't look right."  Plaintiff's Dep. at 34-35.  Dr. Baddick

instructed Plaintiff to return to the clinic later that day, so that he could examine the knee.

Complaint ¶ 23.  According to Plaintiff, Dr. Baddick and Dr. Pratt conducted an examination of

his knee and concluded that he was possibly suffering a "patella altered."  Plaintiff's Dep. at 36.

Plaintiff further claimed that one of these doctors informed him that prison authorities had

reviewed his medical file and determined that he would not be referred to outside facilities for

surgery.  Plaintiff's Dep. at 37.

On July 15, 1999, approximately a month after the results of his first x-ray, Plaintiff was

taken to the prison orthopedic clinic, where he was examined by Dr. Stempler.  Second Motion at 5.  According to a consultation record provided by Plaintiff, Dr. Stempler identified a possible disruption in Plaintiff's right patellar tendon and noted significant right knee effusion, requiring several attempts to drain the knee.  First Opposition at Exhibit 4.  Dr. Stempler reportedly informed Plaintiff that he had a "raised patella" and advised him to perform leg exercises and desist wearing the knee immobilizer.  Plaintiff's Dep. at 67-68.  The next day, Plaintiff was taken to an outside MRI Center at Suburban General Hospital, apparently at the recommendation of Dr. Baddick.  Id. at 42.  According to medical records, the MRI revealed a "complete tear of the patellar tendon at the apex of the patella."  First Opposition at Exhibit 5.  This report was received by the prison and reviewed by Dr. Baddick on July 20, 1999.  An immediate outside referral was recommended in light of the diagnosis.  Id.

On July 27, 1999, Plaintiff was examined by Dr. Mandel, an outside orthopedic surgeon. See Motion at 5.  Plaintiff claims that Dr. Mandel informed him that he likely would have permanent damage to his right knee as a result of the allegedly delayed treatment.  Plaintiff's Dep. at 44.  He also claims that Dr. Mandel wanted to perform surgery that day, but that the guards escorting him were not scheduled to stay at the hospital so the surgery was delayed.  Id. at 45.  A November 1999 memorandum prepared by Plaintiff's former attorney states that Dr. Mandel would testify that he wanted to perform the reconstructive surgery in July, in order to limit long term knee damage, but that he did not receive the necessary approval from the prison until much later.  First Opposition at Exhibit 8.  However, Dr. Mandel's contemporaneous chart notes from July 27, 1999 simply state that the surgery "will be scheduled in the future if approved."  Second Motion at Exhibit E.

-4-

Dr. Mandel's July 27 chart notes were reviewed by CPS's Medical Director, Dr. Baddick, on August 13, 1999.  See id.  Prison medical records provided by Plaintiff reveal that he was approved for surgery that day.  First Opposition at Exhibit 6.  He was not scheduled for surgery, however, until September 17, 1999.  Plaintiff's Dep. at 45-46.  Dr. Mandel, who performed the surgery, noted in his report that Plaintiff suffered a total rupture of his patellar tendon, resulting in limitations of knee movement and extension.  First Opposition at Exhibit 6.  He further noted that there was no guarantee that surgery would fully restore the knee.  Id.  After surgery, Plaintiff underwent several months of physical therapy.  Plaintiff's Dep. at 71.  He alleges continuing difficulties with his knee, and an inability to perform everyday functions such as cleaning up and walking down steps.  Id. at 66.

Dr. Stempler and Dr. Moyer, together with PHS and CPS, filed separate motions for summary judgment.  On January 18, 2005, following oral argument, the Court granted the motions in part, dismissing all of Plaintiff's claims except the Eighth Amendment claim against CPS.  The Court subsequently appointed counsel for Plaintiff and established new deadlines for discovery and the filing of additional dispositive motions.  Following the close of discovery, CPS filed a second motion for summary judgment, seeking dismissal of Plaintiff's sole remaining Eighth Amendment claim.

