## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARREN JOHNSON, | : | |
| | : | CIVIL NO: 00-711 |
| Plaintiff, | : | |
| | : | Magistrate Judge Jacob P. Hart |
| v. | : | |
| | : | |
| CORRECTIONAL PHYSICIAN | : | Filed via ECF |
| SERVICES, | : | |
| | : | |
| Defendant. | : | |

## PLAINTIFF DARREN JOHNSON'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Plaintiff Darren Johnson, by and through counsel, hereby submits the following proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

1.      Darren Johnson is a prisoner at State Correctional Institution at Graterford ("SCI Graterford").  (Trial Tr. 15:10-16.)

2.      On June 9, 1999, Mr. Johnson was playing volleyball at SCI Graterford when he injured his right knee.  (Trial Tr. 15:22-23; see Ex. 8 at 1.)

3.      When a patient seeks medical attention with a sports-related knee injury, the physician should first take a history of the patient, and then examine the patient.  If there is a significant injury, then an X-ray is conducted to rule out the possibility of a fracture, arthritis, dislocation, or similar condition.  An MRI might be ordered to examine a patient's ligaments and menisci.  (Mandel Dep. 9:12-10:13.)

4.      An X-ray is a very routine test that physicians order for many injuries.  It is frequently ordered at the first visit if there is any sign of significant injury such as swelling, bleeding within the knee, significant amount of pain, or difficulty walking.  (Mandel Dep. 10:1-11:2.)

5.      An MRI should be ordered if there are symptoms such as significant swelling of the knee, great pain, knee instability, clicking and popping, and especially if an X-ray reveals that there is not a fracture.  (Mandel Dep. 11:10-22.)

6.      An MRI is usually ordered at the first visit to an orthopedic specialist if there is suspicion of a torn ligament or torn meniscus.  (Mandel Dep. 11:23-12:3.)

7.      If a physician observes symptoms such as a markedly swollen knee full of blood, an inability to walk, and the X-ray is negative for a fracture, then an MRI should be ordered right away.  (Mandel Dep. 14:3-16.)

8.      An MRI is typically conducted within few days to a week after it is ordered. (Mandel Dep. 14:24-15:4.)

9.      The patellar tendon is one of the largest tendons in the body.  It attaches the patella (kneecap) to the tibia (shin bone).  It runs from the bottom of the patella to a bony protrusion in the front of the shin just below the knee.  The patellar tendon handles the force generated by the quadriceps muscles, which are the large muscles in the front of the thigh that straighten the leg.  (Mandel Dep. 19:16-20:3.)

10.     If the patellar tendon is torn, there is no attachment of the quadriceps muscles to the tibia and a person would not be able to straighten his knee.  (Mandel Dep. 20:4-7.)

11.     A torn patellar tendon is very painful.  (Mandel Dep. 20:11.)

12.     A torn patellar tendon also results in significant swelling of the knee, bleeding in the knee, and the individual might not be able to walk.  (Mandel Dep. 20:12-17.)

13.     The only effective treatment for a torn patellar tendon is surgery.  (Mandel Dep. 20:18-21.)

14.     A ruptured patellar tendon cannot heal properly on its own without surgery. (Mandel Dep. 23:13-22.)

15.     Surgery for a torn patellar tendon is best conducted within a month of an injury. (Mandel Dep. 20:24-21:1.)

16.     If surgery is conducted within a month of injury, then 80 to 85 percent of patients receive full restoration of their knee mechanics and strength.  (Mandel Dep. 45:21-46:18.)

17.     If surgery is not conducted within a month of the injury, then surgery becomes more difficult because the muscle begins to atrophy and shrink, and scar tissue forms around the area of the torn tendon.  After one month, surgery may be more about reconstruction than repair. (Mandel Dep. 21:5-16.)

18.     If surgery is not conducted until three months after an injury, the result will not be as successful, and there may be remaining weakness in the quadriceps muscles, stiffness or loss of motion, and the surgeon will have greater difficulty establishing the correct tension for the tendon.  (Mandel Dep. 22:5-23:1.)

19.     If surgery is not conducted within the first month of injury, then the long-term potential consequences may be permanent weakness in extension of the knee, and compromise in the motion of the knee.  (Mandel Dep. 23:5-7.)

20.     A referral from a primary care physician to an orthopedist should take place within a few days after an injury in order for surgery to be conducted within one month of injury. (Mandel Dep. 24:23-25:22.)

21.     After the volleyball accident on June 9, 1999, Mr. Johnson was escorted to the main entrance of the yard and taken to the dispensary in a wheelchair, where he was given an ice pack, an Ace bandage and crutches, and then instructed to sign up for sick call.  (Trial Tr. 15:22-25; 16:11-12.)

