IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARREN JOHNSON : CIVIL ACTION
 
v. :
 
CORRECTIONAL PHYSICIAN :
SERVICES : NO. 00-711

**FILED**
JUL 11 2008
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACOB P. HART                                    DATE: 7/10/08
UNITED STATES MAGISTRATE JUDGE

      Set forth below, after a brief procedural history, are my findings of fact and conclusions of law based on a trial to assess damages only, liability having been found at an earlier stage. For the reasons set forth below, I will enter civil judgment in favor of Johnson for $65,000.00.

I.    Procedural History

      On February 9, 2000, Johnson filed this action against Correctional Physician Services, Inc.; Prison Health Services; Commissioner Martin Horn; Dr. Dennis Moyer, and Dr. Stempler. In it, he seeks recovery for inadequate medical care for a torn patellar tendon, which he suffered while incarcerated at the State Correctional Institution at Graterford. Docket at Entry 1. The case was assigned to the Honorable Bruce W. Kauffman.

      After the appointment of counsel and other motion practice, a third amended complaint was filed on January 24, 2003. Docket at Entry 68. In orders dated August 27, 2003, and January 19, 2005, all defendants except Correctional Physician Services ("CPS") were dismissed. Docket at Entries 84 and 123. Johnson alleged a violation of his Eighth Amendment right to prompt and adequate medical care, under 42 U.S.C. § 1983.

Shortly before trial was scheduled to take place, counsel for CPS moved to withdraw on the basis that CPS was no longer in operation and had no funds to pay him. Docket at 155. Judge Kauffman granted this motion, and gave CPS thirty days to obtain substitute counsel. Docket at 160. CPS did not obtain substitute counsel, and Johnson moved for a default judgment against it. Docket at 161. Judge Kauffman entered default judgment against CPS on March 31, 2008. Docket at 165. On April 11, 2008, Judge Kauffman referred this case to the undersigned, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. Pr. 73, for the determination of damages. Docket at 167.

On April 30, 2008, I entered an order scheduling a bench trial on the subject of Johnson's damages for May 28, 2008. Docket at 170. Copies of this order were served upon Kenan Umar and Emory Umar, CPS principles. See Trial Transcript ("Transcript") at 3. On May 28, 2008, however, only Johnson appeared for trial. I therefore proceeded to hear his damages testimony.

II.   Findings of Fact

A.   The Medical Treatment Johnson Received

On June 9, 1999, Darren Johnson was a prisoner at SCI Graterford, serving a life term. Testimony of Darren Johnson, Transcript at 15, 61. On that day, he injured his right knee while playing volleyball. Transcript at 15-16. He was taken by wheelchair to the dispensary, where he was given an ice pack, an Ace bandage, and crutches. Transcript at 16. He was also told by the nurse to "sign up for a sick call." Id. (In order to meet with a doctor, a prisoner is required to put a request slip in the box for a "sick call," so that he will be summoned the next day. Id. ).

Johnson submitted a sick call request slip on June 10, 1999, and was seen by a Dr. Kaneria on June 11, 2008. Id. Dr. Kaneria ordered an x-ray, which was taken that afternoon. Id. The doctor also gave Johnson Motrin. Transcript at 17.

Johnson was not told what the x-ray showed. Id. The x-ray report was, however, disclosed in litigation. Transcript at 21. It read:

> RT. KNEE – The patella [knee cap] is in high position suggesting the possibility of compromise of the patellar ligament. There also appears to be a small joint diffusion. Mild degenerative changes are noted. No fracture is present. There is also calcification at the attachment of the patellar ligament.

Johnson's Exhibit 9. The report bears a signature by Peter J. Baddick, D.O., Medical Director for CPS, dated June 16, 1999, and is stamped "Received" by Graterford on June 18, 1999. Id. and Transcript at 22.

On June 14, 1999, Johnson submitted another slip for a sick call. Id. His leg was still swollen and painful, and it could not be bent, because his knee-cap was pushed out of place, up into his thigh. Id. On June 15, 1999, he saw a Dr. Morgan, who signed him up for a knee tap that afternoon. Transcript at 18. The knee tap involved Dr. Morgan sticking a needle into Johnson's unanesthetized knee, and extracting fluid. Transcript at 19. Johnson found this very painful. Id. The extracted fluid was "purple" or "reddish." Id. Dr. Morgan told Johnson that he had a raised patella. Id. This means that the kneecap was much higher up toward the thigh than is normal. Testimony of Dr. Mandel, Transcript of Video Deposition of May 21, 2008 ("Dr. Mandel") at 28.