## II.  Legal Standard

In deciding a motion for summary judgment pursuant to Fed. R. Civ. P. 56, the test is "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law."  Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994)).  "[S]ummary

judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must examine the evidence in the light most favorable to the non-moving party and resolve all reasonable inferences in that party's favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "there can be 'no genuine issue as to any material fact' . . . [where the non-moving party's] complete failure of proof concerning an essential element of [its] case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The party moving for summary judgment bears the initial burden of showing the basis for its motion. See Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001). If the movant meets that burden, the onus then "shifts to the non-moving party to set forth specific facts showing the existence of [a genuine issue of material fact] for trial." Id.

### III.  Analysis

Count II of the Complaint alleges violations by CPS of the Eighth Amendment's prohibitions on cruel and unusual punishment based on inadequate medical care. The Eighth Amendment imposes a duty on prison officials to provide humane conditions of confinement, including adequate medical treatment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). A violation of the Amendment occurs when (1) a medical need is serious and (2) the acts or omissions by prison officials demonstrate "deliberate indifference" to the inmate's health or safety. See Estelle, 429 U.S. at 106; Monmouth County Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987).

A private health care provider acting under color of state law, such as CPS, can be liable

under § 1983 for Eighth Amendment violations stemming from inadequate medical treatment of prisoners.  See Monell v. Dep't of Social Servs., 436 U.S. 658, 690; Thomas v. Zinkel, 155 F. Supp. 2d 408, 412 (E.D. Pa. 2001).  Such liability cannot rest on respondeat superior alone, however, but instead must be based on some policy, practice, or custom within the institution that caused the injury.  See Thomas, 155 F. Supp. 2d at 412; Miller v. Hoffman, 1998 WL 404034, at *4-5 (E.D. Pa. July 7, 1998).  Thus, to survive a motion for summary judgment, a plaintiff must present evidence of a policy, practice, or custom which caused or exacerbated a serious medical need and was instituted with deliberate indifference to the consequences.  Thomas, 155 F. Supp. 2d at 412; Miller, 1998 WL 404034 at *5 (citing Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989)).

For the purposes of § 1983 analysis, a policy is made when a decision-maker with final authority to establish such a policy issues an official proclamation, policy or edict.  See Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990); Unterberg v. Corr. Med. Sys., Inc., 799 F. Supp. 490, 497-98 (E.D. Pa. 1992).  A custom, on the other hand, "can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law."  Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir.1990).  As a result, custom can be established by "proof of knowledge and acquiescence."  Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989); Unterberg, 799 F. Supp. at 498.  Under the Estelle test, deliberate indifference can be shown in the instant case if there is an established policy or custom that caused CPS to intentionally deny or delay access to necessary medical treatment for non-medical reasons, or if officials intentionally interfered with a course of treatment once prescribed.  See Estelle, 429 U.S. at 104-05; Rouse v. Plantier, 182 F.3d

-7-

192, 197 (3d Cir. 1999).

The Court found in its January 2005 opinion that Plaintiff had set forth sufficient evidence for a reasonable jury to determine that his knee injury is "serious" under the first part of the Estelle test.  See Memorandum and Order dated January 18, 2005 ("Order") at 7-8.  With respect to the second part of the Estelle test, the Court found that CPS had not met its burden of establishing the absence of a genuine issue of material fact with respect to the delays in Plaintiff's treatment.  See id. at 12.  The Court also found that although Plaintiff had not presented conclusive evidence of a CPS policy or custom that caused the alleged delay, he had created a genuine issue of material fact by submitting affidavits from other inmates who also claimed to have experienced delays in receiving medical treatment.  See id.

In response to the Court's January 2005 opinion, CPS's Second Motion advances three arguments as to why summary judgment is appropriate.  First, CPS contends that Plaintiff's treatment was not, in fact, delayed because his  medical condition was not an emergency that required immediate surgery on July 27, 1999, the day he was seen by Dr. Mandel.  Second, CPS argues that it did not have a policy or practice of delaying medical treatment for prisoners.  Third, it asserts that prison officials rather than CPS controlled when prisoners would be sent for outside medical treatment, thus suggesting that if there was a delay in Plaintiff's medical treatment, it was caused by prison officials rather than CPS.