22.     When an inmate fills out a sick call slip or Inmate Request to Staff Member form, they are to place it in the institutional mailbox, and it is picked up later by prison staff.  Inmates do not get copies of sick call slips, but do receive copies of their request slips.  (Trial Tr. 25:24-27:5; 72:9-13.)

23.     On June 11, 1999, Mr. Johnson went to sick call where he was seen by Dr. Kaneria, who signed him up for an X-ray.  An X-ray was conducted that day.  (Trial Tr. 16:22-25; see Ex. 8 at 1; Ex. 9; Ex. 18 at 1.)

24.     Mr. Johnson signed up for sick call again on June 14, 1999 because his leg was still swollen and in pain.  His kneecap was raised and felt like it was sitting inside his thigh, and he could not flex his knee.  (Trial Tr. 17:6-18:2.)

25.     On June 15, 1999, Mr. Johnson was called for sick call.  Dr. Moyer noted that Mr. Johnson's knee had marked effusion (fluid in his knee) with decreased range of motion.  Dr. Moyer then conducted a knee tap (knee aspiration).  (Trial Tr. 18:18 -19:11; see Ex. 8 at 2.)

26.     The knee tap was conducted without anesthesia and was very painful.  (Trial Tr. 18:25-19:4; see also Ex. 8 at 2.)

27.     When Dr. Moyer conducted the knee tap, he withdrew 20 ccs of bloody fluid from the right knee.  (Trial Tr. 19:8-9; Ex. 8 at 2; Ex. 8 at 2.)

28.     A knee tap, also called a knee aspiration, is performed by placing a needle with a syringe into the knee joint and drawing fluid out of the knee.  (Mandel Dep. 16:2-7.)

29.     A knee tap is commonly performed with local anesthesia such as Novocain or Xylocaine.  (Mandel Dep. 17:1-3.)

30.     The primary purpose of a knee tap is diagnostic, to determine if the fluid in the knee is bloody or clear.  Clear fluid is normal lubricating fluid, which can build up with irritation or inflammation.  (Mandel Dep. 16:10-19.)

31.     Any injury that is severe enough to tear blood vessels will cause bleeding in the knee joint.  Typical injuries include a torn ligament, such as the anterior cruciate ligament or posterior cruciate ligament, a fracture, and a tear of a tendon in the joint, such as the patellar tendon or quadriceps tendon.  A torn meniscus may also cause blood in the knee.  (Mandel Dep. 15:5-16:1.)

32.     A knee tap may also reduce pain in the knee and help the knee become more mobile, but it can not treat any underlying problems in the knee such as a torn ligament. (Mandel Dep. 17:4-20.)

33.     Blood in a patient's knee should trigger a referral to an orthopedic specialist. (Mandel Dep. 25:24-26:3.)

34.     On June 15, 1999, Mr. Johnson's symptoms such as pain and tenderness in his right knee, his inability to flex his knee, the lack of range of motion, and the presence of bloody fluid extracted from his knee together should have triggered a referral by Dr. Moyer to an orthopedist at this time.  (Mandel Dep. 57:2-22.)

35.     The report for the X-ray taken on June 11, 1999 was received on June 18, 1999. (Ex. 9.)

36.     The X-ray report stated: "RT. KNEE—The patella is in high position, suggesting the possibility of compromise of the patellar ligament.  There also appears to be a small joint diffusion.  Mild degenerative changes are noted.  No fracture is present.  There is also calcification at the attachment of the patellar ligament.  IMPRESSION:  Patella alta." (Ex. 9.)

37.     The X-ray report indicating a patella alta, along with Mr. Johnson's pain, swelling in the knee, inability to flex, decreased range of motion, and the presence of bloody fluid in his knee should have triggered a referral to an orthopedic specialist at this time.  (Mandel Dep. 59:1-8.)

38.     A patella alta, or patella in a high position, is a term used to describe X-ray results that show a knee cap, which normally is positioned in front of the knee, is riding upward toward the thigh.  (Mandel Dep. 17:22-18:9.)

39.     A patella alta can occur if the patellar tendon is torn or ruptured because nothing is holding the patella (kneecap) down in its normal position.  (Mandel Dep. 18:9-15.)

40.     If an X-ray reveals a patella alta, a physician should determine whether the patellar tendon is ruptured through conducting a physical examination and refer the patient to an orthopedist.  (Mandel Dep. 18:19-23.)

41.     Mr. Johnson signed up for sick call again on June 22, 1999 due to continued pain. (Trial Tr. 19:13-15; see Ex. 8 at 2.)