Johnson received a second knee tap on June 22, 1999, after submitting another sick call request. Transcript at 20. This time, "yellowish" fluid was withdrawn. Id.

Johnson's knee remained "very painful" and "completely stiff." Transcript at 22-23. He requested another sick call, which was delayed by disruption in the prison, but which took place on July 2, 1999. Transcript at 23-24. Dr. Kaneria told Johnson that he would sign him up for an

appointment in the orthopedic section. Record at 24. A consultation record submitted by Johnson as an exhibit shows that Dr. Kaneria indeed requested an "ortho consult" that day, describing "persistent knee pain" and "high patella alta" with no response to pain medication. Johnson's Exhibit 10. However, Dr. Baddick denied the request on July 6, 1999, writing: "Please identify objective/diagnostic data pertaining to this complaint. This would help with ortho visit." Id.

On July 3, 1999, Johnson submitted an Inmate's Request to Staff Member slip addressed to Dr. Baddick. Johnson's Exhibit 11. He wrote:

> I have injured my knee on June 9, 1999 and went through 2 knee taps and given Motrin and an ace bandage through this duration of over 30 days. I have been scheduled to see Ortho. but haven't heard anything. Can you explain to me what's wrong with my knee? And, do I need surgery?

Id.

On July 9, 1999, Johnson received a pass to go the secretary's office in the Medical Department, to pick up a knee brace which had been ordered for him. Transcript at 27. While attempting to fit the knee brace on Johnson's leg, (it turned out to be the wrong knee brace), the Medical Office administrator commented to Johnson that his knee did not look right. Transcript on 28. She called Dr. Baddick. Transcript at 28-30. Dr. Baddick took Johnson to an exam room, and performed a third knee tap. Transcript at 30. According to Johnson, "Dr. Baddick told me that he had requested for me to have an orthopedic consult three times, but it was denied." Id. It was not clear, however, whether it was CPS or the jail which had denied Dr. Baddick's requests. Id.

4

A consultation record dated July 9, 1999, shows that Dr. Baddick did, indeed, refer Johnson to Dr. Stempler, a CPS orthopedic specialist. Johnson's Exhibit 15. Johnson saw Dr. Stempler on July 15. Transcript at 32-33. According to Johnson, Dr. Stempler said: "There's nothing wrong with your knee. Just do leg exercises." Transcript at 33. Nevertheless, Johnson was taken for an MRI on July 16, 1999. Transcript at 34.

Johnson was not told what the results were of the MRI. Transcript at 34. The report, however, reads, in part:

> CONCLUSION: MRI of the right knee shows a complete tear of patellar tendon at the apex of the patella with retraction and there is evidence of a contusion of the tendon as well. Patella shows some superior subluxation but there is no fracture and quadriceps tendon is intact. There is a large amount of joint effusion and subcutaneous edema in front and sides of the knee.

Johnson's Exhibit 16. The report is stamped as having been received at Graterford on July 19, 1999. Id.

On July 27, 1999, Johnson was taken to Suburban General Hospital to meet with Dr. Richard Mandel. Transcript at 35. Dr. Mandel is an orthopedic surgeon. Dr. Mandel at 6. Upon examination, Dr. Mandel found that Johnson had a "little bit" of fluid in his right knee. Dr. Mandel at 28. He also had a marked "patella alta." Id. Dr. Mandel diagnosed Johnson as having a ruptured patellar tendon. Dr. Mandel at 29.

> Dr. Mandel recalled:
>
> I think I told him that he needed to have an operation, that the patellar tendon needed to be fixed if he was going to have any hope of walking normally on that leg. But that since seven weeks had already elapsed from the time of the injury, I couldn't promise him or guarantee him that he was going to have a perfect outcome.

Dr. Mandel at 39.

5

Testifying as a medical expert, Dr. Mandel explained at his videotaped deposition that an orthopedist generally tries to repair a torn patellar tendon within a month of the injury, because after that, the muscle begins to atrophy, and scar tissue forms around the area where the tendon has torn. Dr Mandel at 20-21. At that point, repair is more difficult, and surgery may not restore full range of motion and strength in the leg. Dr. Mandel at 21-23. For that reason, Dr. Mandel wanted to operate on Johnson's knee the day of their first appointment. Dr. Mandel at 30. His office contacted SCI Graterford, but he did not receive approval to operate immediately. Dr Mandel at 31-32, 40-41; Testimony of Darren Johnson, Transcript at 36.