In support of its first argument, CPS points to Dr. Mandel's chart note from the July 27 visit which states that, after discussing his options with the doctor, Plaintiff wanted to go ahead with the surgery, but which also states that the surgery "will be scheduled in the future if approved."  Second Motion at Exhibit E.  CPS argues that this chart note contradicts Plaintiff's

contention that Dr. Mandel thought the surgery should be performed immediately (First

Opposition at 10) since the chart note contemplates performing the surgery "in the future" after

obtaining authorization through the normal authorization procedure.  CPS also submits sworn

testimony from CPS's Medical Director, Dr. Baddick, that if Plaintiff had needed immediate

surgery on July 27, the proper procedure was for Dr. Mandel to call him for verbal approval.  See

Second Motion at Exhibit G ("Baddick Verification"), ¶ 15.  However, Dr. Mandel did not call

Dr. Baddick on July 27 to obtain approval for performing immediate surgery, nor did he ever call

Dr. Baddick to obtain approval for performing surgery immediately.  See id. at ¶ 14, 16.  Finally,

CPS offers Dr. Baddick's sworn testimony that he was involved in Plaintiff's medical care and

that "[a]t no time did anyone from CPS do anything to delay Mr. Johnson's medical treatment."

See id. at ¶¶ 2, 3.

    In support of its second argument, CPS has submitted sworn verifications from Dr. Glen

Jeffries, a CPS administrator during the relevant time period; Dr. Kenan Umar, CPS President

during the relevant time period, and Dr. Baddick.  All three doctors testify that CPS did not have

a policy or practice of delaying surgery or other healthcare for inmates at SCI-Graterford.  See

Second Motion at Exhibit C ("Jeffries Verification"), ¶¶ 2, 3; Second Motion at Exhibit D

("Umar Verification"), ¶¶ 2, 3; Baddick Verification, ¶ 5.

    With respect to its third argument, CPS points to testimony from Dr. Jeffries and Dr.

Umar that on prior occasions, prison officials, without CPS's consent, delayed sending prisoners

for outside medical treatment for security or administrative reasons.  See Jeffries Verification, ¶¶

4, 6; Umar Verification ¶¶ 4, 6.  According to Dr. Umar, CPS did not have control over when

prisoners saw outside medical consultants because it did not participate in the transportation or

security of inmates, was not told of these arrangements, and could only recommend treatment for inmates. See Umar Verification, ¶ 7. Dr. Baddick also testified that CPS had no control over when prison officials would transport inmates, including Plaintiff, for treatment by outside consultants or for surgery. See Baddick Verification, ¶ 8.

Despite the new evidence presented in CPS's Second Motion, there are still material questions of fact precluding summary judgment. As the Court stated in its prior opinion, Plaintiff has produced evidence from which a jury might conclude that CPS did not respond to his knee injury in a timely or adequate fashion, despite knowledge of the injury. Based on Plaintiff's assertions that Dr. Mandel wanted to perform surgery immediately following the July 27 examination, there is also evidence in the record from which a reasonable jury might infer that failing to schedule his surgery until September 17, 1999 was an intentional interference with a prescribed course of treatment. Moreover, although CPS has submitted testimony that it had no policy or custom of delaying medical treatment, the affidavits from other inmates who experienced delays in their treatments create a material question of fact as to whether such a policy or custom exists. Accordingly, CPS's second motion for summary judgment must be denied.

**IV. Conclusion**

For the aforementioned reasons, Defendant's Second Motion for Summary Judgment will be denied. An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DARREN JOHNSON** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 00-711** |
| | : | |
| **NORMAN STEMPLER, M.D., <u>et al.</u>** | : | |

## <u>ORDER</u>

       **AND NOW**, this       day of March, 2007, upon consideration of Defendant

Correctional Physicians Services, Inc.'s Motion for Summary Judgment (docket no. 138),

Plaintiff's Opposition thereto (docket no. 139), and Defendants' Response (docket nos. 140,

141), and for the reasons stated in the accompanying Memorandum, it is **ORDERED** that the

Motion is **DENIED**.

                              **BY THE COURT:**


                               **/s/ Bruce W. Kauffman**
                               **BRUCE W. KAUFFMAN,  J.**