42.     On June 22, 1999, Dr. Moyer noted that Mr. Johnson's knee was still swollen, and he had traumatic effusion (fluid) in his right knee with decreased range of motion.  (See Ex. 8 at 2.)

43.    Dr. Moyer conducted another knee tap on June 22, 1999, and withdrew sero-sanguinous (mixed joint fluid with blood) fluid.  (Trial Tr. 7:15; Ex. 8 at 2.)

44.    With the abnormal X-ray and Mr. Johnson's other symptoms, an orthopedic consultation would have been the reasonable next step.  (Mandel Dep. 61:5-8.)

45.    The condition of Mr. Johnson's knee did not improve after the second knee tap. His knee continued be in serious pain, and it began to heal abnormally, causing problems with walking.  (Trial Tr. 22:24-23:7.)

46.    Mr. Johnson was barely able to walk, and stayed in his cell most of the time. Other inmates brought food to him because he was unable to walk to get his meals.  (Trial Tr. 23:6:16.)

47.    On June 30, 1999, Mr. Johnson signed up again for sick call, but the sick call was cancelled due to a fight in the prison.  (Trial Tr. 23:18-20, see Ex. 8 at 3.)

48.    Mr. Johnson went to sick call again on July 2, 1999, and he explained to Dr. Kaneria that he continued to have pain and swelling in his knee.  (Trial Tr. 23:21-25; see Ex. 8 at 3.)

49.    Dr. Kaneria noted that Mr. Johnson's knee was in a high position and had small effusion (fluid).  (See Ex. 8 at 3.)

50.    Dr. Kaneria informed Mr. Johnson that he would sign him up for an orthopedic consultation.  (Trial Tr. 23:21-25; see also Ex. 8 at 3.)

51.    On or around July 3, 1999, Mr. Johnson submitted an Inmate Request to Staff Member slip inquiring about the orthopedic consultation and to get additional information about his knee.  (Trial Tr. 25:14-23; see Ex. 11.)

52.     On July 2, 1999, Dr. Kaneria did submit a request for Mr. Johnson to have an orthopedic consultation but this request was denied.  (Trial Tr. 24:6 – 25:3; see Ex. 10.)

53.     On July 9, 1999, Mr. Johnson received a pass to report to the secretary's office of the medical department to receive a knee brace.  (Trial Tr. 27:9-13.)

54.     When Rose, the office administrator or secretary, brought the knee brace out, it did not fit.  (Trial Tr. 28:11-18.)

55.     Rose noticed that Mr. Johnson's knee did not look proper as his kneecap was raised.  Rose wrote Mr. Johnson a pass permitting him to wait in the office, and she called Dr. Baddick.  (Trial Tr. 28:20-29:23; see Ex. 12.)

56.     Dr. Baddick noted that Mr. Johnson's right knee had profound effusion (fluid) and was unable to flex his knee.  (See Ex. 8 at 3.)

57.     Dr. Baddick and physician assistant Eugene Pratt conducted a knee tap administered with anesthesia.  (Trial Tr. 30:1-9.)

58.     Dr. Baddick referred Mr. Johnson to Dr. Stempler for an orthopedic consultation. Dr. Stempler is an orthopedist who examines prisoner patients onsite at SCI Graterford.  (Trial Tr. 31:15-17; 33:3-7; Ex. 8 at 3; see Ex. 15.)

59.     Dr. Baddick also referred Mr. Johnson for an MRI.  (See Ex. 14.)

60.     Dr. Stempler saw Mr. Johnson on July 15, 1999.  After looking at Mr. Johnson's knee, he informed Mr. Johnson that there was nothing wrong, advised him to do leg exercises, and provided an elastic knee brace.  (Trial Tr. 33:3-21; see Ex. 15.)

61.     Mr. Johnson's knee at this time was still swollen and in pain, could not bend, and Mr. Johnson's walking was limited.  (Trial Tr. 33:23-34:2.)

62.     Mr. Johnson received an MRI on July 16, 1999, which revealed a "complete rupture of the patellar tendon at the apex of the patella with retraction of the tendon."  (Ex. 16.)

63.     The medical department received the results of the MRI on July 20, 1999, and Dr. Baddick referred Mr. Johnson to Dr. Mandel, an orthopedic surgeon.  (See Ex. 8 at 4; Ex. 17.)

64.     On July 27, 1999, Mr. Johnson was taken to Suburban General Hospital where he was examined by Dr. Mandel.  (Trial Tr. 35:2-7.)