>This interchange took place at trial:
>
>THE COURT: Ms. Yeh, do you know who it was that didn't approve the surgery?
>
>MS. YEH (Counsel for Johnson): That we do not know for sure.
>
>THE COURT: So you don't know whether it was someone employed by the defendant or someone employed by the prison?
>
>MS. YEH: Mm-hmm. It's our understanding that it's most likely someone employed by the defendant.
>
>THE COURT: I would assume, since it's medical.
>
>...
>
>MS. YEH: Just as a note, in the chart he approval is noted in – eventually it was approved, and, you know, we'll go through that – but it's noted in the medical reports, so that's why we –
>
>THE COURT: So when it was finally approved, it was approved by someone in that –
>
>MS. YEH: In the medical department.

Transcript at 36-37.

Indeed, Johnson's prison medical records include an entry on August 13, 1999, reading: "O: Approved for surgical provider for repair of torn patellar tendon." Johnson's Exhibit 8 at numbered page 5.

On September 9, 1999, Johnson was taken to the hospital for pre-operative procedures. Transcript at 38. He was told at that time that he would receive surgery on his knee on September 17, 1999, over three months after his injury. Id. The surgery took place as scheduled, with no complications. Johnson's Exhibit 3. The medical note includes the observation that, because it was a longstanding injury, "no guarantees or assurances could be made regarding regaining of quadriceps strength or preserving range of motion of the knee." Id.

B.   Johnson's Symptoms and the Current Condition of Johnson's Knee

In the days right after Johnson's injury, his leg was swollen and painful. Transcript at 17. He couldn't flex his knee. Transcript at 18. These symptoms continued despite his knee taps. Transcript 19, 20. Around the time of Johnson's second knee tap, his leg was very painful. Transcript at 22. The injury had begun to heal abnormally, so that the leg was completely stiff. Transcript at 22-23. Johnson was not able to walk around comfortably. Transcript at 23. He was not able to attend all meals, because the cafeteria was three flights of stairs away – at times, other inmates brought him food. Id. The leg remained very painful and stiff into July, and Johnson's walking remained limited. Transcript at 33-34.

By September, Johnson's knee was "permanently stiff". Transcript at 38. Johnson was not able to walk much, and had to climb steps one at a time using his left foot only, rather than using his feet alternately. Transcript at 38-39.

Johnson testified that at the time of trial, almost eight years post-surgery, his knee does not bend or straighten completely, and still causes him pain and tingling, particularly in damp weather. Transcript at 40, 44. Ordinarily the knee is numb. Transcript at 45. Climbing and descending stairs is still difficult. Id. Johnson stated that he takes over-the-counter ibuprofen two or three times per week. Id.

Johnson testified that he used to participate in sports, and was no longer able to do so. Transcript at 46-47. He also "stays away from a lot of guys" in prison, spending free time in his cell because he feels vulnerable. Transcript at 47-50. He sleeping is troubled by his leg, and it impairs his ability to use the lavatory. Transcript at 51. He also said that his troubles with his leg have caused him stress and depression, and that he feels embarrassed in front of his family when they visit. Transcript at 50-51.

Further, Johnson testified that, in 1994, he tore the patellar tendon in his left knee. Transcript at 42. It was repaired surgically the day after the injury, and is now "perfect, excellent" with a full range of motion. Transcript at 43-44.

C.  Lost Wages

Johnson works six hours a day, five days a week, in a shoe factory at SCI Graterford. Transcript at 52. He would prefer to work eight hours a day, but he is not able to do so because of his inability to stand for long periods. Transcript at 52 and 60. If he were able to work eight hours each day, he would make approximately $7.00 more per week than he makes now. Transcript at 53.

In addition, leg pain sometimes prevents Johnson from making the highest possible bonus, which is based on productivity and attendance. Transcript at 52, 56-58. Approximately

three days in a week Johnson goes to work despite leg pain, because he fears being disciplined for missing work. Transcript at 59. Nevertheless, Johnson estimates that he has missed 40-50 hours of work a year since 1999 because of leg pain, particularly in the afternoons because of his need to limit standing. Transcript at 60.

Further, before Johnson was incarcerated, he worked as a file clerk and as a dishwasher. Transcript at 62. If his life sentence were to be commuted, Johnson could probably not perform either of those jobs because they both require a lot of standing. Transcript at 62-63. Johnson estimated that there was a 50/50 chance that his sentence would be commuted after he served 20 years – thus, six years after the date of trial. Transcript at 62-63.