65.     Dr. Mandel noted that Mr. Johnson had a marked patella alta, and that Mr. Johnson was only able to get within 30 to 35 degrees of straightening the knee.  (Mandel Dep. 28:6-29:12; Ex. 2.)

66.     Dr. Mandel diagnosed Mr. Johnson with a ruptured patellar tendon and recommended surgery.  (Mandel Dep. 29:17-30:1.)

67.     Dr. Mandel wanted to perform the surgery immediately.  (Mandel Dep. 30:2-4.)

68.     At the time Dr. Mandel examined Mr. Johnson, it had been already seven weeks since the time of injury.  The injury was no longer in the acute period but in the subacute period. (Mandel Dep. 30:8-16.)

69.     Dr. Mandel informed Mr. Johnson that his knee was completely torn, that he would likely have permanent damage to his right knee, and would require reconstructive surgery. Because seven weeks had already elapsed since his injury, Dr. Mandel could not promise a perfect outcome.  (Trial Tr. 35:8-16; Mandel Dep. 39:2-9.)

70.     Dr. Mandel informed Mr. Johnson that he wanted to perform surgery immediately and asked Mr. Johnson if he was ready for surgery.  (Trial Tr. 35:21-22.)

71.     Mr. Johnson was willing to have the surgery, but Dr. Mandel was unable to perform the surgery that day.  (Trial Tr. 35:23-36:3; Mandel Dep. 39:17-19; see also Ex. 2.)

72.     The guards from SCI Graterford escorting Mr. Johnson stated that they were not scheduled to stay.  (Trial Tr. 36:5.)

73.     Dr. Mandel went into another office and informed Mr. Johnson that he was going to make a phone call.  (Trial Tr. 36:5-12.)

74.     Dr. Mandel or an individual from his office made efforts to obtain approval from the prison for surgery on July 27, 1999.  (Mandel Dep. 31:7-32:1.)

75.     Dr. Mandel was advised that he could not perform the surgery until it was approved by prison authorities, and that Mr. Johnson would have to be returned to SCI Graterford and go through the scheduling channels.  (Mandel Dep. 30:22-24, 40:20-41:2.)

76.     When Dr. Mandel returned, he informed Mr. Johnson that the surgery was not approved at that time.  (Trial Tr. 36:5-12.)

77.     Mr. Johnson was transported back to SCI Graterford without receiving surgery. (Trial Tr. 36:11.)

78.     On July 30, 1999, Mr. Johnson went to sick call complaining of knee pain.  Mr. Pratt noted that his knee had crepitus (crackling or bubbles in knee) and prescribed Motrin.  (See Ex. 8 at 5.)

79.     On August 13, 1999, Mr. Johnson was approved for surgery.  (Ex. 8 at 5.)

80.     When Dr. Mandel sought to perform surgery on July 27, 1999, he was informed that he would be advised when the surgery was approved.  While a week or so would not have made a significant difference at that point, he had no inkling at the time that it would take two months to get approval and for the surgery to be scheduled, which made a difference in the surgery results for Mr. Johnson.  (Mandel Dep. 40:20-41:17.)

81.     During this general time period, it was routine for Dr. Mandel to request approval for surgery or medical treatment for a prisoner from SCI Graterford and for the approval to take longer than expected.  (Mandel Dep. 32:2-11.)

82.     Generally an appointment for surgery by Dr. Mandel could be scheduled within one week, especially for a condition that Mr. Johnson had.  (Mandel Dep. 33:4-9.)

83.     Mr. Johnson received surgery for his knee on September 17, 1999.  (Trial Tr. 37:9-10; <u>see</u> Ex. 3, 4)

84.     By the time Dr. Mandel performed the surgery, Mr. Johnson had a chronic patellar tendon rupture in his right knee, meaning that his injury that was more than three months old.  (Mandel Dep. 37:1-8; Ex. 4.)

85.     Dr. Mandel performed a patellar tendon reconstruction and repair.  In addition to the patellar tendon, the retinaculum, the tissue to the side of the patellar tendon, was torn.  Dr. Mandel removed the scar tissue, reattached the patella, and repaired the retinaculum.  It took almost two hours.  (Mandel Dep. 34:3-35:18; Ex. 3.)

86.     When Dr. Mandel first examined Mr. Johnson on July 27, 1999, he did not anticipate that he would not be able to perform surgery on Mr. Johnson's knee until two months later.  This additional two months likely caused an adverse effect on the success of Mr. Johnson's surgery.  (Mandel Dep. 41:9-17.)

87.     In total, Mr. Johnson submitted about seven sick call slips seeking treatment for his knee.  (Trial Tr. 64:10-13.)