D.  Dr. Mandel's Expert Testimony

As mentioned above, Dr. Mandel offered expert testimony as well as fact testimony at his videotaped deposition. I have reviewed his qualifications, as set forth in his C.V., and in the transcript of his deposition, and grant Johnson's motion to qualify him as an expert witness. See Transcript at 7-9, and Johnson's Exhibit 1.

Dr. Mandel explained that the patellar tendon is one of the largest tendons in the body. Dr. Mandel at 19. It attaches the kneecap to the shinbone. Id. The patellar tendon handles the force generated by the quadriceps muscles which are the large muscles in the front of the thigh that straighten the leg. Dr. Mandel at 19-20. If a person's patellar tendon is torn, he cannot straighten his knee. Dr. Mandel at 20. A torn patellar tendon is also "pretty painful." Id.

Dr. Mandel testified that when a doctor first meets with a patient with a sports-related knee injury, the doctor should ask the patient to describe what happened, and then physically examine the knee. Dr. Mandel at 9. The doctor will then order an x-ray if he thinks there has

9

been "any sort of significant injury", and in some situations, will also order an MRI "as an additional study to look at other structures within the knee such as the ligaments and the menisci." Dr. Mandel at 10.

Dr. Mandel recommended that an x-ray be taken within a week of any knee injury "if we can see abnormalities such as swelling, bruising ... and if the patient is having significant pain or difficulty walking." Dr. Mandel at 12-13. If an injured knee is "markedly swollen, full of blood", or where there is a great deal of swelling, pain or instability, or if a patient can't walk, and where the x-ray is negative for fractures, Dr. Mandel would order an MRI right away. Dr. Mandel at 11, 14.

According to Dr. Mandel, the significance of finding blood in the knee is that:

> [A]ny type of injury that is significant enough to tear blood vessels will obviously cause bleeding within the knee joint. So these – this would typically be a torn ligament within the knee such as an anterior cruciate ligament or a posterior cruciate ligament. Also any fracture that occurs and extends into the joint itself will also cause bleeding within the joint, will case the joint to fill up with blood. A tear of a tendon in the joint such as the patellar tendon or the quadriceps tendon will also cause the joint to fill up with blood.

Dr. Mandel at 15.

"Patella alta", i.e., a high-riding kneecap, can signify a torn or ruptured patellar tendon, since the patellar tendon anchors the kneecap in its normal position. Dr. Mandel at 18. Therefore, if an x-ray reveals patella alta, a doctor should then determine whether the patellar tendon is ruptured. Id. A general practitioner should either order an MRI of the knee, or make an immediate referral to an orthopedist. Dr. Mandel at 18-19.

The only effective treatment for a torn patellar tendon is surgery. Dr. Mandel at 20. A knee tap relieves some of the pressure on the knee, but it has no value in terms of treating a torn

10

tendon. Dr. Mandel at 17. As alluded to above, the surgery should be performed within a month of the injury, before the muscle atrophies, or scar tissue begins to form. Dr. Mandel at 20-21.

If surgery is performed within one month, 80-85% of patients "make an excellent recovery," with "a full range of motion and normal strength and [no] pain." Dr. Mandel at 21-22, 46. If the tendon is not repaired within a month, the surgery becomes more complicated, and the outcome more uncertain, with a chance of remaining weakness in the quadriceps, and/or some stiffness and loss of motion. Dr. Mandel at 21.

Prison medical records from 2006 show that Johnson's right knee was not normal, and had "relatively no extension". Dr. Mandel at 43; Johnson's Exhibit 5. According to Dr. Mandel, the delay in Johnson's treatment was related to the continuing abnormality in his knee. Dr. Mandel at 45. The two-month delay in scheduling Johnson's surgery after the torn patellar tendon was diagnosed might have contributed to this. Dr. Mandel at 41. It would be common for a person whose patellar tendon repair was delayed three months to have a limp, lack full flexing and extension in his leg, and to be unable to run. Dr. Mandel at 52.

In Dr. Mandel's opinion, it would have been reasonable for CPS to have referred Johnson to an orthopedist by June 15, 1999, when bloody fluid was extracted from his knee. Dr. Mandel at 57. The results of Johnson's x-ray, seen by Dr. Baddick on June 16, 1999, should have triggered a referral to a specialist, since a number of factors were pointing to an injury to the patellar tendon. Dr. Mandel at 59. An orthopedic consult at that time "would have been the expected thing to do if the person was not in prison." Dr. Mandel at 61.