88.     Between July 27, 1999 and September 17, 1999, Mr. Johnson's knee was permanently stiff and he was barely able to walk.  He had difficulty walking up steps.  (Trial Tr. 38:20-39:9.)

89.     In January 2006, medical records indicate that Mr. Johnson's knee still flared up, especially with dampness.  He had degenerative arthritis in his knee, and was prescribed naprosyn, an anti-inflammatory medication, for his knee.  He was also unable to extend it completely.  (Ex. 5.)

90.     In January 2007, Mr. Johnson received a physical exam.  At that time he had decreased range of motion and experienced pain when flexing or bending his knee.  (Ex. 6; Mandel Dep. 44:22-45:7.)

91.     Mr. Johnson has had a job at the shoe factory from prior to his 1999 injury. Immediately following his injury, he missed two to three hours a day, approximately three days a week, from his job.

92.     Mr. Johnson was also moved to a different assignment of pulling tacks out of the bottom of the shoes after they were formed, due to his limited ability to stand for long periods of time.  (Trial Tr. 40:2-13.)

93.     Mr. Johnson also required more breaks, which his supervisor permitted.  (Trial Tr. 40:11-14.)

94.     After surgery, Mr. Johnson received physical therapy for twelve weeks.  (Trial Tr. 40:20-41:3; see Ex. 7.)

95.     Mr. Johnson requested additional physical therapy, but was informed that each inmate could only receive a limited amount of physical therapy due to costs.  (Trial Tr. 41:10-12.)

96.     While Mr. Johnson's knee did improve, it still did not make a complete recovery. His knee still does not bend fully and continues to cause him pain.  (Trial Tr. 40:18-19.)

97.     Physical therapy can assist injuries to the knee but cannot always overcome complications from delays in medical treatment.  (Mandel Dep. 49:15-23.)

98.     In Mr. Johnson's case, the physical therapy he received was unable to restore his knee.  (Mandel Dep. 50:7-17.)

99.     Prior to the accident, Mr. Johnson had no problems with his knee, and had no trouble walking, running, standing or lifting.  (Trial Tr. 41:16-42:1.)

100.    Mr. Johnson can only extend his right knee to about 40 – 45 degrees.  (Trial Tr. 44:4-12.)

101.    Mr. Johnson constantly experiences numbness in his knee, and sometimes causes him pain and tingling when it rains and during damp weather.  (Trial Tr. 44:21-24; 45:3-6.)

102.    About two to three times a week, Mr. Johnson needs to take over-the-counter medication such as Motrin and ibuprofen for his knee pain.  He spends approximately $4 each month on pain medication.  (Trial Tr. 45: 7-19.)

103.    Mr. Johnson's ability to climb stairs is greatly limited because he is unable to bend his knee fully.  (Trial Tr. 45:20-25.)

104.    Mr. Johnson is unable to carry large packages and is limited to standing for 45-55 minutes at a time.  (Trial Tr. 46:1-4.)

105.    Prior to his injury, Mr. Johnson regularly exercised for his health, and played sports such as handball and volleyball.  After the injury, he is unable to play any sports or engage in physical activities.  (Trial Tr. 46:5-47:5.)

106.    Mr. Johnson previously injured his left (the other) knee in 1994 while a prisoner at SCI Camp Hill.  Mr. Johnson received surgery within 20 days of that injury.  He has no trouble with his left knee.  (Trial Tr. 42:2-44:3; Ex. 28 at 3, 4.)

107.     Mr. Johnson's knee and limited ability to move causes him to constantly fear for his safety and be on the defense in prison, as there are often fights and other disturbances in prison.  (Trial Tr. 47:13-50:2.)

108.     Mr. Johnson is housed on a cell block with approximately 400 cells, containing population of approximately 560 prisoners.  Aside from time spent at his job, Mr. Johnson would be permitted to spend eight hours a day outside his cell, but due to his fear for his safety, he spends only about two hours outside his cell, and spends the rest in his cell.  (Trial Tr. 47:23-48:4.)

109.     Mr. Johnson's condition also causes him stress and depression most of the time. (Trial Tr.50:3-5, 50:23-51:3.)

110.     Mr. Johnson's family treat him differently – sometimes they appear embarrassed due to his leg scars and his apparent disability, and sometimes they are sympathetic towards him. This causes Mr. Johnson to feel that it is his fault.  (Trial Tr. 50:7-22.)

111.     Mr. Johnson's knee condition affects his sleep because he can only sleep on his left side since he needs to keep his leg straight to prevent twitching, and affects his ability to use the lavatory since he is unable to bend his leg fully back.  (Trial Tr. 51:4-15.)