In the absence of any contradiction or apparent basis for disagreement, I adopt Dr. Mandel's testimony, as set forth above, as findings of fact.

11

E.  Other Witnesses: Carl Cooper and Bernard Jackson

1.  Carl Cooper

Carl Cooper is another prisoner at SCI Graterford. In May, 1999, Cooper slipped and fell, injuring his right knee. Testimony of Carl Cooper, Transcript at 71. He went to sick call, where he was prescribed an anti-inflammatory drug, and a muscle relaxant. Id. At that time, his knee was extremely swollen and painful, and he could not fully flex or extend his leg. Id.

Over time, the swelling in Cooper's knee was reduced, but the knee remained painful. Transcript at 72. The knee swelled again occasionally, and at those times, Cooper would submit a sick call request, and go to sick call, where he was given anti-inflammatory medication or a muscle relaxant. Id. Over the course of a two to three year period he submitted perhaps 12 or 14 sick call slips related to his knee, as well as five or six request slips addressed to the medical department. Transcript at 72, 74.

In October, 2001, Dr. Stempler, the contract orthopedist, ordered an MRI of Cooper's knee. Johnson's Exhibit 30 at page 4. His right lateral meniscus was found to be torn in several places, and to have undergone "moderately severe" degenerative changes. Id. at page 5. On October 28, 2002, surgery was performed on Cooper's right knee to correct "degenerative joint disease with complex tear of lateral meniscus." Johnson's Exhibit 29. Post-surgery, Cooper continues to have pain in his knee, if it is overused or if it moves the wrong way. Transcript at 77.

2. <u>Bernard Jackson</u>

Bernard Jackson, as well, is a prisoner at SCI Graterford. Testimony of Bernard Jackson, Transcript at 81. His big toe was injured on August 2, 1999, when another inmate dropped a dumbbell on his right foot. Transcript at 81-82. An x-ray taken the same day showed that the toe was fractured. Johnson's Exhibit 31 at page 3. The x-ray report was seen by "Emre Beken M.D., CPS Physician." <u>Id</u>. It appears to have been received at SCI Graterford on August 11, 1999. On the same day, Dr. Beken referred Jackson to Dr. Stempler for an orthopedic consult, but his appointment did not take place until August 26, 1999. Exhibit 31 at 1.

Dr. Stempler told Jackson that there was a complete break, but that there was nothing he could do for him since "they waited too late for me to see you." Transcript at 85. The toe did not heal perfectly. A May 31, 2000, x-ray shows:

> Radiographs of the right foot are correlated with prior studies. Mild deformity of the distal shaft of the proximal phalanx of the right great toe is again noted related to a previous healed fracture. There is slight angulation and impaction of the healed fracture. This fracture also appears to have involved the articular surface and there is mild deformity and early post-traumatic osteoarthritis on the inter-phalangeal joint of the 1st toe.

Exhibit 31 at 5. Jackson now experiences pain and a "frostbit" feeling in his toe. Transcript at 86. He is unable to run. Transcript at 85.

III. <u>Conclusions of Law</u>

As mentioned, a finding of liability has already been made. The following are my conclusions of law as to damages.

1. The imperfect results of the surgery to correct the torn patellar tendon on Johnson's left knee was, at least in part, a result of treatment delays caused by CPS. The delay between

Johnson's appointment with Dr. Mandel and his surgery may, however, have been a matter of prison logistics, not caused by CPS. Nevertheless, to compensate Johnson for the physical pain and suffering, as well as the mental pain and suffering, and permanent loss of function caused by CPS, I award Johnson $60,000.00.

  2. To compensate Johnson for his lost wages and loss of earning power, I award Johnson an additional $5,000.00.

  3. In cases, such as this, where jurisdiction relies on a federal question, an award of prejudgment interest is committed to the discretion of the district court. Savarese v. Agriss, 883 F.3d 1194, 1207 (3d Cir. 1989). An award of prejudgment interest is not warranted here because it is not necessary to make Johnson whole. See Rosen v. Rucker, 095 F.2d 702, 705 (3d Cir. 1990).

  4. Despite the evidence offered of repeated misconduct by CPS, an award of punitive damages is inappropriate here, due to CPS's apparent inability to pay, and to the lack of a deterrent effect in punishing an entity which no longer exists.

  In accordance with the above, I will enter a Civil Judgment in favor of Darren Johnson and against CPS in the amount of $65,000.00.

            BY THE COURT:

            _____
            JACOB P. HART
            UNITED STATES MAGISTRATE JUDGE