112.     Mr. Johnson works six hours a day for five days a week at the shoe factory at SCI Graterford.  He was returned to being a toe former.  (Trial Tr. 52:13-17.)

113.     Mr. Johnson would be permitted to work eight hours a day but is unable to do so because of his limited standing capabilities.  (Trial Tr. 52:9-15.)

114.     Mr. Johnson is willing to work eight hours a day if he were able.  If Mr. Johnson was able to work eight hours each day, he could make an additional approximately $7.00 each week.  (Trial Tr. 53:10-13; 60:20-22.)

115.    In his current position, Mr. Johnson receives 42 cents an hour as his base pay, and could make up to 70 cents an hour as a bonus.  (Trial Tr. 52:20-53:8; see Ex. 26.)

116.    The bonus pay is determined by the production of boots produced overall in the shoe factory.  Mr. Johnson is required to produce at least 15 to 20 racks each day to meet the bonus requirement.  Each rack consists of 20 shoes, so he is required to produce between 300 to 400 shoes each day for the workers to meet the bonus.  (Trial Tr. 57:15-18.)

117.    If Mr. Johnson were to miss ten percent of the total hours in a month, he would only receive half his bonus.  Starting in May 2008, if Mr. Johnson were to miss ten percent of his hours, then he would receive ten percent less of his bonus.  Mr. Johnson has missed enough hours so that at times he has not received the full bonus permitted.  (Trial Tr. 58:13-24.)

118.    Mr. Johnson could also be disciplined for missing work.  Disciplinary action includes placement in the restricted housing unit, or the "hole."  (Trial Tr. 59:8-14.)

119.    Mr. Johnson makes his best efforts to go to work, even if he experiences pain in his leg.  Approximately three times a week, Mr. Johnson feels pain in his leg but still goes to work.  (Trial Tr. 59:18.25.)

120.    Despite Mr. Johnson's efforts to get to work, he still misses work, mostly in the afternoons, due to long periods of standing and subsequent leg pain.  He has missed approximately 40 to 50 hours of work each year.  (Trial Tr. 60:4-17; see, e.g. Ex. 26.)

121.    While Mr. Johnson is serving a life sentence, there is the possibility of release through commutation or a challenge to his conviction.  Prior to his incarceration, Mr. Johnson held jobs working as a file clerk for the Veterans Administration and dishwasher.  If released, Mr. Johnson would have difficulty performing the jobs he had prior to his incarceration due to the physical requirements of those jobs.  (Trial Tr. 61:13-25.)

**Carl Cooper**

122.    Carl Cooper is a prisoner at SCI Graterford.  In May 1999, he slipped and fell when trying to stand for count.  (Trial Tr. 71:9-13.)

123.    Mr. Cooper was taken to sick call where he was prescribed Motrin and Indocet, a muscle relaxer and anti-inflammatory medication.  (Trial Tr. 71:15-16.)

124.    Mr. Cooper's knee was swollen and in great pain, he was unable to extend or bend his leg.  (Trial Tr. 71:16-25.)

125.    After the sick call visit, Mr. Cooper's pain continued, and the swelling in the knee decreased, but would still occasionally swell.  He would go to sick call and would then be offered a muscle relaxant or anti-inflammatory medication.  (Trial Tr. 71:3-6.)

126.    Mr. Cooper submitted at least twelve sick call slips over several years, seeking medical treatment.  During this time his knee was constantly swollen and extremely painful, and would occasionally give out.  He was offered Indocet and ibuprofen.  (Trial Tr. 72:14-18; 74:1-3; see Ex. 30 at 1:  Cooper SCI Graterford medical records (noting chronic right knee pain for three years.))

127.    In October 2001, Mr. Cooper was taken for an MRI.  (See Ex. 30 at 4.)

128.    The MRI revealed that Mr. Cooper's knee had "tears of the right lateral meniscus" and "moderately severe degenerative changes."  (See Ex. 30 at 4.)

129.    On October 28, 2002, surgery was performed on Mr. Cooper's knee.  (See Ex. 29.)

130.    After the surgery, the condition of Mr. Cooper's knee improved, but did not return to a normal knee.  Mr. Cooper continues to feel pain, has limited movement and is unable to run.  (Trial Tr. 77:7-21; see Ex. 30 at 21.)

**Bernard Jackson**

131.    Bernard Jackson is a prisoner at SCI Graterford.  On August 2, 1999, Mr. Jackson's toe was injured when another prisoner dropped a dumb bell on his foot.  (Trial Tr. 81:16-82:1; <u>see</u> Ex. At 10.)

132.    Mr. Jackson received a pass to go to the infirmary, where he received ice for his toe.  (Trial Tr. 82:23-83:24.)

133.    On August 2, 199, an X-ray was conducted on his toe, which revealed that the toe was fractured.  (Trial Tr. 84:4-9; <u>see</u> Ex. 31 at 3: Jackson SCI Graterford medical records.)

134.    Mr. Jackson received an orthopedic shoe, prescribed Motrin, and was given a crutch.  He was advised that he would not receive a cast as the X-ray would be sent to a neurologist.  (Trial Tr. 84:10-21; <u>see</u> Ex. 31 at 6, 10.)

135.    Mr. Jackson was never sent to a neurologist.  (Trial Tr. 84:23.)

136.    Approximately one month later, Mr. Jackson was sent to Dr. Stempler, a contract orthopedic specialist.  (Trial Tr. 84:24-85:3; <u>see</u> Ex. 31 at 1.)

137.    Dr. Stempler informed Mr. Jackson that while the X-ray showed a break, he was unable to provide any treatment for him as too much time had passed, and the toe had already reset itself and the bones had fused together.  (Trial Tr. 85:7-18.)

138.    An X-ray report from May 15, 2000 notes, "Mild deformity of the distal shaft of the proximal phalanx of the right great toe" and that "[t]his fracture also appears to have involved the articular surface and there is mild deformity and early post traumatic osteoarthritis or the inter phalangeal joint of the 1st toe."  (<u>See</u> Ex. 31 at 5.)

139.    Mr. Jackson is now unable to run, requires orthotics for his shoes, and experiences pain in his toe when it is cold.  (Trial Tr. 85:19-25.)

## PROPOSED CONCLUSIONS OF LAW

1.      When a § 1983 plaintiff seeks damages for violations of his constitutional rights, the level of damages is determined according to principles derived from the common law of torts." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 (1986); see also Allah v. Al-Hafeez, 226 F.3d 247, 250 (3d Cir. 2000) ("It is well settled that compensatory damages under § 1983 are governed by general tort-law compensation theory.").

2.      At times, however, common law tort rules of damages may not fully protect the interests of a particular constitutional right, and therefore the rules governing compensation for injuries caused by the deprivation of constitutional rights should then be tailored to the interests protected by the particular right in question.  Carey v. Piphus, 435 U.S. 247, 258, 259 (1978).

3.      Here, Mr. Johnson has a right to receive prompt and adequate medical care pursuant to the Eighth Amendment of the U.S. Constitution.  If necessary medical treatment is delayed for non-medical reasons, such as for cost, a case of deliberate indifference and violation of the Eighth Amendment has been made out.  See Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987).

4.      Compensatory damages may be awarded once the plaintiff shows actual injury despite the fact the monetary value of the injury is difficult to ascertain.  Brooks v. Andolina, 826 F.2d 1266, 1269 (3d Cir. 1987).

5.      Expert evidence is not required to prove emotional distress in § 1983 cases. Bolden v. SEPTA, 21 F.3d 29, 36 (3d Cir. 1994).

6.     Compensatory damages include:

a.   The physical harm to the plaintiff during and after the events at issue, including ill health, physical pain, disability, disfigurement, or discomfort and any physical harm that plaintiff is reasonably certain to experience in the future, and any such physical pain and suffering, disability, and discomfort which plaintiff will, with reasonable certainty, suffer in the future.  See Restatement (Second) of Torts § 905 cmt. b; § 924 cmt. b (1979).

b.   The emotional and mental harm to the plaintiff during and after the events at issue, including fear, humiliation, and mental anguish, and any such emotional and mental harm that the plaintiff is reasonably certain to experience in the future.  See Restatement (Second) of Torts § 905 cmt. c (1979); Memphis Cmty. Sch. Dist., 477 U.S. at 307.

c.   The reasonable value of the medical care and supplies that the plaintiff reasonably needed and actually obtained, and the present value of such care and supplies that the plaintiff is reasonably certain to need in the future.  See Restatement (Second) of Torts § 924(c).

d.   The wages that the plaintiff has lost because of his inability or diminished ability to work, and the present value of wages that he is reasonably certain to lose in the future because of his inability or diminished ability to work.  See Restatement (Second) of Torts § 906(b); 924(c).

7.     As previously discussed above in the "Proposed Findings of Fact," Mr. Johnson is entitled to compensatory damages for the following reasons:  (1) for three months after his injury, Mr. Johnson experienced great pain and limited mobility before he received surgery; (2)

he submitted multiple sick call and/or request slips seeking medical attention; (3) he continues to experience pain in his knee; (4) he has permanent harm to his knee as it does not fully bend, and limits his ability run, play sports and lift large packages; (5) his limited mobility causes him to fear for his safety in prison; (6) he constantly feels stress and embarrassment; and (6) his knee prohibits him from working the maximum number of hours permitted at his job thus resulting in lower pay.

8.     Punitive damages may be assessed in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Smith v. Wade, 461 U.S. 30, 56 (1983).

9.     The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior.  Memphis Cmty. Sch. Dist. at 306 n.9.

10.     In considering the purposes of punishment and deterrence, a factfinder is entitled to consider whether defendant's act posed a risk to health and safety, whether defendant acted in a deliberately deceptive manner, and whether defendant engaged in repeated misconduct.  BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 576 (1996).  Here, defendant's actions was a risk to Mr. Johnson's health and safety, and the delays experienced by Mr. Cooper and Mr. Jackson support a showing that the delays in medical treatment were not isolated incidents but repeated misconduct.

11.     In evaluating the size and process of awarding punitive damages, three factors are considered:  (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and the punitive award; and (3) the

difference between the punitive award and the civil penalties authorized or imposed in comparable cases.  BMW, 517 U.S. at 575.

12.     Mr. Johnson has demonstrated these damages with a preponderance of the evidence.

13.     The district court has discretion to award prejudgment interest in § 1983 cases. See Savarese v. Agriss, 883 F.2d 1194, 1207 (3d Cir. 1989).  This lawsuit was filed in December 2000, and thus Mr. Johnson may be awarded up to seven and a half years of interest.

14.     In Simmons v. State of New York, 824 N.Y.S.2d 770 (N.Y. Ct. Cl. 2006), 2006 NY Slip Op 51614U, the plaintiff similarly alleged that a prison's delay in diagnosing and repairing a torn quadriceps tendon caused plaintiff increased pain and suffering and permanent harm.  In a bench trial, the court awarded a total of $190,000 to plaintiff, i.e. $140,000 for prisoner-plaintiff's past pain and suffering, and $50,000 for plaintiff's future pain and suffering,[1] with interest, for damages.  The award did not include compensation for lost earnings.  2006 NY Slip Op 51614U, at *3 n.3.[2]  Therefore, an amount of $200,000 in compensatory and punitive damages would be a reasonable amount to award to Mr. Johnson.

---

[1] Due to contributory negligence principles, plaintiff's actual award was reduced 50%, to a total of $95,000.  2006 NY Slip OP 51614U, at *11.

[2] See also Williams v. Liefer, 491 F.3d 710, 714, 716 (7th Cir. 2007) (upholding a jury award of $4,500 for six hours of pain and dangerously elevated blood pressure for no good reason due to prison's delay in providing medical treatment for plaintiff's high blood pressure); Hill v. Marshall, 962 F.2d 1209, 12211, 1214, 1215 (6th Cir. 1992) (upholding $95,000 in compensatory damages where plaintiff was deprived of his tuberculosis medication in prison, leading to an increased risk of developing active tuberculosis and mental anguish).

Respectfully submitted,

  /s/Su Ming Yeh
Su Ming Yeh, Attorney I.D. No. 95111
Angus Love, Attorney I.D. No. 22392
Pennsylvania Institutional Law Project
718 Arch Street, Suite 304 South
Philadelphia, PA 19106
T:  215-925-2966
F:  215-925-5337
smyeh@pailp.org

*Counsel for Plaintiff Darren Johnson*

DATE:  June 27, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DARREN JOHNSON,              :
                              :        CIVIL NO: 00-711
             Plaintiff,   :
                              :        Judge Bruce W. Kauffman
      v.                     :
                              :        Filed via ECF
CORRECTIONAL PHYSICIAN  :
SERVICES, Inc.,            :
                              :
            Defendant.   :

**CERTIFICATE OF SERVICE**

       On June 27, 2008, I, Su Ming Yeh, hereby certify that I caused a true and correct copy of this Plaintiff Darren Johnson's Proposed Findings of Fact and Conclusions of Law to be served via First Class Mail, postage pre-paid, to:

     Kenan Umar
     2836 Crest Ter
     Norristown, PA 19403

     Kenan Umar
     2802 Crest Ter
     Norristown, PA 19403

                               /s/Su Ming Yeh
                          Attorney ID:  PA 95111
                          Pennsylvania Institutional Law Project
                          718 Arch Street, Suite 304 South
                          Philadelphia, PA 19106
                          T:  215-925-2966
                          F:  215-925-5337
                          smyeh@pailp.org

DATE:  June 27, 2008